# EXHIBIT A

FITZGERALD KNAIER LLP
    Kenneth M. Fitzgerald (SBN: 142505)
    Robert G. Knaier (SBN: 234466)
    Keith M. Cochran (SBN: 254346)
402 West Broadway, Suite 1400
San Diego, CA 92101
Tel:  (619) 241-4810
Fax:  (619) 955-5318

Attorneys for Plaintiff
UC Poway Post Holder, LLC

**ELECTRONICALLY FILED**
Superior Court of California,
County of San Diego

**09/08/2021** at 11:48:00 AM

Clerk of the Superior Court
By Kristin Sorianosos,Deputy Clerk

## SUPERIOR COURT OF CALIFORNIA

## COUNTY OF SAN DIEGO

| | |
|---|---|
| UC POWAY POST HOLDER, LLC, a Delaware limited liability company, <br><br>                Plaintiff, <br><br>     v. <br><br> POWAY PROPERTY, LP, a Delaware limited partnership, DAVID HALL, an individual, TRENT CLAUGHTON, an individual, MARCO DEDOMINICIS, an individual, and DENNY CHOW, an individual, and Does 1 through 25, inclusive, <br><br>                Defendants. | Case No.:37-2021-00036903-CU-BC-CTL <br><br> **Declaration of D. Ross Pemmerl in Support of Plaintiff UC Poway Post Holder, LLC's *Ex Parte* Application for Appointment of Receiver** <br><br> Date:       September 9, 2021 <br> Time:      8:30 a.m. <br> Dept.:      C-72 <br> Judge:     Hon. Timothy Taylor <br><br> Case Filed:  August 27, 2021 |

**EXHIBIT A**
**Page 3**

*UC Poway Post Holder, LLC v. Poway Property, LP, et al.*
Pemmerl Declaration iso *Ex Parte* Application for Appointment of Receiver

**EXHIBIT A**
**Page 4**

I, D. Ross Pemmerl, declare as follows:

1.  I am over the age of eighteen. I have personal knowledge of the facts set forth herein and, if called upon to do so, could and would testify competently thereto.

2.  I am the Chief Credit Officer of UC Funds. UC Funds is a national real estate investment fund, offering debt, mezzanine, and equity financing for commercial real estate. Since its inception in 2010, UC Funds has deployed over $2.5 billion in the commercial real estate space throughout the country. Plaintiff UC Poway Post Holder, LLC ("Plaintiff") is a related entity of UC Funds.

3.  I earned a BA in Economics from Wesleyan University. I have over 12 years of commercial real estate finance experience. Over the past ten years with UC Funds, I have underwritten, structured, and closed over $1.2 billion in transaction volume.

4.  Plaintiff UC Poway Post Holder, LLC is a Delaware limited liability company that was formed on or around October 20, 2020 for the purpose of providing financing for the construction of a mixed-use project known as the "Poway Outpost," located at 13247 Poway Road, Poway, California 92064. The Poway Outpost was zoned for 53 residential units and approximately 40,000 square feet of commercial space.

5.  On October 22, 2020, defendant Poway Property, LP ("Defendant") entered into a loan agreement (the "Loan Agreement") to borrow $21,100,000 from UC Funding, LLC, an entity related to UC Funds. The funds were to be used to complete the Poway Outpost. Attached as Exhibit 1 is a true and correct copy of the loan agreement.

6.  The Loan Agreement provided, among other things, that: (a) that Defendant's failure to make any interest payment was an event of default under Section 3.01(a); (b) that the lender was entitled to accelerate the maturity of the loan upon any default under Section 4.01(a); and (c) the lender was entitled to seek appointment of a Receiver after instituting a judicial foreclosure under Section 4.01(d).

1

**EXHIBIT A**
**Page 4**

*UC Poway Post Holder, LLC v. Poway Property, LP, et al.*
Pemmerl Declaration iso *Ex Parte* Application for Appointment of Receiver

7. Also on October 22, 2020, Defendant executed a Promissory Note in favor of the lender, promising to repay the $21,100,000 plus interest. Attached as Exhibit 2 is a true and correct copy of the Promissory Note.

8. The Promissory Note was secured by, among other things, a Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing ("Deed of Trust"). The Deed of Trust named the lender as the beneficiary, granting the lender a security interest in the property. Attached as Exhibit 3 is a true and correct copy of the Deed of Trust.

9. Also on October 22, 2020, defendants David Hall, Tent Claughton, Marco DeDominicis, and Denny Chow (collectively, "the Guarantors") each entered into guarantees (collectively, "the Guarantees"), under which they assumed liability for certain of Defendant's obligations under the Loan Agreement and Promissory Note. Attached as Exhibit 4 is a true and correct copy of the Indemnity and Guaranty Agreement. The Guarantors also guaranteed Defendant's performance of the property's development and payment of associated costs. Attached as Exhibit 5 is a true and correct copy of the Completion Indemnity and Guaranty Agreement. The Guarantors also agreed to indemnify against hazardous substance perils at the property. Attached as Exhibit 6 is a true and correct copy of the Hazardous Substance Indemnity Agreement.

10. Also on October 22, 2020, the lender assigned to Plaintiff the right to payment under the Promissory Note, all of its rights under the Loan Agreement, and all of its rights under the Deed of Trust. Attached as Exhibit 7 is a true and correct copy of the assignment.

11. Shortly after closing the loan, in December 2020, Defendant requested an additional $2 million from Plaintiff to complete the project. In a December 22, 2020 email, Denny Chow, on behalf of Defendant, sent Plaintiff an email, disclosing significant dewatering problems. Mr. Chow blamed the dewatering contractor for improperly designing and installing the dewatering system. Mr. Chow admitted that the dewatering problems were causing considerable delays and increased costs. Attached as

2

EXHIBIT A
Page 5

*UC Poway Post Holder, LLC v. Poway Property, LP, et al.*
Pemmerl Declaration iso *Ex Parte* Application for Appointment of Receiver

1   Exhibit 8 is a true and correct copy of Mr. Chow's December 22, 2020 email.

2   12.   In January 2021, Mr. Chow, on behalf of Defendant, emailed Plaintiff

3   requesting an additional $4.2 million to address the dewatering issues.  Attached as

4   Exhibit 9 is a true and correct copy of Mr. Chow's January 28, 2021 email.

5   13.   Plaintiff did not agree to Defendant's request for an additional $2 million

6   in December 2020 or Defendant's request for an additional $4.2 million in January

7   2021.

8   14.   On February 1, 2021, Defendant failed to make a $104,474.31 interest

9   payment under the loan documents.  In failing to do so, Defendant breached the

10   Promissory Note, was in default under the loan documents, and the balance of the loan

11   became due and payable.  As of the date of this declaration, Defendant has not cured the

12   default or made any of the subsequent interest payments it was required to make under

13   the loan documents.

14   15.   On or around March 9, 2021, I learned that Defendant terminated the

15   general contractor KD Stahl and closed down the property.  I conducted a site visit of

16   the property on March 11, 2021 and confirmed that there was no construction crew on

17   site and that the project appeared to be abandoned.

18   16.   Previously, in October 2020, Defendant and the developer Capexco US

19   GP, Inc. took out an insurance policy on the Poway Outpost.  Named as an additional

20   insured under that policy was the lender.  In late August 2021, Plaintiff learned that

21   Defendant and Capexco US GP, Inc. let the insurance policy lapse.  This is a deep

22   concern.

23   17.   It is my understanding that construction on the Poway Outpost has been

24   halted, there is no construction staff or crew on site, the property is locked off, and there

25   are no plans to resume construction or remediate any of the significant dewatering

26   issues threatening the site.  And Defendant has been unresponsive to Plaintiff's requests

27   for information.  Accordingly, Plaintiff is concerned about the significant dewatering

28   issues and the potentially dangerous condition of the property as the rainy season in San

3

*UC Poway Post Holder, LLC v. Poway Property, LP, et al.*
Pemmerl Declaration iso *Ex Parte* Application for Appointment of Receiver

1  Diego approaches.

2        I declare under penalty of perjury under the laws of the State of California that

3  the foregoing is true and correct.  Executed September 7, 2021 in Denver, Colorado.

4

5

6

7

8                                       D. Ross Pemmerl

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

**EXHIBIT A**
**Page 7**          *UC Poway Post Holder, LLC v. Poway Property, LP, et al.*
Pemmerl Declaration iso *Ex Parte* Application for Appointment of Receiver

# EXHIBIT 1

**POWAY PROPERTY LP
(BORROWER)**

and

**UC FUNDING, LLC
(LENDER)**

**LOAN AGREEMENT**

Dated:  As of October 22, 2020

Poway Outpost
Loan Number: 62041

NY 00058782 v5

## LOAN AGREEMENT

**THIS LOAN AGREEMENT** (this "**Agreement**") is made as of October 22, 2020, between **POWAY PROPERTY LP**, a Delaware limited partnership, authorized to transact business in the State of California ("**Borrower**") having an address at 13772 Paseo Valle Alto, Poway, California 92064, and **UC FUNDING, LLC**, a Delaware limited liability company (together with its successors and assigns, "**Lender**") having an address c/o UC Credit Services LLC, 745 Boylston Street, Suite 502, Boston, Massachusetts 02116, Attention: Loan Servicing.

## RECITALS

A.     Lender has extended a loan to Borrower in the original principal amount of TWENTY-ONE MILLION ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($21,100,000.00) (the "**Loan**").

B.     The Loan is evidenced by (i) this Agreement and (ii) a Promissory Note of even date herewith, executed by Borrower and payable to the order of Lender (the "**Note**") in the amount of the Loan, which Note is secured by, among other things, a Deed of Trust, Assignment of Leases and Rents, Security Agreement, and Fixture Filing dated of even date herewith (the "**Security Instrument**"), from Borrower to Lender, encumbering that certain real property described on Exhibit A attached hereto, together with all buildings and other improvements now or hereafter located thereon (collectively, the "**Property**").  This Agreement, the Note, the Security Instrument and all other documents and instruments evidencing and/or securing the Loan, as the same may from time to time be amended, consolidated, renewed or replaced, are collectively referred to herein as the "**Loan Documents**".

C.     In consideration of the Loan and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, Borrower and Lender agree as follows:

## ARTICLE I
## DEFINITIONS AND CONDITIONS PRECEDENT

1.01.   Definitions.  The following words and phrases shall have the meaning specified below:

"**Access Laws**" shall have the meaning specified in Section 2.18(c).

"**Affiliate**" shall mean, as to any Person, any other Person that, directly or indirectly, owns more than forty percent (40%) of, is in control of, is controlled by or is under common ownership or control with such Person or is a director or officer of such Person or of an Affiliate of such Person.  As used in this definition, the term "control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise.

"**Agreement**" shall have the meaning specified in the recitals to this Agreement.

"**Applicable Interest Rate**" shall have the meaning specified in the Note.

"**Borrower**" shall have the meaning specified in the preamble to this Agreement.

"**Cash Collateral Account**" shall have the meaning specified in Section 6.01(c).

"**Cash Flow Reserves**" shall mean, together, the Impound Reserve and the Replacement Reserve.

"**Clearing Account**" shall have the meaning specified in Section 6.01(a) hereof.

"**Clearing Bank**" shall mean an Eligible Bank selected by Borrower and approved by Lender or any successor Eligible Bank approved or appointed by Lender acting as Clearing Bank under the Control Agreement.

"**Closing Date**" shall mean the date on which Lender first funds the Loan.

"**Collection Period**" shall mean, with respect to any Payment Date, the period of days from the eleventh (11th) day of the month immediately preceding the Payment Date to the tenth (10th) day of the month in which such Payment Date occurs. With respect to the first Payment Date, the Collection Period shall commence on and include the date hereof and end on and include the tenth (10th) day of the calendar month of such first Payment Date.

"**Completion Date**" shall have the meaning specified in Section 2.27(c).

"**Construction Contract**" shall mean any contract executed or to be executed by Borrower, other than the General Contract, relating to work performed or to be performed, or materials supplied or to be supplied, in connection with the construction of the Renovations.

"**Construction Contractor**" shall mean any contractor who is a party to a Construction Contract.

"**Construction Costs**" shall mean any costs of construction related to the construction of the Renovations or Replacements.

"**Construction Disbursement**" shall mean the disbursement of funds from any of the Reserves for payment of Construction Costs.

"**Contingency Funds**" shall have the meaning specified in Section 2.27(m).

"**Control Agreement**" shall have the meaning specified Section 6.01(a) hereof.

"**CSCDA**" means the California Statewide Communities Development Authority.

"**Default Interest Rate**" shall have the meaning specified in the Note.

"**Deferred Fees**" shall mean the permitting fees in the amount of $1,274,430.87 being deferred by the City of Poway until completion of the Renovations and the payment of which are a condition to the City of Poway issuing a certificate of occupancy for the Renovations.

"**Deferred Fees Reserve**" shall have the meaning specified in Section 2.05(f).

NY 00058782 v5

2

"**Deferred Fees Reserve Deposit Default**" shall have the meaning specified in Section 2.05(f).

"**Deposit Bank**" shall mean the bank or banks selected by Lender to maintain the Cash Collateral Account.

"**Disbursement Request**" shall mean a written request from Borrower, in the form then used by Lender, requesting a Construction Disbursement from the Renovation Reserve or the Replacement Reserve and including the affidavits, certificates and contractor's statements tendered in support of such Construction Disbursement.

"**Disclosure Document**" shall have the meaning specified in Section 7.23(b).

"**Eligible Account**" shall mean either (i) an account or accounts maintained with an Eligible Bank, or (ii) a Trust Account.  Eligible Accounts may bear interest.

"**Eligible Bank**" shall mean a bank that (i) satisfies the Rating Criteria, and (ii) insures deposits held by such bank through the Federal Deposit Insurance Corporation.

"**Environmental Laws**" shall have the meaning specified in Section 2.22(a).

"**EPA Mold Guidelines**" shall mean the guidelines set forth in "Mold Remediation in Schools and Commercial Buildings" prepared by the U.S. Environmental Protection Agency.

"**ERISA**" shall have the meaning specified in Section 2.01(o).

"**Event of Default**" shall have the meaning specified in Section 3.01.

"**Exchange Act**" shall have the meaning specified in Section 7.23(b).

"**Exchange Act Filing**" shall have the meaning specified in Section 7.23(b).

"**Exit Fee**" shall have the meaning specified in the Note.

"**Force Majeure**" shall mean strikes, lock-outs, war, civil disturbance, natural disaster, acts of terrorism or, acts of God, endemics, pandemics, governmental regulation of the sale of materials, workers and supplies or the transportation thereof, shortages of material or labor resulting directly from general market shortages, governmental control, restriction or diversion, delays in governmental authorities conducting inspections, issuing licenses or permits or requiring additional approvals or imposing additional restrictions, including restrictions based on general public health and safety concerns, all of which are not reasonably foreseeable based on laws in existence as of the date hereof and other causes beyond Borrower's reasonable control, other than shortage of funds, which cause a delay in Borrower's performance of an obligation related to construction of the Renovations.

"**Full Replacement Cost**" shall mean actual replacement value (exclusive of costs of excavations, foundations, underground utilities and footings) with a waiver of depreciation, but in no event less than the outstanding principal balance of the Note.

NY 00058782 v5

3

"**General Contract**" shall mean a guaranteed maximum price general construction contract between Borrower and General Contractor for the construction of the Renovations including, without limitation, the related budget contained therein.

"**General Contractor**" shall mean K.D. Stahl Construction Group, Inc., a California corporation, or another general contractor who (i) is selected by Borrower to perform the Renovations, and (ii) maintains insurance and is otherwise acceptable to Lender in its sole discretion.

"**Governmental Approvals**" shall mean any authorization, consent, or approval of, or any certificate of occupancy, license, permit, or certification issued by, or any exemption of, registration or filing with, or report or notice to, any Governmental Authority.

"**Governmental Authority**" shall mean any court, board, agency, commission, office or authority of any nature whatsoever or any governmental unit (federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"**Guarantor**" shall mean David Hall, Trent Claughton, Marco DeDeominicis, and Denny Chow, each an individual, individually and together, as the context may require.

"**Hazardous Substances**" shall have the meaning specified in Section 2.22(a).

"**Impound Reserve**" shall have the meaning specified in Section 2.04.

"**Inspecting Engineer**" shall mean an inspecting architect, engineer or other consultant commissioned or approved by Lender.

"**Interest**" shall have the meaning specified in Section 7.20.

"**Interest Reserve**" shall have the meaning specified in Section 2.05(d).

"**Investor**" shall have the meaning specified in Section 7.23(a)(i).

"**Issuer**" shall have the meaning specified in Section 7.23(c)(i).

"**Leases**" shall mean any and all leases, subleases, licenses, rental agreements and occupancy agreements of whatever form now or hereafter affecting all or any part of the Property and any and all guarantees, extensions, renewals, replacements and modifications thereof.

"**Lender**" shall have the meaning specified in the preamble to this Agreement.

"**Lender Group**" shall have the meaning specified in Section 7.23(c)(i).

"**Liabilities**" shall have the meaning specified in Section 7.23(c)(i).

"**Loan**" shall have the meaning specified in the recitals to this Agreement.

"**Loan Documents**" shall have the meaning specified in the recitals to this Agreement.

"**Material Action**" means to (i) dissolve, merge, liquidate or consolidate; (ii) except as permitted herein, sell all or substantially all of its assets; (iii) engage in any business activity other than as set forth in Section 2.24, or amend its organizational documents with respect to the matters set forth in Section 2.24 and Schedule IV without the consent of Lender; or (iv) file a bankruptcy or insolvency petition or otherwise institute insolvency proceedings with respect to itself, or consent to the institution of bankruptcy or insolvency proceedings with respect to itself, or file a petition seeking, or consent to, reorganization or relief with respect to itself, under any applicable federal or state law relating to bankruptcy, or consent to the appointment of a receiver, liquidator, assignee, trustee, sequestrator (or other similar official) of itself or a substantial part of its property, or make any assignment for the benefit of creditors, or admit in writing its inability to pay its debts generally as they become due, or to take action in furtherance of any such action.

"**Material Adverse Effect**" shall have the meaning specified in Section 2.01(d).

"**Maturity Date**" means January 1, 2022, subject to extension as expressly set forth in Section 1.06 of the Note.

"**Mold**" shall mean fungi that reproduces through the release of spores or the splitting of cells or other means, including but not limited to mold, mildew, fungi, fungal spores, fragments and metabolites such as mycotoxins and microbial volatile organic compounds.

"**Mold O&M Plan**" shall have the meaning specified in Section 2.22(e).

"**Note**" shall have the meaning specified in the recitals to this Agreement.

"**NRSRO**" shall mean any credit rating agency that has elected to be treated as a nationally-recognized statistical rating agency for purposes of the Exchange Act irrespective of whether or not such credit rating agency has been engaged by Lender or another party to rate any of the Securities issued in connection with a Secondary Market Transaction involving the Loan or any portion thereof.

"**Obligations**" means any and all present and future liabilities and obligations of Borrower to Lender, including those under or in connection with each Loan Document, together with all reasonable fees and expenses incurred in collecting any or all of such liabilities and obligations or enforcing any rights under each Loan Document, including all reasonable fees and expenses of counsel to Lender and of any experts and agents which may be paid or incurred by Lender in collecting any such items or enforcing any such rights.

"**Other Reserves**" shall mean, collectively, the Renovation Reserve, the Soft Costs Reserve, the TILC Reserve, the Deferred Fees Reserve and the Interest Reserve.

"**PACE Financing**" means that certain $13,700,000.00 financing of the PACE Improvements obtained by Borrower through the CSCDA Open PACE Program established by CSCDA.

NY 00058782 v5

"**PACE Financing Documents**" means the California Statewide Communities Development Authority Open PACE Program Assessment Contract dated as of August 7, 2020 between Borrower and CSCDA and the exhibits attached thereto.

"**PACE Improvements**" means the portion of the Construction consisting of energy efficiency improvements, renewable energy improvements, water efficiency improvements, seismic strengthening improvements, and electric vehicle charging infrastructure that are being paid for with the proceeds of the PACE Financing. The PACE Improvements are set forth on **Exhibit D** attached hereto and made a part hereof.

"**PACE Program Administrator**" shall mean Counterpointe Energy Solutions (CA) LLC, a Delaware limited liability company.

"**Payment Date**" shall mean the first day of each month during the term of the Loan, commencing with December 1, 2020.

"**Payment Direction Letter**" shall have the meaning specified in Section 6.02(a).

"**Permitted Investments**" shall mean any investment suitable for the investment of escrows and reserves established under mortgage loans included in a Secondary Market Transaction in which some or all of the Certificates issued are rated "**AAA**" (or the equivalent rating) by the Rating Agencies, as the standards therefor are established from time to time, or such investments which are otherwise acceptable to Lender.

"**Permitted Liens**" shall mean (i) the lien of the Security Instrument, and (ii) all other liens shown as exceptions to coverage under the Title Insurance Policy.

"**Person**" shall mean any individual, corporation, partnership, limited liability company, joint venture, estate, trust, unincorporated association, any other person or entity, and any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Petition**" shall have the meaning specified in Section 3.01(i).

"**Property**" shall have the meaning specified in the recitals to this Agreement.

"**Property Agreement**" shall mean any agreement entered into by Borrower with respect to the ownership, leasing, use, operation, maintenance, management, repair or restoration of the Property.

"**Property Indemnified Party**" shall have the meaning specified in Section 7.25.

"**Property Management Agreement**" shall mean a property management agreement approved by Lender between Borrower and Property Manager.

"**Property Manager**" shall mean a property manager approved by Lender.

"**Rating Agency**" shall mean each of Standard & Poor's Ratings Services, a division of The McGraw–Hill Companies, Inc. ("**S&P**"), Moody's Investors Service, Inc. ("**Moody's**"), and Fitch, Inc. or any other nationally–recognized statistical rating organization to the extent any of the foregoing have been engaged by Lender or its designee in connection with or in anticipation of any Secondary Market Transaction.

"**Rating Criteria**" with respect to any Person, means that (i) the short-term unsecured debt obligations of such Person are rated at least "**A-1**" by S&P and, if rated by another Rating Agency, are rated in an equivalent category by such other Rating Agency, if deposits are held by such person for a period of less than 30 days, or (ii) the long-term unsecured debt obligations of such Person are rated at least "**AA-**" by S&P and, if rated by another Rating Agency, are rated in an equivalent category by such other Rating Agency, if deposits are held by such person for a period of 30 days or more.

"**Regulation AB**" shall mean Regulation AB under the Securities Act and the Exchange Act, as such Regulation may be amended from time to time.

"**Release**" shall mean, without limitation, any intentional or unintentional placing, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, discarding or abandoning of any Hazardous Substance, other than in the normal course of business or activities of Borrower or its Tenants, and in compliance with all Environmental Laws.

"**Renovation Budget**" shall mean, collectively, the budget for the Renovations, in AIA form, approved, or to be approved, by Lender and attached, or to be attached, as Exhibit B to this Agreement.

"**Renovation Deficiency**" shall have the meaning specified in Section 2.05(a).

"**Renovation Reserve**" shall have the meaning specified in Section 2.05(a).

"**Renovations**" shall mean the items approved on the Renovation Budget.

"**Rents and Profits**" shall mean all rents, royalties, issues, profits, revenue, income and other benefits of the Property, now or hereafter arising from the use or enjoyment of all or any portion thereof or from any present or future Leases, and all cash or securities deposited to secure performance by the Tenants of their obligations under any of the Leases, whether said cash or securities are to be held until the expiration of the terms of said Leases or applied to one or more of the installments of rent coming due prior to the expiration of said terms.

"**Replacement Reserve**" shall have the meaning specified in Section 2.05(c).

"**Replacements**" shall have the meaning specified in Section 2.05(c).

"**Reserves**" shall mean, collectively, the Cash Flow Reserves and the Other Reserves.

"**Retainage**" shall mean a holdback with respect to the value of General Contractor's, each Construction Contractor's, and each subcontractor's work in place in respect of the

Renovations, which shall be ten percent (10%) (or such lesser amount as may be approved by Lender in its sole discretion) of all amounts due under the General Contract or the applicable Construction Contract or subcontract, as verified from time to time by the Inspecting Engineer pursuant to the provisions of this Agreement.

"**Secondary Market Transaction**" shall have the meaning specified in Section 7.23(a)(i).

"**Securities**" shall have the meaning specified in Section 7.23(a)(i).

"**Securities Act**" shall have the meaning specified in Section 7.23(b).

"**Security**" shall have the meaning specified in Section 7.18.

"**Security Instrument**" shall have the meaning specified in the recitals to this Agreement.

"**Servicer**" means a servicer or account administrator of Lender designated by and acting for the benefit of Lender.

"**Soft Costs**" means the indirect costs of the Construction including, without limitation, architectural, engineering, and legal fees, and permit fees.

"**Soft Costs Budget**" shall mean the budget for Soft Costs, which is attached hereto as **Exhibit C**.

"**Soft Costs Deficiency**" shall have the meaning specified in Section 2.05(b)(vii).

"**Soft Costs Disbursement**" shall mean the disbursement of funds from the Soft Costs Reserve for payment of Soft Costs.

"**Soft Costs Reserve**" shall have the meaning specified in Section 2.05(b).

"**Special Purpose Entity**" shall mean a limited partnership, limited liability company or corporation which, at all times until the Loan is repaid in full and all other Obligations are satisfied, meets all of the requirements of Section 2.24.

"**Substantial Completion**" shall have the meaning specified in Section 2.27(c).

"**Sweep Notice**" means the notice provided by Lender to the Clearing Bank that an Event of Default has occurred and that (i) Borrower shall no longer have any access to the Clearing Account, and (ii) all funds in the Clearing Account shall be delivered to the Cash Collateral Account.

"**Sweep Period**" means the period after Lender's delivery of a Sweep Notice.

"**Tenant**" shall mean each tenant, lessee, licensee or other party to a Lease.

NY 00058782 v5

"**TILC Reserve**" shall have the meaning specified in Section 2.05(e).

"**Title Insurance Policy**" shall mean an ALTA mortgagee title insurance policy in form approved by Lender issued with respect to the Property and insuring the lien of the Security Instrument.

"**Underwriter Group**" shall have the meaning specified in Section 7.23(c)(i).

1.02.    Conditions Precedent. The obligation of Lender to enter into this Agreement and to make the Loan is conditioned upon (a) Borrower's delivery, performance, and satisfaction, as applicable, all in Lender's sole discretion, of (i) all items on that certain Closing Checklist issued by Lender with respect to the Loan, (ii) proof that Borrower has invested equity in the Property in an amount of not less than $11,100,000.00, (iii) proof that the PACE Financing has closed and that Pace Program Administrator has made $12,475,000.00 available for the payment of Construction Costs related to the PACE Improvements; and (iv) such other documents, instruments or certificates as Lender and its counsel may require, including such documents as Lender deems necessary or appropriate to effectuate the terms and conditions of this Agreement and the other Loan Documents, and to comply with the laws of the state in which the Property is located, and (b) payment by Borrower of Lender's origination fee and all fees and expenses required to be paid and/or reimbursed in accordance with the Loan Documents.

## ARTICLE II
## REPRESENTATIONS, WARRANTIES, AND COVENANTS OF BORROWER

For so long as the Obligations or any part thereof remain unpaid, Borrower represents, covenants and agrees as follows:

2.01    Representations and Warranties of Borrower.    Borrower, for itself and its successors and assigns, does hereby represent, warrant and covenant to and with Lender, its successors and assigns, that:

(a)    Borrower is duly organized, validly existing and in good standing with full power and authority to own its assets and conduct its business, and is duly qualified in all jurisdictions in which the ownership or lease of its property or the conduct of its business requires such qualification, except where the failure to be so qualified would not have a material adverse effect on its ability to perform its obligations hereunder. Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents by it, and has the power and authority to execute, deliver and perform under this Agreement, the other Loan Documents and all the transactions contemplated hereby and thereby.

(b)    Each of the Loan Documents constitutes a legal, valid, and binding obligation enforceable against such of Borrower and Guarantor as are parties thereto. The execution and delivery of the Loan Documents and compliance with the provisions thereof under the circumstances contemplated therein do not and will not conflict with or constitute a breach or violation of or default under the organizational documents of Borrower, or any agreement or

other instrument to which Borrower or Guarantor is a party, or by which either of them is bound, or to which any of their properties are subject, or any existing law, administrative regulation, court order or consent decree to which any of them is subject.

(c)    Borrower and Guarantor are in full compliance with all of the terms and conditions of the Loan Documents to which they are a party, and no default or Event of Default has occurred and is continuing with respect to any of the Loan Documents.

(d)    There is no pending, filed or threatened action, suit or proceeding, arbitration or governmental investigation involving Borrower (and, if Borrower is a partnership, any of its general partners, or if Borrower is a limited liability company, any member of Borrower), Guarantor, or the Property which, if adversely determined, would reasonably be expected to materially and adversely affect (i) title to the Property, (ii) the business, prospects, profits, operations or condition (financial or otherwise) of Borrower or any general partner or member, or Guarantor, as applicable, (iii) the enforceability, validity, perfection or priority of the lien of any Loan Document, (iv) the ability of Borrower or Guarantor to perform any obligations under any Loan Document, (v) the principal benefit of the security intended to be provided by the Loan Documents, or (vi) the current principal use of the Property (each, a "**Material Adverse Effect**").

(e)    There are no security agreements or financing statements affecting any of the Property other than the security agreements and financing statements created in favor of Lender.

(f)    All financial statements heretofore and hereafter delivered to Lender by Borrower, whether of Borrower, Guarantor or related or affiliated entities, are and will be true and correct in all material respects, in the case of audited financial statements, have been and will be prepared in accordance with generally accepted accounting principles consistently applied, and, in the case of all such financial statements, do and will truly and accurately reflect the financial condition and contingent liabilities of the parties to which they relate and the results of the operations for the parties to which they relate as of the dates thereof and for the periods covered thereby.  Since the date of the latest of such financial statements delivered to Lender, there has been no material adverse change in the financial condition or in the assets or liabilities of such parties or any material increase in their contingent liabilities.  Any requisite income tax returns and reports of such parties have been filed, or extensions of the time for filing same have been obtained, and no income taxes or penalties of such parties are due and no controversy or objection in respect of such parties' income tax returns and reports is pending or threatened.

(g)    Borrower has good and marketable title to the Property, subject only to the Permitted Liens.

(h)    The Property is taxed separately without regard to any other real estate and constitutes a legally subdivided lot or lots under all applicable legal requirements (or, if not subdivided, no subdivision or platting of the Property is required under applicable legal requirements), and for all purposes may be mortgaged, conveyed, pledged, hypothecated, assigned or otherwise dealt with as an independent parcel.

NY 00058782 v5

10

(i)     The Property and the intended use thereof by Borrower comply and, after completion of the Renovations, shall comply, with all applicable restrictive covenants, zoning ordinances, subdivision and building codes, flood disaster laws, applicable health and environmental laws and regulations and all other ordinances, orders or requirements issued by any state, federal or municipal authorities having or claiming jurisdiction over the Property. The Property does not require any rights over, or restrictions against, other property in order to comply with any of the aforesaid governmental ordinances, orders or requirements.

(j)     All utility services necessary and sufficient for the full use, occupancy, operation and disposition of the Property for its intended purpose are available to the Property, including water, storm sewer, sanitary sewer, gas, electric, cable and telephone facilities.

(k)     All streets, roads, highways, bridges and waterways necessary for access to and full use, occupancy, operation and disposition of the Property have been completed, have been dedicated to and accepted by the appropriate municipal authority and are open and available to the Property without further condition or cost to Borrower.

(l)     Borrower has not received notice of, and has no knowledge of, (i) any proceedings, whether actual, pending or threatened, for the taking under the power of eminent domain or any similar power or right, of all or any portion of the Property, or of any other collateral security for the Loan; or (ii) any damage to or destruction of any portion of the Property or such other property; or (iii) any zoning, building, fire or health code violations in respect of the Property which have not heretofore been corrected.

(m)     The proceeds of the Loan will be used by Borrower to pay closing costs, to refinance the Property, to pay for Renovations, and to fund reserves for interest, Soft Costs and tenant improvements and leasing commissions.  No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulations T, U or X of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulations T, U or X or any other Regulations of such Board of Governors, or for any purpose prohibited by legal requirements or by the terms and conditions of the Loan Documents.

(n)     Borrower is not an "investment company", or a company "controlled" by an "investment company", as such terms are defined in the Investment Company Act of 1940, as amended.

(o)     Borrower is not an "employee benefit plan", as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), which is subject to Title I of ERISA and the assets of Borrower do not constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101.

(p)     The improvements on the Property are structurally sound, in good repair and free of defects in materials and workmanship and have been constructed and installed in substantial compliance with the plans and specifications relating thereto. All major building systems located within the improvements including, without limitation, the heating and air

conditioning systems and the electrical and plumbing systems, will be in good working order and condition.

(q)     Borrower has delivered to Lender a true, correct and complete schedule of all Leases affecting the Property as of the date hereof, which accurately and completely sets forth in all material respects for each such Lease, the following: (i) the name of the Tenant, (ii) the Lease expiration date, (iii) extension and renewal provisions, (iv) the base rent payable, and (v) the security deposit held thereunder.  Borrower will (1) not commingle any security deposits of Tenants with any other assets of Borrower, and (2) deposit all cash security deposits of Tenants in a separately designated account under Borrower's or Lender's or its servicer's control and held in accordance with the terms of the applicable Lease and all applicable Laws.

(r)     Borrower has delivered to Lender true, correct and complete copies of all Property Agreements and no default exists or would exist, with the passing of time or the giving of notice, or both, under any Property Agreement which would, in the aggregate, have a Material Adverse Effect.

(s)     The PACE Financing Documents are in full force and effect with no defaults thereunder or breaches or deficiencies in the performance of the obligations thereunder. No amendments or modifications have been made to the PACE Financing Documents. All of the parties to the PACE Financing Documents are in full compliance with their respective obligations thereunder. There does not exist any condition that would materially and adversely affect the ability of Borrower to fulfill and perform all of its obligations under the PACE Financing Documents. True, correct and complete copies of the PACE Financing Documents have been delivered to Lender. The PACE Financing Documents set forth all of the agreements and understandings between the respective parties with respect to the PACE Financing, and there are no other agreements, contracts or other documents relating to the PACE Financing.  The PACE Financing is repayable solely through special assessments on the Property.

(t)     Borrower engaged Shawn Patrick Heyl ("**Broker**"), a licensed California real estate broker, to arrange the Loan and Broker, among other things, (i) reviewed financing proposals and consulted with Borrower regarding such proposals and any options or alternatives, (ii) reviewed and negotiated the Loan Documents on behalf of Borrower, and (iii) corresponded with Lender regarding the terms of the Loan.

(u)     The representations and warranties contained in this Agreement, or the review and inquiry made on behalf of Borrower therefor, have all been made by Persons having the requisite expertise and knowledge to provide such representations and warranties.  No statement or fact made by or on behalf of Borrower in this Agreement or in any certificate, document or schedule furnished to Lender pursuant hereto, contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained therein or herein not misleading (which may be to Borrower's best knowledge where so provided herein). There is no fact presently known to Borrower which has not been disclosed to Lender and which would have a Material Adverse Effect.

(v)    The representations, warranties and agreements set forth herein are in addition to, and not in substitution for, the representations, warranties and agreements made by Borrower in the Note, Security Instrument and other Loan Documents.

2.02    <u>Insurance</u>.

(a)    Borrower shall, at Borrower's expense, maintain in force and effect on the Property at all times, until the Obligations are paid in full and the lien of the Security Instrument released, insurance having the coverages and complying with the requirements listed on Schedule I attached hereto and otherwise reasonably acceptable to Lender.

(b)    Certified copies of all insurance policies, and any endorsements, shall be made available for inspection by Lender upon request.  If any policy is canceled before the Obligations are paid in full and the lien of the Security Instrument has been released, and Borrower fails to immediately procure replacement insurance, Lender reserves the right, but shall have no obligation, to immediately procure replacement insurance at Borrower's cost.

(c)    Borrower shall provide to Lender renewal Certificates of Insurance not less than fifteen (15) days prior to each policy expiration date.  Any failure by Borrower to maintain the insurance required under this <u>Section 2.02</u> shall not constitute a waiver of Borrower's obligation to fulfill these requirements.

2.03    <u>Payment of Taxes</u>.  Borrower shall pay or cause to be paid, except to the extent provision for payment is made pursuant to <u>Section 2.04</u> of this Agreement, all taxes and assessments which are or may become a lien on the Property or which are assessed against or imposed upon the Property.  Borrower shall furnish Lender with receipts (or, if receipts are not immediately available, with copies of canceled checks evidencing payment with receipts to follow promptly after they become available) showing payment of such taxes and assessments at least fifteen (15) days prior to the applicable delinquency date therefor.

2.04    <u>Tax and Insurance Impound Reserve</u>.  Borrower shall establish and maintain at all times while any of the Obligations remain unpaid an Impound Reserve (the "**Impound Reserve**") with Lender for payment of real estate taxes and assessments (which shall include, without limitation, any assessments attributable to the PACE Financing) and insurance on the Property and as additional security for the Obligations.  On the date hereof, Borrower shall deposit in the Impound Reserve an amount determined by Lender to be sufficient (when added to the monthly deposits described herein) to pay the next due installment of real estate taxes and assessments on the Property at least two (2) months prior to the delinquency date thereof and the next due insurance premiums with respect to the Property at least two (2) months prior to the due date thereof.  Then, commencing on the first (1st) Payment Date and continuing monthly thereafter on each subsequent Payment Date, Borrower shall pay to Lender, concurrently with the monthly payment due under the Note, a deposit to the Impound Reserve in an amount equal to the sum of (a) one-twelfth (1/12) of the amount of the annual real estate taxes and assessments that will next become due and payable on the Property, plus (b) one-twelfth (1/12) of the amount of the annual premiums that will next become due and payable on insurance policies which Borrower is required to maintain hereunder, each as estimated and determined by Lender.  So long as no Event of Default exists hereunder, all sums in the Impound Reserve shall be held by

Lender in the Impound Reserve to pay said taxes, assessments and insurance premiums in one installment, in each case before the same become delinquent. Borrower shall be responsible for ensuring the receipt by Lender, at least thirty (30) days prior to the respective due date for payment thereof, of all bills, invoices and statements for all taxes, assessments and insurance premiums to be paid from the Impound Reserve, and so long as no Event of Default exists, Lender shall pay the Governmental Authority, insurance company or other party entitled thereto directly to the extent funds are available for such purpose in the Impound Reserve. In making any payment from the Impound Reserve, Lender shall be entitled to rely on any bill, statement or estimate procured from the appropriate public office or insurance company or agent without any inquiry into the accuracy of such bill, statement or estimate and without any inquiry into the accuracy, validity, enforceability or contestability of any tax, assessment, valuation, sale, forfeiture, tax lien or title or claim thereof. If the total funds in the Impound Reserve shall exceed the amount of payments actually applied by Lender for the purposes of the Impound Reserve, plus a two (2) month reserve, such excess may be credited by Lender on subsequent payments to be made hereunder or, at the option of Lender, refunded to Borrower. If at any time, however, the Impound Reserve does not contain sufficient funds to pay the sums required when the same become due and payable, Borrower shall, within ten (10) days after receipt of written notice thereof, deposit with Lender the full amount of any such deficiency.

2.05    Additional Reserves. As additional security for the Obligations, Borrower has established and shall maintain with Lender the following additional Reserves:

(a)    Renovation Reserve.

(i)    Renovation Reserve. On the date of this Agreement, Borrower has established with Lender a reserve in the amount of $10,405,636.71 (the "**Renovation Reserve**"). Subject to, and in accordance with the terms of this Agreement, Lender shall make Construction Disbursements from the Renovation Reserve to reimburse Borrower for Construction Costs incurred by Borrower in connection with the Renovations; provided that funds on deposit in the Renovation Reserve shall not be used to pay for Construction Costs arising in connection with the PACE Improvements, it being acknowledged that such Construction Costs will be paid using the proceeds of the PACE Financing.

(ii)    Renovation Budget. Lender shall make Construction Disbursements for Renovations to Borrower in accordance with the Renovation Budget approved by the parties and attached hereto as Exhibit B. If Borrower has not submitted, and Lender has not approved, the Renovation Budget prior to the date of this Agreement, then Borrower agrees, within thirty (30) days after the date hereof, to submit the Renovation Budget to Lender, which Renovation Budget shall include a timetable setting forth the dates for the completion of all Renovations set forth therein. Upon approval of the Renovation Budget by Lender, the Renovation Budget will be attached hereto as Exhibit B. The parties anticipate that the total cost of the Renovation will be $14,067,051.29, which shall be paid from the following sources: (A) $10,405,636.71 from the Renovation Reserve, and (B) $3,661,414.58 from the PACE Financing (collectively, the "**Construction Funds**").

(iii)    Disbursement Requests. Lender's obligation to make Construction Disbursements from the Renovation Reserve shall be subject to the satisfaction of the conditions

contained in <u>Schedule II</u> to this Agreement (any of which may also be requested by Lender in the interims between draws, at its discretion, if deemed necessary to determine the progress of work). In addition, if and to the extent that there are any outstanding Construction Costs related to the PACE Improvements that are due and payable as of the date of any requested Construction Disbursement, (A) such costs will be paid with the proceeds of the PACE Financing prior to or simultaneously with the requested Construction Disbursement, or (B) Lender shall be satisfied that (1) the Pace Program Administrator has approved such costs and submitted all necessary paperwork to CSCDA for the payment thereof, and (2) all Construction Costs related to the PACE Improvements for which payment previously was requested have been paid. Lender shall not be required to fund any Construction Disbursements if PACE Program Administrator fails to fund the proceeds of the PACE Financing for the PACE Improvements as provided above.

(iv)    <u>Construction Disbursements</u>.    Each Construction Disbursement from the Renovation Reserve (A) shall be in an amount not less than Twenty-Five Thousand and No/100 Dollars ($25,000.00), and (B) shall not be in excess of the budgeted amounts for Construction Costs as itemized in the Renovation Budget. Lender shall not be required to make disbursements from the Renovation Reserve more frequently than once in any thirty (30) day period. To the extent that Borrower provides evidence satisfactory to Lender that Borrower has realized a cost savings in one or more items in the Renovation Budget, such savings may be reallocated to the other items in such Renovation Budget, provided such allocation is (1) permitted under applicable law and does not affect the rights of any of the contractors or materialmen, and (2) approved by Lender, which approval shall not be unreasonably withheld. Lender shall not be required to disburse funds from the Renovation Reserve for costs incurred by Borrower with respect to materials stored on or off the Property unless Lender shall, in its sole discretion, deem it advisable to do so.

(v)    <u>Disbursement Procedure</u>.    Each Construction Disbursement from the Renovation Reserve shall be made, in whole or in part, (A) by crediting the amount thereof to an account of Borrower, (B) by Lender directly paying the General Contractor or any Construction Contractors, subcontractors, or materialmen engaged in the construction of the Renovations in the event such amount is equal to or greater than Twenty-Five Thousand and No/100 Dollars ($25,000.00), or (C) in such other manner as shall be mutually agreed upon by Borrower and Lender.

(vi)    <u>Deficiency</u>.    Lender shall not be obligated to make any Construction Disbursement to Borrower for Renovations if, in the reasonable opinion of Lender, the remaining available Construction Funds are at any time less than the actual sum, as reasonably estimated by Lender and/or the Inspecting Engineer, which will be required to complete Renovation in accordance with the Renovation Budget and this Agreement and to pay all Construction Costs and all other costs and expenses of any nature whatsoever which must be incurred in connection with the completion of the construction of the Renovations (the amount by which it is less being hereinafter referred to as the "**Renovation Deficiency**"). Lender shall provide written notice to Borrower upon determining that there is or will be a Renovation Deficiency and, within fifteen (15) days after receipt of such notice, Borrower will either (A) expend on the Renovations, in a manner satisfactory to Lender, an amount equal to the Renovation Deficiency and deliver to Lender evidence satisfactory to Lender of such investment, or (B) deposit with Lender an amount sufficient to eliminate the Renovation Deficiency. Any

NY 00058782 v5

amounts deposited by Borrower with Lender to pay the Renovation Deficiency shall be disbursed by Lender as Borrower shall direct (as approved by Lender), to pay the Construction Costs as the construction of the Renovations progresses. If an Event of Default exists, Lender, in addition to all other rights which it may have, shall have the unconditional right, at its option, to apply, in whole or in part, any amounts deposited by Borrower with Lender with respect to the Renovation Deficiency, to the payment of the Loan in such order and priority as Lender shall deem appropriate. Without limitation of the foregoing, if Lender determines that, in order to complete the renovation of the Property as contemplated in the plans approved by Lender or otherwise in accordance with any applicable legal requirements, Borrower must complete any construction or renovations in addition to the Renovations described in the Renovation Budget, and there are not sufficient funds in the Renovation Reserve to pay for the costs of such additional construction or renovations, then a Renovation Deficiency shall be deemed to have occurred and Borrower will be required to cure such Renovation Deficiency as specified above.

(vii)   Retainage.   In no event shall Lender be obligated to make Construction Disbursements with respect to Renovations in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the construction of such Renovations, as certified by the Inspecting Engineer, minus the Retainage. The Retainage shall not be released until the Inspecting Engineer certifies to Lender that the construction of the Renovations has been completed in accordance with the provisions of this Agreement, and Lender receives evidence satisfactory to Lender that the costs of the construction of the Renovations have been paid in full or will be paid in full out of the Retainage; provided, however, that Lender will release the portion of the Retainage being held with respect to any Construction Contractor, subcontractor or materialman engaged in the construction of the Renovations as of the date upon which the Inspecting Engineer certifies to Lender that such Construction Contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of the Construction Contractor's, subcontractor's or materialman's contract, the Construction Contractor, subcontractor or materialman delivers the lien waivers (or other local equivalent) and evidence of payment in full of all sums due to the Construction Contractor, subcontractor or materialman as may be requested by Lender. If required by Lender, the release of any such portion of the Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the Construction Contractor, subcontractor or materialman.

(b)   Soft Costs Reserve.   On the date of this Agreement, Borrower has established with Lender a reserve in the amount of $189,161.67 to pay Soft Costs (the "**Soft Costs Reserve**") in accordance with the Soft Costs Budget. Provided that no Default or Event of Default has occurred and is continuing, Lender shall make Soft Costs Disbursements from the Soft Costs Reserve subject to the following conditions:

(i)   At least ten (10) business days prior to the date of any such Soft Costs Disbursement, Borrower shall provide Lender with a written request for a Soft Costs Disbursement executed by Borrower which shall include a description of the proposed expenses for which such Soft Costs Disbursement is being made.

(ii)   Lender shall have determined, in its reasonable discretion, that the amounts being paid are consistent with the Soft Costs Budget.

NY 00058782 v5

16

(iii)    Such Soft Costs Disbursement shall be utilized to pay the actual Soft Costs described in Borrower's request for a Soft Costs Disbursement.

(iv)    Borrower shall provide to Lender copies of paid invoices, canceled checks, or other evidence of payment of the amounts for which the previous Soft Costs Disbursement was made.

(v)    Borrower shall pay to Lender a $1,500.00 processing fee (provided that if Borrower requests disbursements from more than one Reserve at the same time, Lender only will charge a single processing fee of $1,500.00 with respect to such disbursements) and/or any additional administrative or consulting fees required to process the applicable Soft Costs Disbursement.

(vi)    (A) Each Soft Costs Disbursement shall be in an amount of not less than Twenty-Five Thousand and No/100 Dollars ($25,000.00); <u>provided</u>, that a disbursement from the Soft Costs Reserve may be aggregated with any contemporaneous disbursement from the Renovation Reserve, to achieve such minimum, and (B) Lender shall not be required to make Soft Costs Disbursements more frequently than one (1) time in any calendar month.

(vii)    <u>Deficiency</u>.  Lender shall not be obligated to make any Soft Costs Disbursement to Borrower if, in the reasonable opinion of Lender, the balance of the Soft Costs Reserve is at any time less than the actual sum, as reasonably estimated by Lender and/or the Inspecting Engineer, which will be required to pay all Soft Costs (the amount by which it is less being hereinafter referred to as the "**Soft Costs Deficiency**").  Lender shall provide written notice to Borrower upon determining that there is or will be a Soft Costs Deficiency and, within fifteen (15) days after receipt of such notice, Borrower will either (A) expend on Soft Costs, in a manner satisfactory to Lender, an amount equal to the Soft Costs Deficiency and deliver to Lender evidence satisfactory to Lender of such investment, or (B) deposit with Lender an amount sufficient to eliminate the Soft Costs Deficiency.  Any amounts deposited by Borrower with Lender to pay the Soft Costs Deficiency shall be disbursed by Lender as Borrower shall direct (as approved by Lender), to pay Soft Costs as Renovation progresses.  If an Event of Default has occurred and is continuing, Lender, in addition to all other rights which it may have, shall have the unconditional right, at its option, to apply, in whole or in part, any amounts deposited by Borrower with Lender with respect to the Soft Costs Deficiency, to the payment of the Loan in such order and priority as Lender shall deem appropriate. Without limitation of the foregoing, if Lender determines that, in order to complete the Renovation, Borrower must pay any Soft Costs in addition to the items described in the Soft Costs Budget, and there are not sufficient funds available to pay such additional Soft Costs, then a Soft Costs Deficiency shall be deemed to have occurred and Borrower will be required to cure such Soft Costs Deficiency as specified above.

(c)    <u>Replacement Reserve</u>.

(i)    Replacement Reserve.    Borrower has established and shall maintain with Lender at all times while any of the Obligations remain unpaid a repair and replacement reserve (the "**Replacement Reserve**") for payment of costs and expenses incurred by Borrower in connection with capital improvements and replacements performed at the Property; including, but not limited to, the performance of work to the roofs, chimneys, gutters, downspouts, paving, curbs, ramps, driveways, balconies, porches, patios, exterior walls, exterior doors and doorways, windows, carpets, appliances, fixtures, elevators and mechanical and HVAC equipment (collectively, the "**Replacements**"). Commencing on the first (1st) Payment Date after Substantial Completion has occurred and continuing monthly thereafter on each Payment Date, Borrower shall pay to Lender, concurrently with the monthly payment due under the Note, a deposit to the Replacement Reserve in an amount equal to $993.75 (which is based upon an annual reserve of $225.00 per unit per year). Subject to, and in accordance with the terms of this Agreement, Lender shall make Construction Disbursements from the Replacement Reserve to reimburse Borrower for Construction Costs incurred by Borrower in connection with the Replacements.

(ii)    Disbursement Requests.    Lender's obligation to make Construction Disbursements from the Replacement Reserve shall be subject to the satisfaction of the conditions contained in Schedule II to this Agreement (any of which may also be requested by Lender in the interims between draws, at its discretion, if deemed necessary to determine the progress of work).

(iii)    Construction Disbursements.    Lender shall not be required to make disbursements from the Replacement Reserve more frequently than one (1) time in any calendar month. Any Construction Disbursement by Lender hereunder for a Replacement in excess of $10,000.00 and not already paid for by Borrower, shall be made by joint check, payable to Borrower and the applicable contractor, supplier, materialman, mechanic, subcontractor or other party to whom payment is due in connection with such Replacement. In making any payment from the Replacement Reserve, Lender shall be entitled to rely on such request from Borrower without any inquiry into the accuracy, validity or contestability of any such amount.

(iv)    Further Replacements.    Lender may, at Borrower's expense, make or cause to be made during the term of the Loan inspections of the Property to determine the need, as determined by Lender in its reasonable judgment, for further Replacements to the Property. In the event that such inspections reveal that further Replacements to the Property are required, Lender shall provide Borrower with a written description of the required Replacements and Borrower shall complete such Replacements to the reasonable satisfaction of Lender within ninety (90) days after the receipt of such description from Lender, or such later date as may be approved by Lender in its sole discretion.

(v)    Replacement Deficiency.    In the event that the amounts on deposit or available in the Replacement Reserve are inadequate to pay the cost of the Replacements, Borrower shall pay the amount of such deficiency.

(d)   Interest Reserve.   Borrower has established and shall maintain at all times with Lender while any of the indebtedness evidenced by the Note remains unpaid a Reserve for the payment of interest on the Loan (the "**Interest Reserve**").   Contemporaneously with the execution of this Agreement, Borrower has deposited the sum of $1,214,000.00 into the Interest Reserve.   Funds in the Interest Reserve shall be disbursed and replenished as set forth in Schedule V attached hereto.

(e)   TILC Reserve.

(i)   TILC Reserve.   Borrowers have established and shall maintain with Lender at all times while any of the Obligations remain unpaid a Reserve with Lender (the "**TILC Reserve**") for payment of costs and expenses related to tenant improvements ("**Tenant Improvements**") and third party leasing commissions ("**Leasing Commissions**") incurred by Borrowers following the date hereof in connection with the leasing of commercial space at the Property.   Contemporaneously with the execution hereof, Borrowers have deposited $600,000.00 into the TILC Reserve.   Subject to, and in accordance with the terms and conditions of this Agreement, and to the extent that funds are available in the TILC Reserve for such purpose, Lender shall make disbursements from the TILC Reserve for expenses reasonably incurred by Borrowers and approved by Lender for new Leases or Lease extensions, renewals, or modifications entered into by Borrower in accordance with the provisions of Section 2.09 hereof.

(ii)   Disbursement Requests.   Lender's obligation to make Construction Disbursements or disbursements of Leasing Commissions from the TILC Reserve shall be subject to the satisfaction of the conditions contained in Schedule II to this Agreement (any of which may also be requested by Lender in the interims between draws, at its discretion, if deemed necessary to determine the progress of work).   In connection with any Leases having a budget for Tenant Improvements in excess of $50,000, Lender's obligation to make any Construction Disbursements from the TILC Reserve also shall be subject to the satisfaction of the following additional conditions: (A) Borrowers and a general contractor approved by Lender shall have executed a general contract for such Tenant Improvements, which general contract shall be in form and substance acceptable to Lender;   (B) Borrowers and/or the applicable general contractor shall have entered into subcontracts covering not less than seventy five percent (75%) of the budgeted value of the applicable Tenant Improvements and, in each case, having contract prices consistent with any budget for such Tenant Improvements previously approved by Lender, and (C) Borrowers shall have delivered to Lender copies of all Governmental Approvals required in connection with the construction of the applicable Tenant Improvements including, without limitation, building permits.

(iii)   Construction Disbursements and Leasing Commission Disbursements. Lender shall not be required to make disbursements from the TILC Reserve more frequently than one (1) time in any calendar month.   Any Construction Disbursement or Leasing Commission disbursement from the TILC Reserve by Lender hereunder for Tenant Improvements or a Leasing Commission in excess of $10,000.00 and not already paid for by Borrowers, shall be made by joint check, payable to Borrowers and the applicable contractor, supplier, materialman, mechanic, subcontractor, broker or other party to whom payment is due in connection with such Tenant Improvements or Leasing Commission.   In making any payment from the TILC Reserve,

Lender shall be entitled to rely on such request from Borrowers without any inquiry into the accuracy, validity or contestability of any such amount.

(iv)     Tenant Payments.  Borrowers shall pay to Lender for deposit in the TILC Reserve all funds received by Borrowers from Tenants in connection with the cancellation or termination of any commercial Leases, including, but not limited to, any cancellation fees, penalties, and payments relating to unamortized tenant improvements and leasing commissions (collectively, "**Lease Termination Payments**").  So long as no default hereunder or under the other Loan Documents has occurred and is continuing, Lender shall make disbursements of Lease Termination Payments from the TILC Reserve for expenses reasonably incurred by Borrower in connection with leasing the vacated space as set forth above.

(v)     Lease Cost Analysis.  In addition to any other requirements provided herein, Lender's obligation make Construction Disbursements or disbursements of Leasing Commissions from the TILC Reserve shall be subject to the satisfaction of the following condition: the total Tenant Improvements and Leasing Commissions associated with the applicable Lease shall be less than twenty percent (20%) of the total discounted net rent due to Landlord over the applicable term of such Lease.

(vi)     Payment of Additional Costs. For the avoidance of doubt, Borrowers will be responsible for the payment of all costs and expenses related to Tenant Improvements and Leasing Commissions if sufficient funds are not available in the TILC Reserve or if Lender does not approve the payment of such costs and expenses from the TILC Reserve.

(f)     Deferred Fees Reserve.  Borrower has established and shall maintain at all times with Lender while any of the Deferred Fees remains unpaid a Reserve for the payment of the Deferred Fees (the "**Deferred Fees Reserve**").  Borrower shall make the following payments to Lender: on or prior to the fourth Payment Date, the amount of $700,000.00, $170,000.00 of which will be deposited into the Deferred Fees Reserve and $530,000.00 of which will be deposited into the Renovation Reserve; on or prior to the eighth Payment Date, the amount of $500,000.00, which will be deposited into the Deferred Fees Reserve; and on or prior to the twelfth Payment Date, the amount of $500,000.00, which will be deposited into the Deferred Fees Reserve.  If Borrower fails to timely make any such payment or makes only a portion of any such payment on or prior to the date due, the same shall constitute a "**Deferred Fees Reserve Deposit Default**", and during the continuance of any such Deferred Fees Reserve Deposit Default, the Applicable Interest Rate shall increase as set forth in the Note.  A Deferred Fees Reserve Deposit Default shall be deemed to exist on the date of this Agreement through the date upon which Borrower makes the $700,000.00 payment referenced above.  Within five (5) Business  Days following the date that Substantial Completion of the Renovations would have occurred but for the issuance of a certificate of occupancy, Borrower shall pay the full amount of the Deferred Fees to the City of Poway, and Borrower shall be entitled to request a disbursement of all funds in the Deferred Fees Reserve for the payment thereof.

2.06     Security Interest In Reserves; Nature of Accounts; Interest On Reserves.

(a)     General Provisions Regarding Reserves.  As additional security for the payment of the Obligations and performance by Borrower of all duties, responsibilities and

obligations under the Note and each other Loan Document, Borrower hereby unconditionally and irrevocably assigns, conveys, pledges, mortgages, transfers, delivers, deposits, sets over and confirms unto Lender, and hereby grants to Lender a security interest in (i) the Reserves, (ii) the accounts into which the Reserves have been deposited, (iii) all insurance of said accounts, (iv) all accounts, contract rights and general intangibles or other rights and interests pertaining thereto, (v) all sums now or hereafter therein or represented thereby, (vi) all replacements, substitutions or proceeds thereof, (vii) all instruments and documents now or hereafter evidencing the Cash Flow Reserves or such accounts, (viii) all powers, options, rights, privileges and immunities pertaining to the Reserves (including the right to make withdrawals therefrom), and (ix) all proceeds of the foregoing. Borrower hereby authorizes and consents to the accounts into which any Reserves have been deposited being held in Lender's name or the name of any entity servicing the Note for Lender and hereby acknowledges and agrees that Lender, or at Lender's election, such servicing agent, shall have exclusive control over said account. Notice of the assignment and security interest granted to Lender herein may be delivered by Lender at any time to the financial institution wherein any Reserves have been established, and Lender, or such servicing entity, shall have possession of all passbooks or other evidences of such accounts. If an Event of Default occurs then Lender may, without notice or demand on Borrower, at its option: (1) withdraw any or all of the funds (including interest) then remaining in the Cash Flow Reserves and/or credit the amount still available in the Other Reserves and, in each case, apply the same, after deducting all costs and expenses of safekeeping, collection and delivery (including attorneys' fees, costs and expenses) to the Obligations in such manner or as Lender shall deem appropriate in its sole discretion, (2) exercise any and all rights and remedies of a secured party under any applicable Uniform Commercial Code, and/or (3) exercise any other remedies available at law or in equity. No such use or application of the funds contained in the Reserves shall be deemed to cure any Default or Event of Default. All amounts deposited with Lender in the Reserves may be commingled with general funds of Lender. Borrower shall not be entitled to receive any interest with respect to funds deposited in any Reserve and there shall be no interest paid to or otherwise credited to Borrower in connection with such funds.

(b)      No Responsibility of Lender.  Beyond the exercise of reasonable care in the custody thereof or as otherwise expressly provided herein, Lender shall not have any duty as to any Reserves in its possession or control as agent therefor or bailee thereof or any income thereon or the preservation of rights against any Person or otherwise with respect thereto. The Reserves are solely for the protection of Lender and entail no responsibility on Lender's part, except as specifically set forth herein.

(c)      Full Disbursement.      Borrower understands and agrees that, notwithstanding the establishment of the Other Reserves as herein specified, all of the proceeds of the Note have been, and shall be considered, fully disbursed as of the Closing Date and shall bear interest and be payable on the terms provided in the Note.  Upon full payment of the Obligations, the balances then credited to the Other Reserves shall be advanced over to Borrower and no other party shall have any right or claim thereto.

2.07    Casualty and Condemnation.

(a)      Casualty.

(i)    Borrower shall give Lender prompt notice of any damage to or destruction of any portion or all of the Property, and the provisions contained in the following paragraphs of this Section shall apply in the event of any such damage or destruction.

(ii)    In the case of loss covered by policies of insurance, Lender is hereby authorized at its option either (A) to settle and adjust any claim under such policies without the consent of Borrower, or (B) to allow Borrower to agree with the insurance company or companies on the amount to be paid upon the loss; and in any case Lender shall, and is hereby authorized to, collect and receipt for any such insurance proceeds; and the reasonable expenses incurred by Lender in the adjustment and collection of insurance proceeds shall be a part of the Obligations, and shall be reimbursed to Lender upon demand.

(iii)    In the event of any insured damage to or destruction of the Property or any part thereof the proceeds of insurance payable as a result of such loss shall be applied to the Obligations or applied to the repair and restoration of the Property, as Lender in its sole and absolute discretion shall elect.

(iv)    In the event that Lender shall elect that proceeds of insurance are to be applied to the repair and restoration of the Property, Borrower hereby covenants promptly to repair and restore the same.  In such event such proceeds shall be made available, from time to time, to pay or reimburse the costs of such repair and restoration, upon Lender's being furnished with satisfactory evidence of the estimated cost of such repair and restoration and with such architect's certificates, waivers of lien, contractors' sworn statements and other evidence of cost and of payments as Lender may require and approve, and if the estimated cost of the work exceeds 10% of the original principal amount of the indebtedness secured hereby, with all plans and specifications for such repair or restoration as Lender may require and approve.  No payment made prior to the final completion of the work shall exceed 90% of the value of the work performed from time to time, and at all times the undisbursed balance of said proceeds remaining in the hands of Lender shall be at least sufficient to pay for the cost of completion of the work, free and clear of any liens.

(b)    Condemnation.

(i)    Should the Property or any part thereof or interest therein be taken or damaged by reason of any public improvement or condemnation proceeding, or in any other manner, or should Borrower receive any notice or other information regarding any such proceeding, Borrower shall give prompt written notice thereof to Lender, and the provisions contained in the following paragraphs of this Section 2.07(b) shall apply.

(ii)    Lender shall be entitled to all compensation, awards and other payments or relief therefor, and shall be entitled at its option to commence, appear in and prosecute in its own name any action or proceedings.  Lender shall also be entitled to make any compromise or settlement in connection with such taking or damage.  All proceeds of compensation, awards, damages, rights of action and proceeds awarded to

NY 00058782 v5

22

Borrower are hereby assigned to Lender and Borrower shall execute such further assignments of such proceeds as Lender may require.

(iii)    In the event that any portion of the Property is taken or damaged as aforesaid, all such proceeds shall be applied to the Obligations or applied to the repair and restoration of the Property, as Lender in its sole discretion shall elect.

(iv)    In the event that Lender shall elect that such proceeds are to be applied to the repair and restoration of the Property, Borrower hereby covenants promptly to repair and restore the same. In such event such proceeds shall be made available, from time to time, to pay or reimburse the costs of such repair and restoration on the terms provided for in Section 2.07(a)(iv) hereof with respect to insurance proceeds.

2.08    Mechanics' Liens.    Borrower shall pay when due all claims and demands of mechanics, materialmen, laborers and others for any work performed or materials delivered for the Property; provided, however, that Borrower shall have the right to contest in good faith any such claim or demand, so long as it does so diligently, by appropriate proceedings and without prejudice to Lender and provided that neither the Property nor any interest therein would be in any danger of sale, loss or forfeiture as a result of such proceeding or contest. In the event Borrower shall contest any such claim or demand, Borrower shall promptly notify Lender of such contest and thereafter shall, upon Lender's request, promptly provide a bond, cash deposit or other security satisfactory to Lender to protect Lender's interest and security should the contest be unsuccessful. If Borrower shall fail to immediately discharge or provide security against any such claim or demand as aforesaid, Lender may do so and any and all expenses incurred by Lender, together with interest thereon at the Default Interest Rate from the date incurred by Lender until actually paid by Borrower, shall be immediately paid by Borrower on demand and shall be secured by the Security Instrument and by all of the other Loan Documents securing all or any part of the Obligations.

2.09    Leases and Licenses.

(a)    Without the prior written consent of Lender, Borrower shall not, and shall not cause or permit Property Manager, to (i) enter into any Lease for any residential unit at the Property on a lease form other than the form of lease previously approved by Lender, (ii) modify such approved lease form in any material respect, (iii) enter into any residential Leases on terms substantially less favorable to Borrower than the then-current market terms, (iv) enter into any residential Leases for a term of more than one (1) year, or (v) enter into any non-residential Leases except as provided in Section 2.09(b) below. Borrower shall provide Lender not less than ten (10) Business Days to review any proposed change to the lease form for the leasing of residential units.

(b)    Borrower covenants and agrees that it shall not, and shall not cause or permit Property Manager, to enter into any non-residential Lease without the prior written approval of Lender, which approval shall not be unreasonably withheld. The request for approval of each such proposed new non-residential Lease shall be made to Lender in writing and shall be accompanied by: (i) such biographical and financial information about the proposed tenant as Lender may require in conjunction with its review, (ii) a copy of the proposed form of

Lease, and (iii) a summary of the material terms of such proposed Lease (including, without limitation, rental terms and the term of the proposed Lease and any options). It is acknowledged that Lender intends to include among its criteria for approval of any such proposed non-residential Lease the following: (A) such Lease shall be with a bona-fide arm's length tenant; (B) such Lease shall not contain any rental or other concessions which are not then customary and reasonable for similar properties and Leases in the market area of the Property; (C) such Lease shall provide that the Tenant pays for its expenses; (D) the rental shall be at least at the market rate then prevailing for similar properties and Leases in the market areas of the Property; and (E) such Lease shall contain subordination and attornment provisions in form and content acceptable to Lender. Failure of Lender to approve or disapprove any such proposed Lease within ten (10) business days after receipt of such written request and all the documents and information required to be furnished to Lender with such request shall be deemed approval, provided that the written request for approval specifically and clearly stated, IN 14 POINT TYPE OR GREATER, that if Lender fails to respond to such request within ten (10) business days, Lender's approval shall be deemed to have been granted.

(c)     Borrower shall not do or suffer to be done any act that might result in a default by the landlord, lessor or licensor under any such Lease or allow the Tenant, lessee or licensee thereunder to withhold payment of rent and shall not further assign any such Lease or any such rents. Borrower, at no cost or expense to Lender, shall enforce, short of termination, the performance and observance of each and every condition and covenant of each of the parties under such Leases. Borrower shall not, without the prior written consent of Lender, modify any of the Leases, terminate or accept the surrender of any Leases, or waive or release any other party from the performance or observance of any obligation or condition under such Leases except, with respect only to residential Leases, in the normal course of business in a manner which is consistent with sound and customary leasing and management practices for similar properties in the community in which the Property is located. Borrower shall not permit the prepayment of any rents under any of the Leases for more than one (1) month prior to the due date thereof.

(d)     Borrower shall notify Lender in writing, within two (2) Business Days following Borrower's receipt thereof of any early or other termination fee or payment paid by any non-residential tenant under any Lease, and Borrower further covenants and agrees that Borrower shall hold any such termination fee or payment in trust for the benefit of Lender and that any use of such termination fee or payment shall be subject in all respects to Lender's prior written consent in Lender's sole discretion (which consent may include, without limitation, a requirement by Lender that such termination fee or payment be placed in reserve with Lender to be disbursed by Lender for tenant improvement and leasing commission costs with respect to the Property and/or for payment of the Loan or otherwise in connection with the Loan, as determined by Lender).

(e)     All Leases must contain an automatic attornment provision whereby in the event of a foreclosure, the Tenant automatically shall recognize the successor owner as landlord and such tenant shall have no right to terminate its Lease in the event of such foreclosure. If Borrower enters into any new non-residential Lease or any modification or renewal of any existing non-residential Lease, at Lender's request, Borrower shall cause the Tenant thereunder to execute a subordination and attornment agreement in form and substance satisfactory to

Lender. Borrower shall provide Lender with a copy of the fully executed original of all non-residential Leases promptly following their execution. In addition, Borrower shall furnish to Lender, within ten (10) days after a request by Lender to do so, a current rent roll certified by Borrower as being true and correct containing the names of all Tenants with respect to the Property, the terms of their respective Leases, the spaces occupied and the rentals or fees payable thereunder and the amount of each Tenant's Security Deposit.

2.10    Alienation and Further Encumbrances. Borrower acknowledges that Lender has relied upon the principals of Borrower and their experience in owning and operating properties similar to the Property in connection with the closing of the Loan. Accordingly, except as specifically allowed in this Section 2.10, and notwithstanding anything to the contrary contained in Section 7.05 hereof, in the event that the Property or any part thereof or any interest therein shall be sold (including any installment sales agreement), conveyed, disposed of, alienated, hypothecated, leased (except to Tenants in accordance with the provisions of Section 2.09 hereof), assigned, pledged, mortgaged, further encumbered or otherwise transferred or Borrower shall be divested of its title to the Property or any interest therein, in any manner or way, whether voluntarily or involuntarily, without the prior written consent of Lender being first obtained, which consent may be withheld in Lender's sole and absolute discretion, then, the same shall constitute an Event of Default and Lender shall have the right, at its option, to declare any or all of the Obligations, irrespective of the maturity date specified in the Note, immediately due and payable and to otherwise exercise any of its other rights and remedies contained hereunder or under any of the other Loan Documents. If such acceleration is during any period when any Minimum Interest or Exit Fee is payable pursuant to the provisions set forth in the Note, then, in addition to all of the foregoing, such Minimum Interest and/or Exit Fee shall also then be immediately due and payable to the same end as though Borrower were prepaying the entire Loan on the date of such acceleration. For the purposes of this Section, the sale, conveyance, transfer, disposition, alienation, hypothecation, pledge or encumbering (whether voluntarily or involuntarily) of all or any portion of the ownership interest in (or, directly or indirectly through constituent parties, any of the ultimate beneficial ownership interest in) Borrower shall be deemed to be a transfer of an interest in the Property. The Loan is not assumable.

2.11    Payment of Utilities, Assessments, Charges, Etc. Borrower shall pay when due all utility charges which are incurred by Borrower or which may become a charge or lien against any portion of the Property for gas, electricity, water and sewer services furnished to the Property and all other assessments or charges of a similar nature, or assessments payable pursuant to any restrictive covenants, whether public or private, affecting the Property or any portion thereof, whether or not such assessments or charges are or may become liens thereon. Borrower shall pay all operating expenses relating to the Property when due and shall not distribute any cash flow generated by the Property to its shareholders, partners or members until all such operating expenses relating to the Property have been paid in full.

2.12    Access Privileges and Inspections. Lender and the agents, representatives and employees of Lender shall, subject to the rights of tenants, have full and free access to the Property and any other location where books and records concerning the Property are kept at all reasonable times for the purposes of inspecting the Property and of examining, copying and making extracts from the books and records of Borrower relating to the Property. Borrower shall lend assistance to all such agents, representatives and employees of Lender.

NY 00058782.v5

25

2.13    <u>Waste; Alteration of the Property</u>.  Borrower shall not commit, suffer or permit any waste on the Property nor take any actions that might invalidate any insurance carried on the Property.  Borrower shall maintain the Property in good condition and repair.  Other than as part of the Renovations, no part of the improvements located on the Property may be removed, demolished or materially altered, without the prior written consent of Lender.  Without the prior written consent of Lender, Borrower shall not commence construction of any improvements on the Property other than improvements required for the maintenance or repair of the Property, the Renovations in accordance with the provisions of <u>Section 2.05(a)</u> above, and any tenant improvements performed pursuant to any Leases approved by Lender.

2.14    <u>Zoning</u>.  Without the prior written consent of Lender, Borrower shall not seek, make, suffer, consent to or acquiesce in any change in the zoning or conditions of use of the Property.

2.15    <u>Financial Statements/Books and Records/Estoppels</u>.    Borrower shall keep accurate books and records of account of the Property and its own financial affairs sufficient to permit the preparation of financial statements therefrom in accordance with generally accepted accounting principles.  Lender and its duly authorized representatives shall have the right to examine, copy, and audit Borrower's records and books of account at all reasonable times.  So long as any of the Obligations remain unpaid, Borrower shall provide to Lender, in addition to any other financial statements required hereunder or under any of the other Loan Documents, the financial statements and information listed in <u>Schedule III</u>, all of which must be certified to Lender as being true and correct by Borrower or the entity to which they pertain, as applicable, be prepared in accordance with generally accepted accounting principles consistently applied and be in form and substance acceptable to Lender.

If any of the aforementioned materials are not furnished to Lender within the applicable time periods, then, in addition to all other rights and remedies of Lender hereunder, Borrower shall pay to Lender a late fee of $500.00.  Further, if any of the aforementioned materials are not furnished to Lender within the applicable time periods, or Lender is dissatisfied with the contents of any of the foregoing, in addition to any other rights and remedies of Lender contained herein, Lender shall have the right, but not the obligation, to obtain the same by means of an audit by an independent certified public accountant selected by Lender, in which event Borrower agrees to pay, or to reimburse Lender for, any expense of such audit and further agrees to provide all necessary information to said accountant and to otherwise cooperate in the making of such audit.  Borrower agrees that any and all materials furnished hereunder are the property of Lender (and Lender's servicer) and may be released and made available to such parties as Lender or its servicer deems appropriate, including any Rating Agency responsible for rating securities issued in any Secondary Market Transaction.

2.16    <u>Further Documentation</u>.    Borrower shall, on the request of Lender in its reasonable discretion and at the expense of Borrower, promptly correct any defect, error or omission which may be discovered in the contents of this Agreement or in any of the other Loan Documents and promptly execute, acknowledge, deliver and record or file such further instruments and do such further acts as may be necessary, desirable or proper to carry out more effectively the purposes of this Agreement and the other Loan Documents or as may be deemed advisable by Lender to protect, continue or preserve the liens and security interests hereunder;

NY 00058782 v5

including, without limitation, security instruments, financing statements and continuation statements.

2.17   <u>Payment of Costs; Advances to Protect Property</u>.  As more particularly set forth in the Security Instrument, Borrower shall pay all reasonable costs and expenses of every character incurred in connection with the closing of the Loan or otherwise attributable or chargeable to Borrower as the owner of the Property; including, without limitation, appraisal fees, recording fees, documentary, stamp, mortgage or intangible taxes, brokerage fees and commissions, title policy premiums and title search fees, uniform commercial code/tax lien/litigation search fees, escrow fees and  reasonable attorneys' fees.   If Lender determines that Borrower is not adequately performing or has failed to perform any of its obligations, covenants or agreements contained in this Agreement or in any of the other Loan Documents, or if any action or proceeding of any kind is commenced which might affect Lender's interest in the Property or Lender's right to enforce its security, then Lender may, at its option, with or without notice to Borrower, make any appearances, disburse or advance any sums and take any actions as may be necessary or desirable to protect or enforce the security of the Security Instrument or to remedy the failure of Borrower to perform its covenants and agreements (without, however, waiving any Event of Default), and any expenses so incurred by Lender, together with interest thereon at the Default Interest Rate shall be additional indebtedness of Borrower secured by the Security Instrument and by all of the other Loan Documents securing all or any part of the Obligations.

2.18   <u>Compliance with Laws</u>.

(a)   Borrower shall at all times (i) remain qualified to transact business in the State of California, and (ii) keep all material licenses, permits, and applicable governmental authorizations necessary for its operation of the Property in full force and effect.

(b)   Borrower shall at all times comply with all statutes, ordinances, regulations and other governmental or quasi-governmental requirements and private covenants now or hereafter relating to the ownership, construction, use or operation of the Property; including, but not limited to, those concerning employment and compensation of persons engaged in operation and maintenance of the Property and any environmental or ecological requirements, even if such compliance shall require structural changes to the Property. Borrower shall not use or occupy, or allow the use or occupancy of, the Property in any manner which violates any lease of or any other agreement applicable to the Property or any applicable law, rule, regulation or order or which constitutes a public or private nuisance or which makes void, voidable or cancelable, or increases the premium of, any insurance then in force with respect thereto.

(c)   Borrower agrees that the Property shall at all times comply to the extent applicable with the requirements of the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988 and all other state and local laws and ordinances related to handicapped access and all rules, regulations, and orders issued pursuant thereto including, without limitation, the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (collectively "**Access Laws**").  Borrower agrees to give prompt notice to Lender of the receipt by Borrower of any complaints related to violations of any Access Laws and of the

NY 00058782 v5

commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

2.19    Additional Taxes.    In the event of the enactment after the date hereof of any law of the state where the Property is located or of any other governmental entity deducting from the value of the Property for the purpose of taxation any lien or security interest thereon, or imposing upon Lender the payment of the whole or any part of the taxes or assessments or charges or liens herein required to be paid by Borrower, or changing in any way the laws relating to the taxation of mortgages or security agreements or debts secured by mortgages or security agreements or the interest of a lender or secured party in the property covered thereby, or the manner of collection of such taxes, so as to adversely affect this Agreement or the Loan or Lender, then, in any such event, Borrower, upon demand by Lender, shall pay such taxes, assessments, charges or liens, or reimburse Lender therefor; provided, however, that if in the opinion of counsel for Lender (a) it might be unlawful to require Borrower to make such payment, or (b) the making of such payment might result in the imposition of interest beyond the maximum amount permitted by law, then and in either such event, Lender may elect, by notice in writing given to Borrower, to declare all of the Obligations to be and become due and payable in full, thirty (30) days from the giving of such notice.

2.20    Contractual Statute of Limitations; Waiver.    Borrower hereby agrees that any claim or cause of action by Borrower against Lender, or any of Lender's directors, officers, partners, members, employees, agents, accountants or attorneys, based upon, arising from or relating to the Loan, or any other matter, cause or thing whatsoever, whether or not relating thereto, occurred, done, omitted or suffered to be done by Lender or by Lender's directors, officers, partners, members, employees, agents, accountants or attorneys, whether sounding in contract or in tort or otherwise, shall be barred unless asserted by Borrower by the commencement of an action or proceeding in a court of competent jurisdiction by the filing of a complaint within one (1) year after Borrower first acquires or reasonably should have acquired knowledge of the first act, occurrence or omission upon which such claim or cause of action, or any part thereof, is based, and service of a summons and complaint on an officer of Lender or any other Person authorized to accept service of process on behalf of Lender, within thirty (30) days thereafter.    Borrower agrees that such one (1) year period of time is reasonable and sufficient time for a borrower to investigate and act upon any such claim or cause of action.    The one (1) year period provided herein shall not be waived, tolled or extended except by the specific written agreement of Lender.    In addition and to the extent permitted by applicable law, Borrower hereby agrees that it will not assert, and Borrower hereby waives, any claim against Lender, or any of Lender's directors, officers, partners, members, employees, agents, accountants or attorneys, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, the Loan, or any of the other Loan Documents. This provision shall survive any termination of this Agreement or any of the other Loan Documents.

2.21    Management.    The management of the Property shall be by a professional property management company approved by Lender.    Such management shall be pursuant to a written agreement approved by Lender and the property management company shall be required to execute an Assignment and Subordination of Management Agreement in form acceptable to Lender.    In no event shall (a) any management fee for the Property exceed four percent (4%) of

NY 00058782 v5

28

effective gross rental income, or (b) any manager be removed or replaced or the terms of any management agreement modified or amended without, in each case, the prior written consent of Lender.  Upon the occurrence of an Event of Default hereunder or a default under any management agreement then in effect, which default is not cured within any applicable grace or cure period, Lender shall have the right to terminate, or to direct Borrower to terminate, such management agreement upon thirty (30) days' notice and to retain, or to direct Borrower to retain, a replacement property manager approved by Lender.

    2.22   <u>Hazardous Materials and Environmental Concerns</u>.

        (a)    Borrower hereby represents and warrants to Lender that, except to the extent disclosed in that certain Phase I Environmental Site Assessment Report dated May 5, 2020 and prepared by CBRE, Inc. with respect to the Property: (i) the Property is not, and to the best of Borrower's knowledge, information and belief, after due inquiry and investigation, the Property has not been, in direct or indirect violation of any local, state or federal law, rule or regulation pertaining to environmental regulation, contamination, remediation or human health or safety (including the regulation or remediation of Hazardous Substances as defined below) (collectively, "**Environmental Laws**"), all as amended; (ii) no hazardous, toxic or harmful substances, wastes, materials, pollutants or contaminants (including, without limitation, asbestos, polychlorinated biphenyls, petroleum products, radon, lead-based paint, flammable explosives, radioactive materials, Mold, infectious substances or raw materials which may include hazardous constituents) or any other substances or materials which are included under or regulated by Environmental Laws (collectively, "**Hazardous Substances**") are located on or, to the best of Borrower's knowledge, information and belief, after due inquiry and investigation, have been handled, manufactured, generated, stored, processed, transported to or from, or disposed of on or Released, as hereinafter defined, or discharged from the Property (including underground contamination) except for those substances used by Borrower and its Tenants in the ordinary course of their business and in compliance with all Environmental Laws; (iii) the Property is not subject to any private or governmental lien or judicial, administrative or other notice or action relating to Hazardous Substances or noncompliance with Environmental Laws, nor is Borrower aware of any basis for such lien, notice or action; (iv) there are no underground storage tanks or other underground storage receptacles (whether active or abandoned) for Hazardous Substances on the Property; (v) Borrower has received no notice of, and to the best of Borrower's knowledge and belief, after due inquiry and investigation, there does not exist any investigation, action, proceeding or claim by any agency, authority or unit of government or by any third party which could result in any liability, penalty, sanction or judgment under any Environmental Laws with respect to any condition, use or operation of the Property, nor does Borrower know of any basis for such investigation, action, proceeding or claim; (vi) Borrower has received no notice that, and to the best of Borrower's knowledge and belief after due inquiry and investigation, there has been no claim by any party that, any use, operation or condition of the Property has caused any nuisance, trespass or any other liability or adverse condition on any other property, nor does Borrower know of any basis for such notice or claim; and (vii) there are no present environmental conditions or events or, to the best of Borrower's knowledge, after due inquiry and investigation, past environmental conditions or events on or near the Property that could be reasonably anticipated to materially adversely affect the value of the Property.

(b)    Borrower shall keep or cause the Property to be kept free from Hazardous Substances (except those substances used by Borrower in the ordinary course of its business and in compliance with all Environmental Laws) and in compliance with all Environmental Laws, shall not install or use any underground storage tanks, shall expressly prohibit the use, generation, handling, storage, production, processing and disposal of Hazardous Substances by all Tenants (except those substances used by Tenants in the ordinary course of their activities and in compliance with all Environmental Laws), invitees and trespassers, and, without limiting the generality of the foregoing, during the term of this Agreement, shall not install on the Property or permit to be installed on the Property asbestos or any substance containing asbestos. If required by Lender or under any Environmental Law, Borrower shall maintain an Operations and Maintenance Program for the management of asbestos, lead-based paint, radon or any other Hazardous Substances at the Property.

(c)    Borrower shall promptly notify Lender if Borrower shall become aware of (i) any Release or threatened Release of Hazardous Substances at, on, under, from, or affecting or threatening to affect the Property (except those substances used by Borrower or Tenants in the ordinary course of their business or activities, respectively, and in compliance with all Environmental Laws), (ii) any lien or filing of lien, action or notice affecting or threatening to affect the Property or Borrower resulting from any violation or alleged violation of Environmental Law, (iii) any investigation, inquiry or proceeding concerning Borrower or the Property pursuant to any Environmental Law or otherwise relating to Hazardous Substances, or (iv) any occurrence, condition or state of facts which would render any representation or warranty in this Section incorrect in any respect if made at the time of such discovery. Further, immediately upon receipt of the same, Borrower shall deliver to Lender copies of any and all orders, notices, permits, applications, reports, and other communications, documents and instruments pertaining to the actual, alleged or potential non-compliance with any Environmental Laws in connection with the Property or presence or existence of any Hazardous Substances at, on, about, under, within, near or in connection with the Property (except those substances used in the ordinary course of its business and in compliance with all Environmental Laws). Borrower shall, promptly and when and as required, at Borrower's sole cost and expense, take all actions as shall be necessary or advisable for compliance with the terms of this Section 2.22 or for the remediation of any and all portions of the Property or other affected property, including, without limitation, all investigative, monitoring, removal, containment, remedial and response actions in accordance with all applicable Environmental Laws (and in all events in a manner satisfactory to Lender), and shall further pay or cause to be paid, at no expense to Lender, all remediation, response, administrative and enforcement costs of applicable governmental agencies which may be asserted against the Property. In the event Borrower fails to do so (A) Lender may, but shall not be obligated to, undertake remediation at the Property or other affected property necessary to bring the Property into conformance with the terms of Environmental Laws, and (B) Borrower hereby grants to Lender and its agents and employees access to the Property and a license to do all things Lender shall deem necessary to bring the Property into conformance with Environmental Laws. Any and all costs and expenses reasonably incurred by Lender in connection therewith, together with interest thereon at the Default Interest Rate from the date incurred by Lender until actually paid by Borrower, shall be immediately paid by Borrower on demand and shall be secured by the Security Instrument and by all of the other Loan Documents securing all or any part of the Obligations. BORROWER COVENANTS AND AGREES, AT BORROWER'S SOLE COST AND EXPENSE, TO

NY 00058782 v5

30

INDEMNIFY, DEFEND (AT TRIAL AND APPELLATE LEVELS, AND WITH ATTORNEYS, CONSULTANTS AND EXPERTS ACCEPTABLE TO LENDER), AND HOLD LENDER HARMLESS FROM AND AGAINST ANY AND ALL LIENS, DAMAGES, LOSSES, LIABILITIES, OBLIGATIONS, SETTLEMENT PAYMENTS, PENALTIES, ASSESSMENTS, CITATIONS, DIRECTIVES, CLAIMS, LITIGATION, DEMANDS, DEFENSES, JUDGMENTS, SUITS, PROCEEDINGS, COSTS, DISBURSEMENTS AND EXPENSES OF ANY KIND OR OF ANY NATURE WHATSOEVER (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS', CONSULTANTS' AND EXPERTS' FEES AND DISBURSEMENTS ACTUALLY INCURRED IN INVESTIGATING, DEFENDING, SETTLING OR PROSECUTING ANY CLAIM, LITIGATION OR PROCEEDING) WHICH MAY AT ANY TIME BE IMPOSED UPON, INCURRED BY OR ASSERTED OR AWARDED AGAINST LENDER OR THE PROPERTY, AND ARISING DIRECTLY OR INDIRECTLY FROM OR OUT OF: (1) THE PRESENCE, RELEASE OR THREAT OF RELEASE OF ANY HAZARDOUS SUBSTANCES ON, IN, UNDER, AFFECTING OR THREATENING TO AFFECT ALL OR ANY PORTION OF THE PROPERTY OR ANY SURROUNDING AREAS, REGARDLESS OF WHETHER OR NOT CAUSED BY OR WITHIN THE CONTROL OF BORROWER; (2) THE VIOLATION OF ANY ENVIRONMENTAL LAWS RELATING TO, AFFECTING OR THREATENING TO AFFECT THE PROPERTY, WHETHER OR NOT CAUSED BY OR WITHIN THE CONTROL OF BORROWER; (3) THE FAILURE BY BORROWER TO COMPLY FULLY WITH THE TERMS AND CONDITIONS OF THIS SECTION 2.22; (4) THE BREACH OF ANY REPRESENTATION OR WARRANTY CONTAINED IN THIS SECTION 2.22; OR (5) THE ENFORCEMENT OF THIS SECTION 2.22, INCLUDING, WITHOUT LIMITATION, THE COST OF ASSESSMENT, CONTAINMENT AND/OR REMOVAL OF ANY AND ALL HAZARDOUS SUBSTANCES ON AND/OR FROM ALL OR ANY PORTION OF THE PROPERTY OR ANY SURROUNDING AREAS, THE COST OF ANY ACTIONS TAKEN IN RESPONSE TO THE PRESENCE, RELEASE OR THREAT OF RELEASE OF ANY HAZARDOUS SUBSTANCES ON, IN, UNDER OR AFFECTING ANY PORTION OF THE PROPERTY OR ANY SURROUNDING AREAS TO PREVENT OR MINIMIZE SUCH RELEASE OR THREAT OF RELEASE SO THAT IT DOES NOT MIGRATE OR OTHERWISE CAUSE OR THREATEN DANGER TO PRESENT OR FUTURE PUBLIC HEALTH, SAFETY, WELFARE OR THE ENVIRONMENT, AND COSTS INCURRED TO COMPLY WITH THE ENVIRONMENTAL LAWS IN CONNECTION WITH ALL OR ANY PORTION OF THE PROPERTY OR ANY SURROUNDING AREAS. THE INDEMNITY SET FORTH IN THIS SECTION 2.22(c) SHALL ALSO INCLUDE ANY DIMINUTION IN THE VALUE OF THE SECURITY AFFORDED BY THE PROPERTY OR ANY FUTURE REDUCTION IN THE SALES PRICE OF THE PROPERTY BY REASON OF ANY MATTER SET FORTH IN THIS SECTION 2.22(c), AND ANY AND ALL LIENS, DAMAGES, LOSSES, LIABILITIES, OBLIGATIONS, SETTLEMENT PAYMENTS, PENALTIES, ASSESSMENTS, CITATIONS, DIRECTIVES, CLAIMS, LITIGATION, DEMANDS, DEFENSES, JUDGMENTS, SUITS, PROCEEDINGS, COSTS, DISBURSEMENTS AND EXPENSES OF ANY KIND OR OF ANY NATURE WHATSOEVER ARISING OUT OF OR RELATING TO INJURY OR DEATH DUE TO EXPOSURE FROM HAZARDOUS SUBSTANCES THAT MAY BE PRESENT OR RELEASED AT, ON, UNDER OR FROM THE PROPERTY. LENDER'S RIGHTS UNDER THIS SECTION SHALL SURVIVE PAYMENT IN FULL OF THE OBLIGATIONS AND SHALL BE IN ADDITION TO ALL

OTHER RIGHTS OF LENDER UNDER THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS.

     (d)    Upon Lender's request, at any time after the occurrence of an Event of Default or at such other time as Lender has reasonable grounds to believe that Hazardous Substances are or have been handled, generated, stored, processed, transported to or from, or released or discharged from or disposed of on or around, the Property (other than in the normal course of Borrower's or the Tenants' business or activities, respectively, and in compliance with all Environmental Laws), or that Borrower or any Tenant of the Property may be in violation of Environmental Laws, Borrower shall provide, at Borrower's sole cost and expense, an inspection or audit of the Property prepared by a hydrogeologist or environmental engineer or other appropriate consultant approved by Lender to determine whether there has been a Release or threatened Release of Hazardous Substances at, on, under, or from the Property onto adjoining properties and if the Property is in full compliance with Environmental Laws (including asbestos-containing material or lead-based paint). If Borrower fails to provide such inspection or audit within thirty (30) days after such request, Lender may order the same, and Borrower hereby grants to Lender and its employees and agents access to the Property and a license to undertake such inspection or audit. The cost of such inspection or audit, together with interest thereon at the Default Interest Rate from the date incurred by Lender until actually paid by Borrower, shall be immediately paid by Borrower on demand and shall be secured by the Security Instrument and by all of the other Loan Documents securing all or any part of the Obligations.

     (e)    Borrower agrees that if prior to the date hereof, or if at any time hereafter, any inspection or audit reveals (or revealed, as applicable) the presence of Mold in the indoor air of the Property at concentrations exceeding ambient air levels or visible Mold on any building materials or surfaces at the Property for which the EPA Mold Guidelines recommends or requires removal thereof by remediation professionals, then, on or before thirty (30) days following (i) the date hereof, if such inspection or audit was made prior to the date hereof or (ii) such inspection or audit, if such inspection or audit is hereafter made, as applicable, Borrower shall, at its sole cost and expense, develop and implement, and thereafter diligently and continuously carry out (or cause to be developed and implemented and thereafter diligently and continually to be carried out), an operations, abatement and maintenance plan (the "**Mold O&M Plan**") to monitor, maintain and remediate any water filtration and Mold issues affecting the Property, which plan shall be prepared by an expert, and be in form, scope and substance acceptable to Lender and sufficient to cause the Property to comply with all applicable laws and all EPA Mold Guidelines and in accordance with the Mold O&M Plan. If a Mold O&M Plan has been prepared prior to the date hereof, Borrower agrees to diligently and continually carry out (or cause to be carried out) the provisions thereof. Compliance with the Mold O&M Plan shall require or be deemed to require, without limitation, the proper preparation and maintenance of all records, papers and forms required under the Environmental Laws.

     (f)    Without limiting the foregoing, Lender and its authorized representatives may, during normal business hours and at its own expense, inspect the Property and Borrower's records related thereto for the purpose of determining compliance with Environmental Laws and the terms and conditions of this Section 2.22.

     2.23    INDEMNIFICATION; SUBROGATION.

NY 00058782 v5

32

(a)    BORROWER SHALL INDEMNIFY, DEFEND AND HOLD LENDER HARMLESS FROM AND AGAINST: (i) ANY AND ALL CLAIMS FOR BROKERAGE, LEASING, FINDER'S OR SIMILAR FEES WHICH MAY BE MADE RELATING TO THE PROPERTY OR THE LOAN, (ii) ANY AND ALL LIABILITY, OBLIGATIONS, LOSSES, DAMAGES, PENALTIES, CLAIMS, ACTIONS, SUITS, LIENS, CHARGES, ENCUMBRANCES, COSTS AND EXPENSES (INCLUDING LENDER'S ATTORNEYS' FEES, TOGETHER WITH APPELLATE COUNSEL FEES, IF ANY) OF WHATEVER KIND OR NATURE WHICH MAY BE ASSERTED AGAINST, IMPOSED ON OR INCURRED BY LENDER UNDER ANY LEASE, FOR ANY LOSS ARISING FROM A FAILURE OR INABILITY TO COLLECT RENTS AND PROFITS OR IN CONNECTION WITH THE LOAN, THIS AGREEMENT, THE OTHER LOAN DOCUMENTS, THE PROPERTY, OR ANY PART THEREOF, OR THE EXERCISE BY LENDER OF ANY RIGHTS OR REMEDIES GRANTED TO IT UNDER THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, AND ANY EVENT OF DEFAULT UNDER THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS, (iii) ANY LIENS (WHETHER JUDGMENTS, MECHANICS', MATERIALMEN'S OR OTHERWISE), CHARGES AND ENCUMBRANCES FILED AGAINST THE PROPERTY, AND (iv) ANY CLAIMS AND DEMANDS FOR DAMAGES OR INJURY, INCLUDING CLAIMS FOR PROPERTY DAMAGE, PERSONAL INJURY OR WRONGFUL DEATH, ARISING OUT OF OR IN CONNECTION WITH ANY ACCIDENT OR FIRE OR OTHER CASUALTY ON THE PROPERTY OR ANY NUISANCE OR TRESPASS MADE OR SUFFERED THEREON, INCLUDING, IN ANY CASE, ATTORNEYS' FEES, COSTS AND EXPENSES AS AFORESAID, WHETHER AT PRETRIAL, TRIAL OR APPELLATE LEVEL FOR ANY CIVIL, CRIMINAL OR ADMINISTRATIVE PROCEEDINGS.   SHOULD LENDER INCUR ANY LIABILITY UNDER THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS, THE AMOUNT THEREOF, INCLUDING, WITHOUT LIMITATION, COSTS, EXPENSES AND REASONABLE ATTORNEYS' FEES, TOGETHER WITH INTEREST THEREON AT THE DEFAULT INTEREST RATE FROM THE DATE INCURRED BY LENDER UNTIL ACTUALLY PAID BY BORROWER, SHALL BE IMMEDIATELY DUE AND PAYABLE TO LENDER BY BORROWER ON DEMAND AND SHALL BE SECURED BY THE SECURITY INSTRUMENT AND BY ALL OF THE OTHER LOAN DOCUMENTS SECURING ALL OR ANY PART OF THE OBLIGATIONS.   HOWEVER, NOTHING HEREIN SHALL BE CONSTRUED TO OBLIGATE BORROWER TO INDEMNIFY, DEFEND AND HOLD HARMLESS LENDER FROM AND AGAINST ANY AND ALL LIABILITIES, OBLIGATIONS, LOSSES, DAMAGES, PENALTIES, CLAIMS, ACTIONS, SUITS, COSTS AND EXPENSES ENACTED AGAINST, IMPOSED ON OR INCURRED BY LENDER BY REASON OF LENDER'S WILLFUL MISCONDUCT OR GROSS NEGLIGENCE.   THIS INDEMNITY SHALL SURVIVE PAYMENT IN FULL OF THE OBLIGATIONS.

(b)    Lender may engage the services of attorneys if it is made a party defendant to any litigation (or threatened action or claim) or to enforce the terms of this Agreement or any of the other Loan Documents or to protect its rights thereunder, and in the event of any such engagement, Borrower shall pay Lender's attorneys' fees (together with reasonable appellate counsel fees, if any), consultants' fees, experts' fees, and expenses reasonably incurred by Lender, whether or not such action is actually commenced against Borrower.  All references to "attorneys" in this subsection and elsewhere in this Agreement shall

include, without limitation, any attorney or law firm engaged by Lender and Lender's in-house counsel, and all references to "fees and expenses" in this subsection and elsewhere in the Security Instrument shall include, without limitation, any fees of such attorney or law firm and any allocation charges and allocation costs of Lender's in-house counsel.

(c)    A waiver of subrogation shall be obtained by Borrower from its insurance carrier and, consequently, Borrower waives any and all right to claim or recover against Lender, its officers, employees, agents and representatives, for loss of or damage to Borrower, the Property, Borrower's property or the property of others under Borrower's control from any cause insured against or required to be insured against by the provisions of this Agreement.

2.24    Covenants with Respect to Indebtedness; Operations and Fundamental Changes of Borrower.  Borrower covenants and warrants that:

(a)    Borrower shall not hold or acquire, directly or indirectly, any ownership interest (legal or equitable) in any real or personal property other than the Property, or become a shareholder of or a member or partner in any entity which acquires any property other than the Property, until such time as the Loan has been fully repaid and all Obligations are satisfied.

(b)    Borrower's operating agreement shall (i) limit its purpose to the acquisition, development, sale, ownership, leasing, transferring, exchanging, management, operation, mortgaging, financing, refinancing and maintenance of the Property and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing, (ii) prohibit other activities, mergers, consolidations and asset sales until such time as the Loan has been fully repaid, (iii) contain separateness covenants satisfactory to Lender and substantially similar to those set forth in Schedule IV attached hereto, and (iv) provide that such provisions shall not be amended without the prior written consent of Lender.

(c)    Borrower represents that it has operated its business in a manner consistent with this Section 2.24 and the provisions contained in Schedule IV from the date of its formation through the Closing Date and agrees that it shall hereafter comply with the terms, conditions, and covenants contained in this Section 2.24 and in Schedule IV.

2.25    Litigation.  Borrower will give prompt written notice to Lender of any litigation or governmental proceedings pending or threatened (in writing) against Borrower which might have a Material Adverse Effect.

2.26    ERISA.

(a)    Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Lender of any of its rights under the Note, this Agreement or any of the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under ERISA.

(b)    Borrower further covenants and agrees to deliver to Lender such certifications or other evidence from time to time throughout the term of this Agreement, as requested by Lender in its sole discretion, that (i) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan"

within the meaning of Section 3(3) of ERISA; (ii) Borrower is not subject to state statutes regulating investments and fiduciary obligations with respect to governmental plans; and (iii) one or more of the following circumstances is true:

        (A)    Equity interests in Borrower are publicly offered securities within the meaning of 29 C.F.R. Section 2510.3-101(b)(2);

        (B)    Less than twenty-five percent (25%) of each outstanding class of equity interests in Borrower are held by "benefit plan investors" within the meaning of 29 C.F.R. Section 2510.3-101(f)(2); or

        (C)    Borrower qualifies as an "operating company" or a "real estate operating company" within the meaning of 29 C.F.R. Section 2510.3-101(c) or (e) or an investment company registered under the Investment Company Act of 1940.

        (c)    BORROWER SHALL INDEMNIFY LENDER AND DEFEND AND HOLD LENDER HARMLESS FROM AND AGAINST ALL CIVIL PENALTIES, EXCISE TAXES, OR OTHER LOSS, COST, DAMAGE AND EXPENSE (INCLUDING, WITHOUT LIMITATION, REASONABLE ATTORNEYS' FEES AND DISBURSEMENTS AND COSTS INCURRED IN THE INVESTIGATION, DEFENSE AND SETTLEMENT OF CLAIMS AND LOSSES INCURRED IN CORRECTING ANY PROHIBITED TRANSACTION OR IN THE SALE OF A PROHIBITED LOAN, AND IN OBTAINING ANY INDIVIDUAL PROHIBITED TRANSACTION EXEMPTION UNDER ERISA THAT MAY BE REQUIRED, IN LENDER'S SOLE DISCRETION) THAT LENDER MAY INCUR, DIRECTLY OR INDIRECTLY, AS A RESULT OF A DEFAULT UNDER THIS SECTION. THIS INDEMNITY SHALL SURVIVE ANY TERMINATION, SATISFACTION OR FORECLOSURE OF THE NOTE AND SECURITY INSTRUMENT.

    2.27    <u>Construction Covenants</u>.

        (a)    <u>Governmental Approvals</u>.  Borrower shall, prior to the initial advance of the Renovation Reserve, obtain all of the Governmental Approvals necessary for the construction of the Renovations and, at all times thereafter, Borrower shall comply with all of the terms and conditions of such Governmental Approvals.

        (b)    <u>Inspections and Reviews</u>.  Borrower shall permit Lender, the Inspecting Engineer and each of their respective representatives to enter upon the Property, inspect the Renovations and all materials to be used in the construction thereof, and examine all detailed plans and shop drawings which are or may be kept at the construction site.  Borrower will cooperate and cause the General Contractor and Construction Contractors to cooperate with the Inspecting Engineer to enable the Inspecting Engineer to perform its functions hereunder.  At the time of each inspection by the Inspecting Engineer, Borrower will make available to the Inspecting Engineer, on demand, daily log sheets, covering the period since the immediately preceding inspection showing the date, weather, subcontractors on the job, number of workers and status of construction.  Further, Borrower shall (i) provide to Lender reasonable advance notice of any project meetings and Lender or the Inspecting Engineer shall be permitted to attend any such project meeting, and (ii) furnish minutes of any project meetings to the Inspecting

Engineer. All inspections by Lender and its consultants and agents, including the Inspecting Engineer, shall be for the sole benefit of Lender. Neither Lender nor any of Lender's consultants or agents assumes or shall have any responsibility, obligation or liability to any Person (including Borrower or Guarantor) by reason of such inspections and no Person (including Borrower or Guarantor) may rely on such inspections for any purpose (including stage of completion, adequacy or workmanship, compliance with applicable Legal Requirements, conformance with the approved plans and specifications, or other matters related to the construction of the Renovations). Lender's inspection and/or approval of an item shall not result in any waiver of Lender's rights in the event such item does not conform with this Agreement unless Lender specifically approves such non-conformance in writing.

(c)    _Performance of Renovations_.  Borrower shall commence construction of the Renovations no later than thirty (30) days after the Closing Date and shall continue the construction of the Renovations with diligence and continuity, as reasonably determined by Lender, in order that the Substantial Completion of the Renovation shall occur on or before June 30, 2021 (the "**Completion Date**").  If, however, Substantial Completion of the Renovations is delayed due to Force Majeure, then the Completion Date shall be extended by such time as the Inspecting Engineer shall determine is reasonable based upon the delay caused by the Force Majeure, provided that, in no event shall the Completion Date be extended as a result of one or more Force Majeure Events beyond September 30, 2021.  For purposes hereof, "**Substantial Completion**" means that Lender has received evidence satisfactory to Lender in its reasonable discretion that (i) all of the Renovations have been substantially completed in a good and workmanlike manner and in compliance with all applicable laws and the plans approved by Lender, (ii) lien waivers have been delivered by each of the General Contractor, Construction Contractors and subcontractors in connection with all work performed and materials supplied in connection with the Renovations, and (iii) all applicable Governmental Authorities have approved the use and occupancy of the Property including, without limitation, the issuance of a temporary or permanent certificate of occupancy for the Property.

(d)    _Conformance of Renovation; Change Orders_.  The Renovations (i) shall comply with all applicable legal requirements, (ii) shall be completed in good and workmanlike manner and in substantial conformity with the plans approved by Lender, and (iii) shall be contained wholly within the boundaries of the Property and shall not encroach on any other real estate, easements, building lines or set-back requirements.  Borrower shall not amend or modify the General Contract, the Construction Contracts approved by Lender, the plans approved by Lender, or the Renovation Budget without Lender's prior written consent; provided that Borrower may implement change orders (each a "**Change Order**" and collectively, the "**Change Orders**") to the General Contract, plans, or Renovations Budget without Lender's prior written approval if (w) the Change Order is for less than $75,000.00, (x) the aggregate sum of all Change Orders does not exceed $250,000.00, (y) the Change Order does not materially alter the design or quality of the Property, and (z) the Change Order does not result in a Renovation Deficiency.

(e)    _Contractor Change Orders_.  Borrower shall require covenants from the General Contractor and any Construction Contractors to the same effect as the covenant made by Borrower in _Section 2.27(d)_ above and it will provide in the General Contract and every Construction Contract that the General Contractor or the applicable Construction Contractor will deliver to Lender or the Inspecting Engineer copies of all subcontracts, Change Orders and any

other contract, purchase order or subcontract covering labor, materials, equipment or furnishings to or for the Renovations, and the names of all Persons with whom the General Contractor or the applicable Construction Contractor has contracted or intends to contract for the construction of the Renovations or for the furnishing of labor or materials therefor.

(f)      Construction Reports.  Promptly upon receipt thereof, Borrower shall provide Lender and the Inspecting Engineer with copies of (i) all material inspections, reports, test results and other information received by Borrower from time to time from its architects, employees, agents, representatives, engineers, consultants, advisors, any contractor or any other Persons involved in the construction of the Renovations, (ii) any notices of default pertaining to the construction of the Renovations, and (iii) any violation notice that Borrower or any of its affiliates (or their respective agents or representatives) receives from any Governmental Authority or any insurance company providing insurance in connection with the construction of the Renovations and the Property.

(g)      Protection.  Borrower shall employ suitable means to protect from theft or vandalism all portions of the Renovations and all tools and building materials stored on the Property.

(h)      Compliance with Construction Agreements.  Borrower shall, and shall use commercially reasonable efforts to cause the General Contractor and each Construction Contractor to, observe and perform in all material respects the Construction Agreements (hereinafter defined) entered into with such parties within the time periods permitted therein.  If Borrower receives from any Person any notice or claim of a default or material nonperformance by Borrower under any Construction Agreement, Borrower will promptly transmit a complete copy of each such notice or claim to Lender and, upon Lender's request, will at all times keep Lender informed, on a timely and current basis, of the status of such claim and any resolution or non-resolution thereof.  Borrower shall pay all amounts due and owing under the Construction Agreements or otherwise with respect to the construction of the Renovations as they become due and owing, notwithstanding that Lender may not be obligated to make an advance hereunder or that the amount of any particular advance may be insufficient to pay such costs, and Borrower shall pay from its own funds any deficiency as an additional equity investment in the Renovations.  As used in this Agreement, "**Construction Agreements**" means all agreements entered into in connection with the construction and design of the Renovations contemplated by the plans approved by Lender, including Borrower's architect's agreement and the General Contract.

(i)      Lien Free Completion.  The construction of the Renovations shall be free and clear of defects and mechanics' liens or claims of liens for materials supplied or labor or services performed in connection therewith.

(j)      Governmental Inspection.  Borrower, forthwith upon completion of the Renovations and each portion thereof, shall cause the same to be inspected by each Governmental Authority having jurisdiction, cause to be corrected any defects and deficiencies which may be disclosed by any such inspection, and cause to be duly issued all occupancy certificates and other licenses, permits and authorizations necessary for the operation and occupancy of the Property; and in any event, Borrower shall do and perform, or cause to be done

NY 00058782 v5

37

and performed, all of the foregoing acts and things and cause to be issued and executed all such occupancy permits, licenses and authorizations on or before the Completion Date.

(k)     Construction Defects. Within ten (10) Business Days after written notice to Borrower from Lender or any Governmental Authority, Borrower shall proceed with diligence to correct any departure from the approved plans and specifications, except as may be otherwise approved by Lender in its reasonable discretion, and to correct all defects in the Renovations. The advance of any Renovation Reserve funds shall not constitute a waiver of Lender's right to require compliance with this subsection (k) with respect to any such defect or departure from the approved plans and specifications. Lender shall have no duty to review or inform Borrower of the quality or suitability of the Renovations or the plans and specifications or any amendment or alteration thereof.

(l)     Signage. Promptly following the execution of this Agreement, Borrower shall, at its own expense, place a sign on the Property indicating, among other things, that Lender is providing the construction financing for the Renovations.  Such sign shall be in form and location reasonably satisfactory to Lender and shall remain in place until Substantial Completion of the Renovations has occurred.

(m)     Contingency.  The parties acknowledge that, as of the date hereof, the Renovation Budget contains a line item for $543,640.00 (the "**Contingency Funds**"), which is to be used as "contingency" for Change Orders and soft costs approved (or deemed approved) by Lender and to correct any matters which were not adequately described in the plans and specifications, but not for any additions to the scope of the Renovations or optional changes of construction materials. In addition to the requirements that must be satisfied for all Construction Disbursements (to the extent applicable), the following shall be conditions to each disbursement of the Contingency Funds: (i) Borrower shall have delivered a written request to Lender explaining the proposed use of the Contingency Funds, (ii) at the time of Borrower's request and Lender's approval of the proposed use of Contingency Funds, Lender has determined that no Renovation Deficiency has occurred and is continuing, and (iii) unless the Contingency Funds are being used to pay the cost of any Change Order that is expressly permitted under Section 2.27(d) above, Lender shall have determined, in Lender's reasonable discretion, that making the requested disbursement of Contingency Funds is consistent with the timely completion of the Renovations in accordance with the terms of this Agreement and will not result in the remaining available Contingency Funds being out of proportion with the remaining Renovations to be completed.

2.27    Equity Contribution. Until the Obligations are paid in full, the equity owners of Borrower shall maintain at all times an aggregate equity investment in Borrower in an amount of not less than $11,100,000.00.  Borrower shall demonstrate in writing and to Lender's reasonable satisfaction, within ten (10) days after a request by Lender, compliance with this Section.

2.28    Net Worth Covenant.  Until the Obligations are paid in full, the parties comprising Guarantor shall maintain at all times an aggregate tangible net worth, exclusive of any direct or indirect interest in the Property, of at least $30,000,000.00.  Borrower shall demonstrate in writing and to Lender's reasonable satisfaction, within ten (10) days after a request by Lender, compliance with this Section. For purposes of this Agreement, "**tangible net**

**worth**" means, as of a given date, Guarantor's equity calculated in conformance with GAAP by subtracting total liabilities from total tangible assets.

2.29   Liquidity Covenant. Until the Obligations are paid in full, the parties comprising Guarantor shall maintain at all times liquid assets having an aggregate value of at least $1,000,000.00. Borrower shall demonstrate in writing and to Lender's reasonable satisfaction, within ten (10) days after a request by Lender, compliance with this Section. For purposes of this Agreement, "**liquid assets**" means cash and unencumbered, marketable securities.

2.30   Additional Loan Documents. Borrower shall perform all of its obligations under the PACE Financing Documents. Borrower shall deliver to Lender true, correct and complete copies of any and all documents, instruments, demands, notices and other communications delivered to or by Pace Program Administrator (or any party collecting assessments on its behalf) under the PACE Financing Documents not more than five (5) Business Days after delivery or receipt thereof. Without limiting the foregoing, within not more than five (5) Business Days after receipt thereof, Borrower shall provide Lender with copies of all communications received by it with respect to the PACE Financing alleging that any party has failed to timely to pay any amounts payable thereunder and/or the occurrence of a breach or default pursuant to the PACE Financing.

2.31   Loan Payable through Assessments. The PACE Financing only shall be paid through assessments pursuant to the PACE Financing Documents.

**ARTICLE III**
**EVENTS OF DEFAULT**

3.01   Events of Default. The occurrence of any of the following events shall be a "default" hereunder and the occurrence of any of the following events which is not cured within any applicable notice and/or cure period specified below shall be an "**Event of Default**" hereunder:

(a)   Borrower fails to (i) pay the principal on the Note when due and payable, or (ii) pay the interest on the Note within five (5) days after the date such payment was due and payable.

(b)   Borrower fails to punctually perform any covenant, agreement, obligation, term or condition hereof which requires payment of any money to Lender and such failure continues for five (5) days after written notice that such payment was due.

(c)   Borrower fails to provide insurance as required by Section 2.02 hereof or fails to perform any covenant, agreement, obligation, term or condition set forth in Section 2.13 hereof (Waste; Alteration of the Property), Section 2.15 hereof (Financial Statements and Books and Records), or Section 2.22 hereof (Hazardous Materials and Environmental Concerns).

(d)   There shall be a sale, conveyance, disposition, alienation, hypothecation, leasing, assignment, pledge, mortgage, granting of a security interest in or other transfer or

further encumbrancing of the Property, Borrower or its owners, or any portion thereof or any interest therein, in violation of <u>Section 2.10</u> hereof.

(e)      Borrower fails to perform any other covenant, agreement, obligation, term or condition set forth herein or in any other Loan Document other than those otherwise described in this <u>Section 3.01</u> and, to the extent such failure or default is susceptible of being cured, such failure or default continues for thirty (30) days after written notice thereof from Lender to Borrower; <u>provided</u>, <u>however</u>, that if such failure or default is susceptible of cure but such cure cannot be accomplished with reasonable diligence within said period of time, and if Borrower commences to cure such default promptly after receipt of notice thereof from Lender, and thereafter prosecutes the curing of such default with reasonable diligence, such period of time shall be extended for such period of time as may be necessary to cure such default with reasonable diligence, but not to exceed an additional sixty (60) days.

(f)      A default occurs under any of the other Loan Documents which has not been cured within any applicable grace or cure period referenced above or therein.

(g)      Any representation or warranty made herein, in or in connection with any application or commitment relating to the Loan, or in any of the other Loan Documents to Lender by Borrower, by any principal, manager or general partner in Borrower or by any indemnitor or guarantor under any indemnity or guaranty executed in connection with the Loan is determined by Lender to have been false or misleading in any material respect at the time made.

(h)      Borrower, any general partner of Borrower or any indemnitor or guarantor under any indemnity or guaranty executed in connection with the Loan becomes insolvent, or shall make a transfer in fraud of creditors, or shall make an assignment for the benefit of creditors, shall file a petition in bankruptcy, shall voluntarily be adjudicated insolvent or bankrupt or shall admit in writing the inability to pay debts as they mature, shall petition or apply to any tribunal for or shall consent to or shall not contest the appointment of a receiver, trustee, custodian or similar officer for Borrower, general partner of Borrower or for any such indemnitor or guarantor or for a substantial part of the assets of Borrower, of any such principal, general partner Borrower or of any such indemnitor or guarantor, or shall commence any case, proceeding or other action under any bankruptcy, reorganization, arrangement, readjustment or debt, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect.

(i)      A petition ("**Petition**") is filed or any case, proceeding or other action is commenced against Borrower, against any general partner of Borrower or against any indemnitor or guarantor under any indemnity or guaranty executed in connection with the Loan seeking to have an order for relief entered against it as debtor or seeking reorganization, arrangement, adjustment, liquidation, dissolution or composition of it or its debts or other relief under any law relating to bankruptcy, insolvency, arrangement, reorganization, receivership or other debtor relief under any law or statute of any jurisdiction, whether now or hereafter in effect, or a court of competent jurisdiction enters an order for relief against Borrower, against any general partner of Borrower or against any indemnitor or guarantor under any indemnity or guaranty executed in connection with the Loan, as debtor, or an order, judgment or decree is entered appointing, with

40

or without the consent of Borrower, of any such general partner of Borrower or of any such indemnitor or guarantor, a receiver, trustee, custodian or similar officer for Borrower, for any such general partner of Borrower or for any such indemnitor or guarantor, or for any substantial part of any of the properties of Borrower, of any such general partner of Borrower or of any such indemnitor or guarantor, and if any such event shall occur, such petition, case, proceeding, action, order, judgment or decree shall not be dismissed within sixty (60) days after being commenced.

(j)    Borrower solicits or aids the solicitation of the filing of any Petition against Borrower, including, without limitation:  (i) providing information regarding the identity of creditors or the nature of creditors' claims to any third party unless compelled to do so by order of a court of competent jurisdiction or by regulation promulgated by a governmental agency, or (ii) paying the legal fees or expenses of any creditor of or interest holder in Borrower with respect to any matter whatsoever.

(k)    The Property or any part thereof shall be taken on execution or other process of law in any action against Borrower.

(l)    Borrower abandons all or a portion of the Property.

(m)    The holder of any lien or security interest on the Property (without implying the consent of Lender to the existence or creation of any such lien or security interest), whether superior or subordinate to the Security Instrument or any of the other Loan Documents, declares a default and such default is not cured within any applicable grace or cure period set forth in the applicable document or such holder institutes foreclosure or other proceedings for the enforcement of its remedies thereunder.

(n)    The Property, or any part thereof, is subjected to actual or threatened waste or to removal, demolition or material alteration (other than the Renovations) so that the value of the Property is materially diminished thereby and Lender determines (in its subjective determination) that it is not adequately protected from any loss, damage or risk associated therewith.

(o)    Any dissolution, termination, partial or complete liquidation, merger or consolidation of Borrower or any of its principals, members, managers or general partners, without Lender's prior written consent, which may be granted or withheld in Lender's sole and absolute discretion.

(p)    Borrower, any general partner of Borrower, or any guarantor has a judgment for monetary damages entered against it which, in Lender's sole and absolute judgment, materially diminishes such entity or person's ability to perform its obligations under the Loan Documents.

(q)    If Borrower (i) abandons or ceases work on any Renovations or Replacements required under the terms of Section 2.05 for a period of more than twenty (20) days, unless such cessation is caused by circumstances beyond the reasonable control of Borrower, (ii) Borrower replaces any contractor approved by Lender for such work without Lender's prior written consent, (iii) Borrower fails to Substantially Complete the Renovations

prior to the Completion Date (as may be extended pursuant to Section 2.27(c) as a result of one or more Force Majeure Events) or, in the reasonable judgment of Lender, Borrower cannot Substantially Complete the Renovations prior to the Completion Date, or (iv) Borrower fails to cure a Renovation Deficiency in accordance with Section 2.05(a)(vi).

(r)     If any guarantor who is an individual dies or is incapacitated and Borrower fails, within thirty (30) days after any such event, to provide (i) a substitute guarantor satisfactory to Lender in its sole and absolute discretion, or (ii) a letter of credit in an amount and in form approved by Lender.

(s)     If Borrower, any general partner of Borrower, or any guarantor shall default in the payment of any moneys due and payable to Lender, other than in connection with the Loan, or any default shall occur in the performance or observance of any obligation or condition on the part of Borrower, any general partner of Borrower, or any guarantor under any written contract, agreement or other instrument heretofore or hereafter entered into with Lender other than in connection with the Loan.

(t)     A default occurs under any of the PACE Financing Documents which has not been cured within any applicable grace or cure period provided therein.

(u)     Borrower fails to pay the Deferred Fees to the City of Poway in accordance with Section 2.05(f).

### ARTICLE IV
### REMEDIES

4.01    Remedies Available.    If there shall occur an Event of Default under this Agreement or any of the other Loan Documents, then the Security Instrument is subject to foreclosure as provided by law and Lender may, at its option and by or through a trustee, nominee, assignee or otherwise, to the fullest extent permitted by law, exercise any or all of the following rights, remedies and recourses, either successively or concurrently:

(a)     Acceleration.    Accelerate the maturity date of the Note and declare any or all of the Obligations to be immediately due and payable without any presentment, demand, protest, notice or action of any kind whatever (each of which is hereby expressly waived by Borrower), whereupon the same shall become immediately due and payable.  Upon any such acceleration, payment of such accelerated amount shall constitute a prepayment of the principal balance of the Note and any applicable Minimum Interest and Exit Fee provided for in the Note shall then be immediately due and payable.

(b)     Entry on the Property.    Without in any way curing or waiving any default of Borrower, either in person, by agent or by court-appointed receiver, with or without bringing any action or proceeding, or by a receiver appointed by a court and without regard to the adequacy of its security, enter upon and take possession of the Property, or any part thereof, in its own name, without force or with such force as is permitted by law and without notice or process or with such notice or process as is required by law unless such notice and process is waivable, in which case Borrower hereby waives such notice and process, and do any and all acts and

perform any and all work which may be desirable or necessary in Lender's judgment to complete any unfinished construction on the Property, to preserve and/or enhance the value, marketability or rentability of the Property, to increase the income therefrom, to manage and operate the Property or to protect the security hereof and all sums expended by Lender therefor, together with interest thereon at the Default Interest Rate shall be immediately due and payable to Lender by Borrower on demand and shall be secured by the Security Instrument and by all of the other Loan Documents securing all or any part of the Obligations.

(c)    <u>Collect Rents and Profits</u>.    With or without taking possession of the Property, sue for or otherwise collect the Rents and Profits, including those past due and unpaid, and apply the same, less costs and expenses of operation and collection, including, without limitation, reasonable attorneys' fees, upon any indebtedness secured hereby, all in such order as Lender in its discretion may determine.

(d)    <u>Appointment of Receiver</u>.    Upon, or at any time prior or after, initiating the exercise of any power of sale, instituting any judicial foreclosure or instituting any other foreclosure of the liens and security interests provided for herein or any other legal proceedings hereunder, make application, ex-parte, to a court of competent jurisdiction for appointment of a receiver for all or any part of the Property, as a matter of strict right and without notice to Borrower and without regard to the adequacy of the Property for the repayment of the Obligations or the solvency of Borrower or any person or persons liable for the payment of such indebtedness, and Borrower does hereby irrevocably consent to such appointment, waives any and all notices of and defenses to such appointment and agrees not to oppose any application therefor by Lender, but nothing herein is to be construed to deprive Lender of any other right, remedy or privilege Lender may now have under the law to have a receiver appointed; <u>provided</u>, <u>however</u>, that the appointment of such receiver, trustee or other appointee by virtue of any court order, statute or regulation shall not impair or in any manner prejudice the rights of Lender to receive payment of the Rents and Profits pursuant to other terms and provisions of the Security Instrument or the Assignment of Leases and Rents of even date herewith.  Any such receiver shall have all of the usual powers and duties of receivers in similar cases, including, without limitation, the full power to hold, develop, rent, lease, manage, maintain, operate and otherwise use or permit the use of the Property upon such terms and conditions as said receiver may deem to be prudent and reasonable under the circumstances as more fully set forth in <u>Section 4.03</u> below.  Such receivership shall, at the option of Lender, continue until full payment of all of the Obligations or until title to the Property shall have passed by foreclosure sale under the Security Instrument or deed in lieu of foreclosure.

(e)    <u>UCC Foreclosure</u>.    Pursue all rights and remedies available to Lender under the Uniform Commercial Code as in effect in the State of California with respect to any personal property collateral for the Loan.

(f)    <u>Foreclosure</u>.    Immediately commence an action to foreclose the Security Instrument or to specifically enforce its provisions or any of the Obligations pursuant to the statutes in such case made and provided and sell the Property or cause the Property to be sold in accordance with the requirements and procedures provided by said statutes in a single parcel or in several parcels at the option of Lender.  In the event foreclosure proceedings are filed by Lender, all expenses incident to such proceedings; including, but not limited to, attorneys' fees

and costs, shall be paid by Borrower and secured by the Security Instrument and by all of the other Loan Documents securing all or any part of the Obligations. The Obligations secured by the Security Instrument; including, without limitation, interest at the Default Interest Rate any prepayment or exit charge, fee or premium required to be paid under the Note in order to prepay principal (to the extent permitted by applicable law), reasonable attorneys' fees and any other amounts due and unpaid to Lender under the Loan Documents, may be bid by Lender in the event of a foreclosure sale hereunder. In the event of a judicial sale pursuant to a foreclosure decree, it is understood and agreed that Lender or its assigns may become the purchaser of the Property or any part thereof.

(g)    Construction Remedies.

(i)    From and after the occurrence of an Event of Default, Lender will have the right, but not the obligation, to enter the Property and to take any and all actions Lender deems necessary or appropriate to complete the construction of the Renovations including (A) making changes in the plans and specifications, the General Contract, any Construction Contracts, any subcontracts, any architect's or engineering agreements, any Governmental Approvals, and any other documents related to the Renovations or any work or materials, (B) entering into, modifying, or terminating any contractual arrangements, (C) taking such actions as it deems necessary with respect to any bonds or insurance policies, (D) prosecuting and defending actions and proceedings in connection with the construction of the Renovations or in connection with any performance or payment bonds delivered hereunder, (E) settling and compromising such actions and accepting payments therefor and executing instruments of release and satisfaction, and (F) performing any and every act with respect to the construction of the Renovations and the operation and maintenance of the Property that Borrower may do on its own behalf.

(ii)    Notwithstanding anything to the contrary set forth herein, Lender shall have the right to discontinue any actions taken pursuant to this Section 4.01(g) at any time and in its sole discretion. Borrower further acknowledges and agrees that should Lender elect to take any such actions, Lender will not thereby assume any liability to Borrower or to any other person for completing the Renovations, or for the manner or quality of the Renovations, and Borrower expressly waives any such liability.

(iii)    All sums expended by or on behalf of Lender in completing the construction of the Renovations (whether or not construction is, in fact, completed), plus a fee of ten percent (10%), to the extent permitted by applicable law, for supervision of construction in addition to any fees charged by third party inspectors or architects to supervise construction will be disbursed from the Renovation Reserve and, to the extent that sufficient funds are not available in the Renovation Reserve, will be considered to be an additional advance to Borrower, payable on demand, bearing interest at the Default Rate and secured by the Security Instrument.

(iv)    Borrower, to implement the rights of Lender under this Section 4.01(g), irrevocably authorizes Lender, during the continuance of any Event of Default, with full power of substitution, for Borrower and in its name, place and stead to take any

and all actions Lender deems necessary or appropriate to complete the construction of the Renovations and to take such other actions as are permitted by this Section 4.01(g).

(h)    Other.  Exercise any other right or remedy available hereunder, under any of the other Loan Documents, or at law or in equity.

4.02    Application of Proceeds.  To the fullest extent permitted by law and to the extent funds are available, the proceeds of any sale under the Security Instrument shall be applied to the following items in such order as Lender in its sole discretion may determine:

(a)    To payment of the costs, expenses and fees of taking possession of the Property, and of holding, operating, maintaining, using, leasing, repairing, improving, marketing and selling the same and of otherwise enforcing Lender's rights and remedies hereunder and under the other Loan Documents; including, but not limited to, receivers' fees, court costs, attorneys', accountants', appraisers', auctioneers', managers' and other professional fees, title charges and transfer taxes.

(b)    To payment of all sums expended by Lender under the terms of any of the Loan Documents and not yet repaid, together with interest on such sums at the Default Interest Rate.

(c)    To payment of the Obligations, including, without limitation, interest at the Default Interest Rate and the Exit Fee, and, to the extent permitted by applicable law, any prepayment fee, charge or premium required to be paid under the Note in order to prepay principal, in any order that Lender chooses in its sole discretion.

(d)    The remainder, if any, of such funds shall be disbursed to Borrower or to the person or persons legally entitled thereto.

4.03    Right and Authority of Receiver or Lender upon an Event of Default; Power of Attorney.  Upon the occurrence of an Event of Default hereunder, and entry upon the Property pursuant to Section 4.01(b) hereof or appointment of a receiver pursuant to Section 4.01(d) hereof, and under such terms and conditions as may be prudent and reasonable under the circumstances in Lender's or the receiver's sole and absolute discretion, all at Borrower's cost and expense, Lender or said receiver, or such other persons or entities as they shall hire, direct or engage, as the case may be, may do or permit one or more of the following, successively or concurrently:  (a) enter upon and take possession and control of any and all of the Property; (b) take and maintain possession of all documents, books, records, papers and accounts relating to the Property; (c) exclude Borrower and its agents, servants and employees wholly from the Property; (d) manage and operate the Property, with full power to employ agents to manage the same, and pay all expenses incurred in the operation of the Property; (e) preserve and maintain the Property; (f) contract and pay for repairs and replacements to the Property and to the fixtures, equipment and personal property located on or used in any way in the operation, use and occupancy of the Property as in the sole subjective judgment and discretion of Lender may be necessary to maintain the same in a tenantable condition; (g) complete any construction or repair of the improvements or the Property, with such changes, additions or modifications of the plans and specifications or intended disposition and use of the same as Lender may in its sole

discretion deem appropriate or desirable to place the Property in such condition as will, in Lender's sole discretion, make it or any part thereof readily marketable or rentable; (h) conduct a marketing or leasing program with respect to the Property, or employ a marketing or leasing agent or agents to do so, directed to the leasing or sale of the Property under such terms and conditions as Lender may in its sole discretion deem appropriate or desirable; (i) employ such contractors, subcontractors, materialmen, architects, engineers, consultants, managers, brokers, marketing agents, or other employees, agents, independent contractors or professionals, as Lender may in its sole and absolute discretion deem appropriate or desirable to implement and effectuate the rights and powers herein granted; (j) execute and deliver, in the name of Lender as attorney-in-fact and agent of Borrower or in its own name as Lender, such documents and instruments as are necessary or appropriate to consummate authorized transactions; (k) negotiate and enter into such Leases or modify existing Leases, under such terms and conditions as Lender may in its sole and absolute discretion deem appropriate or desirable; (l) demand, collect and receive the Rents and Profits from the Property; (m) eject Tenants or repossess personal property, as provided by law, for breaches of the conditions of their Leases or other agreements; (n) sue for unpaid Rents and Profits, payments, income or proceeds in the name of Borrower or Lender; (o) maintain actions in forcible entry and detainer, ejectment for possession and actions in distress for rent; (p) compromise or give acquittance for Rents and Profits, payments, income or proceeds that may become due; (q) delegate or assign any and all rights and powers given to Lender by this Agreement and the other Loan Documents; and (r) do any acts which Lender in its sole discretion deems appropriate or desirable to protect the security established by the Loan Documents and use such measures, legal or equitable, as Lender may in its sole discretion deem appropriate or desirable to implement and effectuate the provisions of this Agreement and the other Loan Documents.  This Agreement and the Security Instrument shall both and each constitute a direction to and full authority to any lessee, or other third party who has heretofore dealt or contracted or may hereafter deal or contract with Borrower or Lender, at the request of Lender, to pay all amounts owing under any Lease, contract, concession, license or other agreement to Lender without proof of the default relied upon.  Any such lessee or third party is hereby irrevocably authorized to rely upon and comply with (and shall be fully protected by Borrower in so doing) any request, notice or demand by Lender for the payment to Lender of any Rents and Profits or other sums which may be or thereafter become due under its Lease, contract, concession, license or other agreement, or for the performance of any undertakings under any such lease, contract, concession, license or other agreement, and shall have no right or duty to inquire whether any Event of Default has actually occurred or is then existing.  Borrower hereby constitutes and appoints Lender, its assignees, successors, transferees and nominees, as Borrower's true and lawful attorney-in-fact and agent, with full power of substitution in the Property, in Borrower's name, place and stead, to do or permit any one or more of the foregoing described rights, remedies, powers and authorities, successively or concurrently, and said power of attorney shall be deemed a power coupled with an interest and irrevocable so long as any Obligations are outstanding.  Any money advanced by Lender in connection with any action taken under this Section 4.03, together with interest thereon at the Default Interest Rate from the date of making such advance by Lender until actually paid by Borrower, shall be a demand obligation owing by Borrower to Lender and shall be secured by the Security Instrument and by every other instrument securing the Obligations.

4.04   Occupancy After Foreclosure.  In the event there is a sale or sales pursuant to Section 4.01 hereof and at the time of such sale or sales, Borrower or Borrower's representatives,

successors or assigns, or any other persons claiming any interest in the Property by, through or under Borrower, are occupying or using the Property, or any part thereof, then, to the extent not prohibited by applicable law, each and all shall, at the option of Lender or the purchaser at such sale, as the case may be, immediately become the tenant of the purchaser at such sale, which tenancy shall be a tenancy from day-to-day, terminable at the will of either landlord or tenant, at a reasonable rental per day based upon the value of the Property occupied or used, such rental to be due daily to the purchaser. Further, to the extent permitted by applicable law, in the event the tenant fails to surrender possession of the Property upon the termination of such tenancy, the purchaser shall be entitled to institute and maintain an action for unlawful detainer of the Property in the appropriate court of the county in which the Property is located.

4.05    Notice to Account Debtors.  Lender may, at any time after an Event of Default has occurred, notify the account debtors and obligors of any accounts, chattel paper, negotiable instruments or other evidences of indebtedness to Borrower included in the Property to pay Lender directly.  Borrower shall at any time or from time to time upon the request of Lender provide to Lender a current list of all such account debtors and obligors and their addresses.

4.06    Cumulative Remedies.  All remedies contained in this Agreement and the other Loan Documents are cumulative and Lender also shall have all other remedies provided at law and in equity.  Such remedies may be pursued separately, successively or concurrently at the sole subjective direction of Lender and may be exercised in any order and as often as occasion therefor shall arise.  No act of Lender shall be construed as an election to proceed under any particular provisions of this Agreement and the other Loan Documents to the exclusion of any other provision of this Agreement and the other Loan Documents or as an election of remedies to the exclusion of any other remedy which may then or thereafter be available to Lender.  No delay or failure by Lender to exercise any right or remedy under this Agreement and the other Loan Documents shall be construed to be a waiver of that right or remedy or of any default hereunder. Lender may exercise any one or more of its rights and remedies at its option without regard to the adequacy of its security.

4.07    Payment of Expenses.  Borrower shall pay on demand all of Lender's costs and expenses reasonably incurred in any efforts to enforce any terms of this Agreement, the Security Instrument or the other Loan Documents, whether or not any lawsuit is filed and whether or not foreclosure is commenced but not completed, including, but not limited to, reasonable legal fees and disbursements, foreclosure costs and title charges, together with interest thereon from and after the date incurred by Lender until actually paid by Borrower at the Default Interest Rate, and the same shall be secured by the Security Instrument and by all of the other Loan Documents securing all or any part of the Obligations.

4.08    Interest After Sale.  In the event the Property or any part thereof shall be sold upon foreclosure as provided hereunder, to the extent permitted by law, the sum for which the same shall have been sold shall, for purposes of redemption (pursuant to the laws of the state in which the Property is located), bear interest at the Default Interest Rate.

## ARTICLE V
## NEGATIVE COVENANTS

So long as any of the Obligations remain outstanding, Borrower shall not:

5.01   Liens.   Create, incur, assume, or suffer to exist, any lien, upon or with respect to any of its properties or assets, now owned or hereafter acquired, except for Permitted Liens.

5.02   Sale of Personal Property.   Sell, lease, assign, transfer, or otherwise dispose of, any of its now owned or hereafter acquired personal property, except for the sale or other disposition of personal property no longer used or useful in the conduct of its business.

5.03.   Dissolution.   Borrower shall not (a) engage in any dissolution, termination, complete or partial liquidation, merger or consolidation with or into any other business entity, (b) transfer, lease or sell, in one transaction or any combination of transactions, all or substantially all of the property or assets of Borrower except to the extent expressly permitted by the Loan Documents, (c) issue any additional equity interests, or (d) amend, modify, grant a waiver under, or terminate the certificate or articles of incorporation, organization or formation, bylaws, or partnership agreement or operating agreement of Borrower.

5.04   Distributions.   At any time there is an outstanding Default or Event of Default, declare or make any distribution to any of its partners.

5.05.   Name, Address and Structure.   Change its name, its place of business or, if more than one place of business, its chief executive office, or its mailing address or organizational identification number if it has one without giving Lender at least thirty (30) days written notice of such change, or change its type of organization, jurisdiction of organization or other legal structure.

5.06.   Capital Expenditures.   Incur or make any material capital expenditures other than those included in a budget previously approved by Lender in writing.

5.07.   Litigation.   Without Lender's prior written consent, commence any material litigation.

5.08.   Property Management Agreement.   Amend or modify any of the provisions of any approved property management agreement or any other Property Agreement for which Lender's approval is required under this Article V.

5.09.   Intentionally omitted.

5.10.   Property Agreements.   Enter into any Property Agreement that either provides for total payments in excess of $50,000 or which has a term in excess of one (1) year, unless it can be cancelled at any time upon not more than thirty (30) days' notice.

5.11   Other Financing Documents.   Materially amend any of the PACE Financing Documents without Lender's prior written consent.

5.12   Leases.   Enter into any operating lease or capital lease where the total compensation to be paid under such operating lease or capital lease is equal to or greater than $10,000.

## ARTICLE VI
## CASH MANAGEMENT

6.01   Clearing Account and Cash Collateral Account.

(a)   Not later than sixty (60) days prior to the anticipated date of Substantial Completion of the Renovations, Borrower shall (i) establish an account at an Eligible Bank (the "**Clearing Account**"), and (ii) cause the Clearing Bank to enter into a control agreement with respect to such Clearing Account in the form required by the Clearing Bank and approved by Lender (together with any modifications, amendments or replacements thereof, the "**Control Agreement**").   The Control Agreement shall, among other things, (x) perfect Lender's security interest in and to the Clearing Account and the proceeds thereof, and (y) provide that Lender shall have the right to control such Clearing Account (subject to Borrower's limited rights, as contemplated herein, of joint access to the Clearing Account prior to the occurrence of an Event of Default).

(b)   At the election of and upon notice from Lender, within ten (10) Business Days after receipt of such notice, Borrower will establish a new Eligible Account (which shall become the new Clearing Account) at a bank selected by Lender and shall cause all funds in the Clearing Account to be transferred to the new Clearing Account.   Any future Rents and Profits from the Property shall thereafter be deposited in such new Clearing Account.   If any Clearing Bank shall request a new or modified Control Agreement to conform to the Clearing Bank's customary practice or requirements, as the same may change from time to time, then if such new or modified Control Agreement is acceptable to Lender, Borrower shall execute and deliver to Lender such Control Agreement.   In the event Borrower fails to execute a Control Agreement as provided above, Borrower hereby appoints Lender as its attorney-in-fact with full authority to enter into replacement Control Agreement(s) and to execute on behalf of Borrower any new or modified Control Agreement acceptable to the proposed Clearing Bank.   All costs and expenses incurred by Lender to negotiate and execute any new or modified Control Agreement shall be paid by Borrower.

(c)   Upon the occurrence of an Event of Default, Lender will establish and thereafter maintain while the Loan is outstanding a cash collateral account (which may be a book-entry Sub-Account of an Eligible Account) at the Deposit Bank (the "**Cash Collateral Account**").

(d)   The Clearing Account and Cash Collateral Account shall each be in the name of Borrower for the benefit of Lender, provided that Borrower shall be the owner of all funds on deposit in such accounts for federal and applicable state and local tax purposes.   No

earnings or interest on the Cash Collateral Account shall be payable to Borrower.  Lender shall not have any obligation to keep or maintain the Cash Collateral Account or any funds deposited therein in interest-bearing accounts If Lender elects in its sole and absolute discretion to keep or maintain the Cash Collateral Account or any funds deposited therein in an interest-bearing account, (i) such funds shall not be invested except in Permitted Investments, and (ii) all interest earned or accrued thereon shall be for the account of and be retained by Lender.  Lender shall not have any liability for any loss resulting from the investment of funds in accordance with the terms and conditions of this Agreement.

(e)    Except as otherwise expressly provided herein, the Clearing Account and Cash Collateral Account shall be subject to the exclusive dominion and control of Lender and none of Borrower, Property Manager or any other party claiming on behalf of, or through, Borrower or Property Manager, shall have any right of withdrawal therefrom or any other right or power with respect thereto.

(f)    Borrower agrees to pay the customary fees and expenses of Clearing Bank (incurred in connection with maintaining the Clearing Account) and Lender and Deposit Bank (incurred in connection with maintaining the Cash Collateral Account) and any successors thereto in connection therewith, as separately agreed by them from time to time.

(g)    Lender shall be responsible for the performance only of such duties with respect to the Cash Collateral Account as are specifically set forth herein, and no duty shall be implied from any provision hereof.  Lender shall not be under any obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own monies.  Borrower shall indemnify and hold Lender and its directors, employees, officers and agents harmless from and against any loss, cost or damage (including, without limitation, reasonable attorneys' fees and disbursements) incurred by such parties in connection with the Cash Collateral Account other than such as result from the gross negligence or willful misconduct of Lender or intentional nonperformance by Lender of its obligations under this Agreement.

6.02    Deposits and Withdrawals.

(a)    Concurrently with the execution of this Agreement, Borrower shall notify and advise each Tenant under each Lease (whether such Lease is presently effective or executed after the date hereof) to send directly to the Clearing Account all payments of Rents and Profits or any other item payable under such Leases pursuant to an instruction letter in the form approved of Exhibit E attached hereto (a "**Payment Direction Letter**").  If Borrower fails to provide any such notice (and without prejudice to Lender's rights with respect to such default), Lender shall have the right, and Borrower hereby grants to Lender a power of attorney (which power of attorney shall be coupled with an interest and irrevocable so long as any portion of the Loan remains outstanding), to sign and deliver a Payment Direction Letter to each tenant of the Property to each tenant of the Property.

(b)    Borrower shall, and shall cause Property Manager to, instruct all Persons that maintain open accounts with Borrower or Property Manager with respect to the Property or with whom Borrower or Property Manager does business on an "accounts receivable" basis with

respect to the Property to deliver all payments due under such accounts to the Clearing Account. Neither Borrower nor Property Manager shall direct any such Person to make payments due under such accounts in any other manner.

(c)      All Rents and Profits or other income from the Property shall (i) be deemed additional security for payment of the Obligations and shall be held in trust for the benefit, and as the property, of Lender, (ii) not be commingled with any other funds or property of Borrower or Property Manager, and (iii) if received by Borrower or Property Manager notwithstanding the delivery of a Payment Direction Letter, be deposited in the Clearing Account within one (1) Business Day after receipt thereof.

(d)      Without the prior written consent of Lender, so long as any portion of the Loan remains outstanding, neither Borrower nor Property Manager shall terminate, amend, revoke or modify any Payment Direction Letter in any manner whatsoever or direct or cause any Tenant to pay any amount in any manner other than as provided in the related Payment Direction Letter.

(e)      So long as any portion of the Loan remains outstanding, none of Borrower, Property Manager or any other Person shall open or maintain any accounts other than the Clearing Account into which revenues from the ownership and operation of the Property are deposited.  The foregoing shall not prohibit Borrower from utilizing one or more separate accounts for the disbursement or retention of funds that have been transferred to Borrower pursuant to the express terms of this Agreement.

(f)      At all times other than during a Sweep Period, Borrower shall have the sole right to withdraw funds on deposit in the Clearing Account and may do so from time to time.  Upon receipt of notice pursuant to the Control Agreement by Clearing Bank of the commencement of a Sweep Period, (i) all rights of Borrower to the withdrawal or other transfer of or access to funds from the Clearing Account shall immediately cease and be automatically vested with Lender, and (ii) Lender shall have the exclusive right to withdraw, transfer, or cause to be withdrawn or transferred, funds on deposit in the Clearing Account and Borrower hereby irrevocably authorizes Lender to transfer, or cause to be transferred, and Lender shall transfer, on each Business Day by wire transfer or other method of transfer mutually agreeable to Clearing Bank and Lender of immediately available funds, all collected and available balances in the Clearing Account to the Cash Collateral Account to be held until disbursed by Lender pursuant to Section 7.02(g).

(g)      Commencing on the first Business Day of each Collection Period on or after the occurrence of an Event of Default, Lender shall allocate amounts deposited in the Cash Collateral Account from time to time during such Collection Period in such order and priority as determined by Lender in its sole discretion.  Lender's right to withdraw and apply funds as stated herein shall be in addition to all other rights and remedies provided to Lender under this Agreement, the Note, the Security Instrument and the other Loan Documents.

(h)      Nothing in this Article VII shall limit, reduce or diminish in any respect Borrower's obligation to pay the Monthly Payment Amount and to further make timely deposits

into the Clearing Account and all other Reserves at the time and in the amounts due under the Loan Documents, whether or not Rents and Profits are then available to make such payments.

6.03    Security Interest.

(a)    To secure the full and punctual payment of the Obligations now or hereafter existing under this Agreement and the other Loan Documents, Borrower hereby grants to Lender a first-priority perfected security interest in the Clearing Account and Cash Collateral Account, all interest, cash, checks, drafts, certificates and instruments, if any, from time to time deposited or held therein, any and all amounts invested in Permitted Investments, and all "proceeds" (as defined in the UCC as in effect in the state in which the Clearing Account and Cash Collateral Account are located or maintained) of any or all of the foregoing.  Furthermore, Borrower shall not, without obtaining the prior written consent of Lender, further pledge, assign or grant any security interest in any of the foregoing or permit any Lien to attach thereto or any levy to be made thereon or any UCC Financing Statements to be filed with respect thereto. Borrower will maintain the security interest created by this Section 7.03(a) as a first priority perfected security interest and will defend the right, title and interest of Lender in and to the Clearing Account and Cash Collateral Account against the claims and demands of all Persons whomsoever.

(b)    Borrower authorizes Lender to file any financing statement or statements required by Lender to establish or maintain the validity, perfection and priority of the security interest granted herein in connection with the Clearing Account and Cash Collateral Account. Borrower agrees that at any time and from time to time, at the expense of Borrower, Borrower will promptly and duly execute and deliver all further instruments and documents, and take all further action, that may be necessary or desirable, or that Lender may reasonably request, in order to perfect and protect any security interest granted or purported to be granted hereby (including, without limitation, any security interest in and to any Permitted Investments) or to enable Lender to exercise and enforce its rights and remedies hereunder.

(c)    Upon the occurrence and during the continuance of an Event of Default, Lender may exercise any or all of its rights and remedies as a secured party, pledgee and lienholder with respect to the Clearing Account and Cash Collateral Account. Without limitation of the foregoing, upon the occurrence and during the continuance of any Event of Default, Lender may use the Clearing Account and Cash Collateral Account for any of the following purposes: (i) repayment of the Obligations including, but not limited to, principal prepayments and the Exit Fee applicable to such full or partial prepayment (as applicable); (ii) reimbursement of Lender for all losses, fees, costs and expenses (including, without limitation, reasonable legal fees) suffered or incurred by Lender as a result of such Event of Default; (iii) payment of any amount expended in exercising any or all rights and remedies available to Lender at law or in equity or under this Agreement or under any of the other Loan Documents; (iv) payment of any item as required or permitted under this Agreement; or (v) any other purpose permitted by applicable law; provided, however, that any such application of funds shall not cure or be deemed to cure any Event of Default.  Without limiting any other provisions hereof, each of the remedial actions described in the immediately preceding sentence shall be deemed to be a commercially reasonable exercise of Lender's rights and remedies as a secured party with respect to the Clearing Account and Cash Collateral Account and shall not in any event be

NY 00058782 v5

deemed to constitute a setoff or a foreclosure of a statutory banker's lien. Nothing in this Agreement shall obligate Lender to apply all or any portion of the Clearing Account or Cash Collateral Account to effect a cure of any Event of Default, or to pay the Obligations, or in any specific order of priority. The exercise of any or all of Lender's rights and remedies under this Agreement or under any of the other Loan Documents shall not in any way prejudice or affect Lender's right to initiate and complete a foreclosure under the Security Instrument.

## ARTICLE VII
## MISCELLANEOUS TERMS AND CONDITIONS

7.01    Time of Essence.  Time is of the essence with respect to all provisions of this Agreement.

7.02    Release of Security Instrument.  If and when Borrower has paid and satisfied in their entirety all of the Obligations, then the lien of the Security Instrument shall be released as and to the extent set forth in the Security Instrument.

7.03    Action by Lender.  Without affecting Borrower's liability for the payment of any of the Obligations, Lender may from time to time and without notice to Borrower: (a) release any person liable for the payment of the Obligations; (b) extend or modify the terms of payment of the Obligations; (c) accept additional real or personal property of any kind as security or alter, substitute or release any property securing the Obligations; (d) recover any part of the Property; (e) consent in writing to the making of any subdivision map or plat thereof; (f) join in granting any easement therein; or (g) join in any extension agreement respecting the term of the Loan or any agreement subordinating the lien of the Security Instrument.

7.04    Notices.  Any notice, report, demand or other instrument authorized or required to be given or furnished hereunder or as required by law ("**Notices**") shall be in writing and shall be given as follows:  (a) by hand delivery; (b) by deposit in the United States mail as first class certified mail, return receipt requested, postage paid; (c) by overnight nationwide commercial courier service; or (d) by electronic mail (other than for notices of default) with a confirmation copy to be delivered by duplicate notice in accordance with any of clauses (a) through (c) above, in each case, addressed to the party intended to receive the same at the following address(es):

**Lender**:

UC Funding, LLC
c/o UC Credit Services, LLC
745 Boylston Street
Suite 502
Boston, Massachusetts  02116
Attention:  Loan Servicing
E-mail:  dchampa@ucfunds.com

with copies to:

Federman Steifman LLP
220 East 42nd Street, 29th Floor
New York, New York 10017
Attention:  John Nastasi, Esq.
E-mail: jnastasi@federmansteifman.com

**Borrower**:

with copies to:

NY 00058782.v5

53

Poway Property LP                          The Opus Law Firm
14555 Symons Valley Road NW                662 Encinitas Blvd.
Calgary, AB T3R 1E7                        Suite 648
Canada                                     Encinitas, California 92024
Attention: Mr. Denny Chow                  Attention: Justin White, Esq.
Email: _____                     E-mail: justin@opus.attorney.com

Any party may change the address to which any such Notice is to be delivered to any other address within the United States of America, by furnishing ten (10) days written notice of such change to the other parties in accordance with the provisions of this <u>Section 7.04</u>. All notices, demands and requests shall be effective upon personal delivery, or one (1) business day after being deposited with a private courier service, or two (2) business days after being deposited in the United States mail as set forth above. The inability to deliver Notices because of a changed address of which no Notice was given, or rejection or refusal to accept any Notice offered for delivery, shall be deemed to be receipt of the Notice as of the date of such inability to deliver or rejection or refusal to accept delivery. Notice for either party may be given by its respective counsel. Additionally, notice from Lender may also be given by the servicer for the Loan.

7.05    <u>Successors and Assigns</u>.    The terms, provisions, indemnities, covenants and conditions hereof shall be binding upon Borrower and the successors and assigns of Borrower, including all successors in interest in and to all or any part of the Property, and shall inure to the benefit of Lender, and its successors and assigns. If Borrower consists of more than one person or entity, each such person or entity will be jointly and severally liable to perform the obligations of Borrower hereunder and under the other Loan Documents.

7.06    <u>Entire Agreement; Amendment; Severability</u>. This Agreement and the other Loan Documents contain the entire agreements between the parties respecting the matters herein and therein set forth and supersede all prior agreements, whether written or oral, between the parties respecting such matters. This Agreement and the terms hereof may not be amended, revised, waived, discharged, released or terminated except by a written instrument or instruments executed by the party against which enforcement of the amendment, revision, waiver, discharge, release or termination is asserted. A determination that any provision of this Agreement is unenforceable or invalid shall not affect the enforceability or validity of any other provision.

7.07    <u>Gender</u>. Within this Agreement, words of any gender shall be held and construed to include any other gender, and words in the singular shall be held and construed to include the plural, and vice versa, unless the context otherwise requires.

7.08    <u>Waiver; Discontinuance of Proceedings</u>. Lender may waive any single Event of Default by Borrower hereunder or under the other Loan Documents without waiving any other prior or subsequent Event of Default, and may remedy any Event of Default by Borrower hereunder without waiving the Event of Default remedied. Neither the failure nor delay by Lender in exercising any right, power or remedy upon any Event of Default by Borrower hereunder or under the other Loan Documents shall be construed as a waiver of such Event of

Default or as a waiver of the right of Lender to exercise any such right, power or remedy at a later date. No single or partial exercise by Lender of any right, power or remedy hereunder or under the other Loan Documents shall exhaust the same or shall preclude any other or further exercise thereof, and every such right, power or remedy hereunder or under the other Loan Documents may be exercised at any time and from time to time. No modification or waiver of any provision hereof or under the other Loan Documents nor consent to any departure by Borrower therefrom shall in any event be effective unless the same shall be in writing and signed by Lender, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose given. Neither notice to nor demand on Borrower in any case shall in and of itself entitle Borrower to any other or further notice or demand in similar or other circumstances. Acceptance by Lender of any payment in an amount less than the amount then due and owing on any of the Obligations shall be deemed an acceptance on account only and shall not in any way affect the existence of an Event of Default hereunder.

7.09    <u>Captions for Convenience</u>. The captions and headings of the sections and paragraphs of this Agreement are for convenience of reference only and shall not be construed in interpreting the provisions hereof.

7.10    <u>GOVERNING LAW</u>. THIS AGREEMENT WILL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED, EXCEPT TO THE EXTENT THAT ANY OF SUCH LAWS MAY NOW OR HEREAFTER BE PREEMPTED BY FEDERAL LAW, SUCH FEDERAL LAW SHALL SO GOVERN AND BE CONTROLLING.

7.11    <u>Litigation Provisions</u>.

(n)    **BORROWER CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED IN BOSTON, MASSACHUSETTS, AND OF ANY STATE OR FEDERAL COURT LOCATED OR HAVING JURISDICTION IN THE COUNTY IN WHICH THE PROPERTY IS LOCATED, IN WHICH ANY LEGAL PROCEEDING MAY BE COMMENCED OR PENDING RELATING IN ANY MANNER TO THIS AGREEMENT, THE LOAN, OR ANY OF THE OTHER LOAN DOCUMENTS.**

(o)    **BORROWER AGREES THAT PROCESS IN ANY LEGAL PROCEEDING RELATING TO THIS AGREEMENT, THE LOAN OR ANY OF THE OTHER LOAN DOCUMENTS MAY BE SERVED ON BORROWER AT ANY LOCATION.**

(p)    **BORROWER AGREES THAT ANY LEGAL PROCEEDING RELATING TO THIS AGREEMENT, THE LOAN, OR ANY OF THE OTHER LOAN DOCUMENTS MAY BE BROUGHT AGAINST BORROWER IN ANY STATE OR FEDERAL COURT LOCATED IN BOSTON, MASSACHUSETTS, AND OF ANY STATE OR FEDERAL COURT LOCATED OR HAVING JURISDICTION IN THE COUNTY IN WHICH THE PROPERTY IS LOCATED. BORROWER WAIVES ANY OBJECTION TO VENUE IN ANY SUCH COURT AND WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE THE VENUE FROM ANY SUCH COURT.**

NY 00058782 v5

(q)    **BORROWER AGREES THAT IT WILL NOT COMMENCE ANY LEGAL PROCEEDING AGAINST LENDER RELATING IN ANY MANNER TO THIS AGREEMENT, THE LOAN OR ANY OF THE OTHER LOAN DOCUMENTS IN ANY COURT OTHER THAN A STATE OR FEDERAL COURT LOCATED IN BOSTON, MASSACHUSETTS, OR IF A LEGAL PROCEEDING IS COMMENCED BY LENDER AGAINST BORROWER IN A COURT IN ANOTHER LOCATION, BY WAY OF A COUNTERCLAIM IN SUCH LEGAL PROCEEDING.**

(r)    **BORROWER HEREBY WAIVES TRIAL BY JURY IN ANY LEGAL PROCEEDING RELATING TO THIS AGREEMENT, THE LOAN OR ANY OF THE OTHER LOAN DOCUMENTS.**

7.12    <u>Counting of Days</u>.  The term "days" when used herein shall mean calendar days. If any time period ends on a Saturday, Sunday or holiday officially recognized by the State within which the Property is located, the period shall be deemed to end on the next succeeding business day.  The term "business day" or "<u>Business Day</u>" when used herein shall mean a weekday, Monday through Friday, except a legal holiday or a day on which banking institutions in New York, New York are authorized by law to be closed.

7.13    <u>Application of the Proceeds of the Note</u>.  To the extent that proceeds of the Note are used to pay indebtedness secured by any outstanding lien, security interest, charge or prior encumbrance against the Property, such proceeds have been advanced by Lender at Borrower's request and Lender shall be subrogated to any and all rights, security interests and liens owned by any owner or holder of such outstanding liens, security interests, charges or encumbrances, irrespective of whether said liens, security interests, charges or encumbrances are released.

7.14    <u>Cross Default</u>.  An Event of Default hereunder shall be an Event of Default under each of the other Loan Documents and an Event of Default under any other Loan Document shall be an Event of Default hereunder.

7.15    <u>Lender May File Proofs of Claim</u>.  In the case of any receivership, insolvency, bankruptcy, reorganization, arrangement, adjustment, composition or other proceedings affecting Borrower or the principals, members or partners in Borrower, or their respective creditors or property, Lender, to the extent permitted by law, shall be entitled to file such proofs of claim and other documents as may be necessary or advisable in order to have the claims of Lender allowed in such proceedings for the Obligations at the date of the institution of such proceedings and for any additional amount which may become due and payable by Borrower hereunder after such date.

7.16    <u>No Representation</u>.  By accepting delivery of any item required to be observed, performed or fulfilled or to be given to Lender pursuant to the Loan Documents, including, but not limited to, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal or insurance policy, Lender shall not be deemed to have warranted, consented to, or affirmed the sufficiency, legality, effectiveness or legal effect of the same, or of any term, provision or condition thereof, and such acceptance of delivery thereof shall not be or constitute any warranty, consent or affirmation with respect thereto by Lender.

7.17   <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be effective only upon delivery and thereafter shall be deemed an original, and all of which shall be taken to be one and the same instrument, for the same effect as if all parties hereto had signed the same signature page.

7.18   <u>Exculpation</u>.

(a)   Notwithstanding anything in the Loan Documents to the contrary, but subject to the qualifications hereinbelow set forth, Lender agrees that (i) Borrower shall be liable upon the indebtedness evidenced and secured hereby and for the other obligations arising under the Loan Documents to the full extent (but only to the extent) of the security therefor, the same being all properties (whether real or personal), rights, estates and interests now or at any time hereafter securing the payment of the Note and/or the other obligations of Borrower under the Loan Documents (collectively, the "**Security**"), (ii) if an Event of Default occurs, any judicial proceedings brought by Lender against Borrower shall be limited to the preservation, enforcement and foreclosure, or any thereof, of the liens, security titles, estates, assignments, rights and security interests now or at any time hereafter securing the payment of the Note and/or the other obligations of Borrower under the Loan Documents, and confirmation of any sale under power of sale, and no attachment, execution or other writ of process shall be sought, issued or levied upon any assets, properties or funds of Borrower or its partners or members other than the Security, except with respect to the liability described below in this Section, and (iii) in the event of a foreclosure of such liens, security titles, estates, assignments, rights or security interests securing the payment of the Note and/or the other obligations of Borrower under the Loan Documents, whether by judicial proceedings or exercise of power of sale, no judgment for any deficiency upon the indebtedness evidenced hereby shall be sought or obtained by Lender against Borrower, except with respect to the liability described below in this <u>Section 7.18</u>.

(b)   Notwithstanding the foregoing provisions, Borrower shall be fully and personally liable and hereby guarantees payment to Lender of, hereby agrees to pay, protect, defend and save Lender harmless from and against, and hereby indemnifies Lender from and against any and all liabilities, obligations, losses, damages, costs and expenses (including, without limitation, attorneys' fees at both the trial and appellate levels), causes of action, suits, claims, demands and judgments of any nature or description whatsoever which may at any time be imposed upon, incurred by or awarded against Lender as a result of:  (i) fraud or material misrepresentation or failure to disclose a material fact by Borrower, any of Borrower's officers, agents, attorneys, principals, general partners, managing members or employees, or any guarantor or indemnitor in connection with the Loan; including, without limitation, the origination of the Loan, any subsequent disbursements from any of the Reserves, or the performance of Borrower's obligations under the Loan Documents; (ii) the gross negligence or willful misconduct of Borrower; (iii) physical waste of the Security; (iv) the breach of any representation, warranty, covenant or indemnification provision contained in the Loan Documents concerning environmental laws, hazardous substances or asbestos including, without limitation, <u>Section 2.22</u> of this Agreement; (v) the removal or disposal of any portion of the Security which is not immediately replaced with items of like kind, value and use; (vi) the misapplication, misappropriation or conversion by Borrower of (A) any insurance proceeds paid by reason of any loss, damage or destruction to the Security, (B) any awards or other amounts received in connection with the condemnation of all or a portion of the Security, (C) any Rents

and Profits following an Event of Default, or (D) any Rents and Profits paid more than one (1) month in advance or any lease termination fee or payment; (vii) the failure to pay, or cause to be paid, taxes and assessments (including, without limitation, assessments related to the PACE Financing) affecting the Property; provided that Borrower shall not be liable under this clause (vii) to the extent that there are sufficient funds available on deposit in the Impound Reserve to pay such taxes and assessments, Lender is obligated pursuant to the terms of the Loan Agreement to pay (or cause to be paid) such taxes and assessments from funds on deposit in the Impound Reserve, and Lender fails to pay (or cause to be paid) such taxes and assessments despite the fact that (1) Lender's access to such funds is not restricted by applicable law, injunction or other court order or restricted as a result of any action, inaction or omission by Borrower or any guarantor or indemnitor, and (2) no Event of Default has occurred and is continuing), or charges for labor or materials or other charges that can create liens on any portion of the Security; (viii) any and all tenant security deposits held by Borrower not being properly applied or returned to tenants when due or delivered to Lender; (ix) the failure to obtain and maintain fully paid for insurance in accordance with Section 2.02 of this Agreement;; (x) the failure to provide financial statements and other data required to be provided by Borrower or Indemnitor in accordance with Section 2.15 of this Agreement; (xi) the failure to replenish the Interest Reserve in accordance with Section 2.05(d) and Schedule V of this Agreement; (xii) the failure to pay any fees for the transfer of franchises, licenses, permits or other agreements, which Lender is required to pay as a prerequisite to the exercise of its rights under the Assignment of Contracts, Permits, Licenses Agreements and Other Rights executed by Borrower of even date herewith; (xiii) any matters for which Lender is indemnified by Borrower pursuant to Section 7.23; (xiv) the failure by Borrower to comply with its obligations under Article VI hereof to (A) open a Clearing Account, (B) execute and deliver a Control Agreement, and (C) deposit (or cause to be deposited) all Rents and Profits from the Property into the Clearing Account; (xv) Borrower fails to maintain its status as a single purpose entity as required by, and in accordance with, Section 2.24 of this Agreement; (xvi) any costs and expenses incurred by Lender in connection with the collection of any amount for which Borrower is personally liable under this Section 7.18, including attorney's fees and costs and the costs of conducting any independent audit of Borrower's books and records to determine the amount for which Borrower has personal liability hereunder; and (xvii) Borrower's failure to pay the Deferred Fees to the City of Poway in accordance with Section 2.05(f). Nothing contained in this Section 7.18 shall (1) be deemed to be a release or impairment of the indebtedness evidenced by the Note or the other Obligations or the lien of the Loan Documents upon the Security, or (2) preclude Lender from foreclosing the Loan Documents in case of any Event of Default or from enforcing any of the other rights of Lender except as stated in this Section 7.18, or (3) limit or impair in any way whatsoever the Indemnity and Guaranty Agreement or the Hazardous Substances Indemnity Agreement, each dated of even date herewith, executed and delivered in connection with the Loan, or release, relieve, reduce, waive or impair in any way whatsoever, any obligation of any party to such Indemnity and Guaranty Agreement or Hazardous Substances Indemnity Agreement.

(c)     Notwithstanding anything to the contrary in this Agreement or any of the other Loan Documents, (i) Lender shall not be deemed to have waived any right which Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the U.S. Bankruptcy Code to file a claim for the full amount of the Obligations or to require that all collateral shall continue to secure all of the Obligations in accordance with the Loan Documents, and (ii) Borrower shall be liable for the full amount of the Obligations in the event that: (A) the first full

monthly payment of principal and/or interest under the Note is not paid when due;; (B) Borrower fails to maintain its status as a single purpose entity as required by, and in accordance with, the terms and provisions of Section 2.24 of this Agreement; (C) Borrower fails to obtain Lender's prior written consent to any subordinate financing or other voluntary monetary lien encumbering the Security; (D) there is a breach of Section 2.10 of this Agreement, (E) Borrower or any guarantor consents to, or acquiesces in, or joins in, an application for the appointment of a receiver, liquidator, or trustee for Borrower or any portion of the Property, or if Borrower or any guarantor are voluntarily adjudicated insolvent or bankrupt, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by, consented to, or acquiesced in by, Borrower or any guarantor or if any proceeding for the dissolution or liquidation of Borrower or of any guarantor shall be instituted by Borrower or any guarantor; or (F) Borrower or any guarantor (or any person composing such guarantor) or any party holding any direct or indirect interest in Borrower or any guarantor shall, in connection with any enforcement action or exercise or assertion of any right or remedy by or on behalf of Lender under or in connection with the Note, this Agreement, the Security Instrument or any of the other Loan Documents, asserts a defense, seeks judicial intervention or injunctive or other equitable relief of any kind or asserts in a pleading filed in connection with a judicial proceeding any defense against Lender or any right any security for the Loan which the court (or appellate court, if applicable) in such action or proceeding determines is without merit (in respect of a defense) or unwarranted (in respect of a request for judicial intervention or injunctive or other equitable relief.

      7.19    Recording and Filing.    Borrower will cause the Loan Documents and all amendments and supplements thereto and substitutions therefor to be recorded, filed, re-recorded and re-filed in such manner and in such places as Lender shall reasonably request, and will pay on demand all such recording, filing, re-recording and re-filing taxes, fees and other charges. Borrower shall reimburse Lender, or its servicing agent, for the costs incurred in obtaining a tax service company to verify the status of payment of taxes and assessments on the Property.

      7.20    Maximum Interest.    The provisions of this Agreement and of all agreements between Borrower and Lender, whether now existing or hereafter arising and whether written or oral, are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of demand or acceleration of the maturity of the Note or otherwise, shall the amount paid, or agreed to be paid ("**Interest**"), to Lender for the use, forbearance or retention of the money loaned under the Note exceed the maximum amount permissible under applicable law. If, from any circumstance whatsoever, performance or fulfillment of any provision hereof or of any agreement between Borrower and Lender shall, at the time performance or fulfillment of such provision shall be due, exceed the limit for Interest prescribed by law or otherwise transcend the limit of validity prescribed by applicable law, then ipso facto the obligation to be performed or fulfilled shall be reduced to such limit and if, from any circumstance whatsoever, Lender shall ever receive anything of value deemed Interest by applicable law in excess of the maximum lawful amount, an amount equal to any excessive Interest shall be applied to the reduction of the principal balance owing under the Note in the inverse order of its maturity (whether or not then due) or at the option of Lender be paid over to Borrower, and not to the payment of Interest. All Interest (including any amounts or payments judicially or otherwise under law deemed to be Interest) contracted for, charged, taken, reserved, paid or agreed to be paid to Lender shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the

NY 00058782-v5

59

full term of the Note, including any extensions and renewal thereof, until payment in full of the principal balance of the Note so that the Interest thereon for such full term will not at any time exceed the maximum amount permitted by applicable law. This Section will control all agreements between Borrower and Lender.

7.21    <u>Application of Default Interest Rate Not a Waiver</u>. Application of the Default Interest Rate shall not be deemed to constitute a waiver of any default or any rights or remedies of Lender under this Agreement, any other Loan Document or applicable legal requirements, or a consent to any extension of time for the payment or performance of any obligation with respect to which the Default Interest Rate may be invoked.

7.22    <u>Relationship of the Parties</u>. The relationship between Borrower and Lender is that of a borrower and a lender only and neither of such parties is, nor shall it hold itself out to be, the agent, employee, joint venturer or partner of the other party.

7.23    <u>Secondary Market Provisions</u>.

(a)    <u>Transfer of Loan</u>.

(i)    Lender may, at any time, sell, transfer or assign the Loan, the Loan Documents and any or all servicing rights with respect thereto, or grant participations therein or issue mortgage pass–through certificates or other securities evidencing a beneficial interest in a rated or unrated public offering or private placement (the "**Securities**") secured by or evidencing ownership interests in the Note and the Security Instrument (each such sale, assignment, participation or securitization, a "**Secondary Market Transaction**"). Lender may forward to each purchaser, transferee, assignee, servicer, participant, investor in such Securities or any NRSRO (all of the foregoing entities collectively referred to as the "**Investor**") and each prospective Investor, all documents and information which Lender now has or may hereafter acquire relating to the Loan and to Borrower, Guarantor, and the Property, whether furnished by Borrower, Borrower's representatives, Guarantor or otherwise, as Lender determines necessary or appropriate.

(ii)    Borrower and Guarantor agree to cooperate with Lender in connection with any transfer made or any Securities created pursuant to this <u>Section 7.23</u>. Borrower also shall promptly furnish, and Borrower and Guarantor consent to Lender furnishing, to such Investors or such prospective Investors or Rating Agency any and all available information concerning the Property, the Leases, and the financial condition of Borrower and Guarantor as may be requested by Lender, any Investor or any prospective Investor or Rating Agency (including, but not limited to, copies of information previously supplied to Lender) in connection with any sale, transfer or participation interest. In addition to any other obligations Borrower may have hereunder, Borrower shall execute such amendments to the Loan Documents and Borrower's organizational documents as may be requested by the holder of the Note or any Investor to effect the assignment of the Note and the other Loan Documents or issuance of Securities including (A) bifurcating the Note into two or more notes or splitting the Security Instrument into two or more instruments of the same or different priorities or otherwise as determined by and

acceptable to Lender, or (B) dividing the Note into multiple components corresponding to tranches of certificates to be issued in a Secondary Market Transaction each having a notional balance and an interest rate determined by Lender; provided, however, that Borrower shall not be required to modify or amend any Loan Document if the overall effect of such modification or amendment would (y) change the initial weighted average interest rate, the maturity or the amortization of principal set forth in the Note, or (z) modify or amend any other material economic term of the Note or the other Loan Documents.

(iii)    If requested by Lender, Borrower shall provide Lender, promptly upon request, with any financial statements, financial, statistical or operating information or other information as Lender shall reasonably determine is necessary or appropriate (including items required (or items that would be required if the Securities issued in connection with a Secondary Market Transaction were offered publicly) to satisfy any and all disclosure requirements pursuant to the Securities Act (including, but not limited to, Regulation AB), the Exchange Act, any other applicable securities laws or any amendment, modification or replacement to any of the foregoing) or required by any other Legal Requirements, in each case, in connection with any Disclosure Document (as hereinafter defined) or any filings pursuant to the Exchange Act in connection with or relating to the Secondary Market Transaction (an "**Exchange Act Filing**") or as may otherwise be reasonably requested by Lender.

(b)    <u>Use of Information</u>.  Borrower understands that information provided to Lender by Borrower and its agents, counsel and representatives may be included in preliminary and final disclosure documents in connection with the Secondary Market Transaction, including an offering circular, a prospectus, prospectus supplement, private placement memorandum or other offering document (each, a "**Disclosure Document**") and may also be included in filings with the Securities and Exchange Commission pursuant to the Securities Act of 1933, as amended (the "**Securities Act**"), or the Securities and Exchange Act of 1934, as amended (the "**Exchange Act**"), and may be made available to investors or prospective investors in the Securities, investment banking firms, NRSROs, accounting firms, law firms and other third-party advisory and service providers relating to the Secondary Market Transaction.  Borrower also understands that the findings and conclusions of any third-party due diligence report obtained by the Lender, the Issuer (as hereinafter defined) or the placement agent or underwriter of the Secondary Market Transaction may be made publicly available if required, and in the manner prescribed, by Section 15E(s)(4)(A) of the Exchange Act and any rules promulgated thereunder.

(c)    <u>Borrower Indemnity</u>.

(i)    Borrower hereby agrees to indemnify Lender (and for purposes of this <u>Section 7.23</u>, Lender shall include its officers and directors) and each Person who controls the Lender within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "**Lender Group**"), the issuer of the Securities (the "**Issuer**" and for purposes of this <u>Section 7.23</u>, Issuer shall include its officers, director and each Person who controls the Issuer within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act), and any placement agent or underwriter with respect to the Secondary Market Transaction, each of their respective

officers and directors and each Person who controls the placement agent or underwriter within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act (collectively, the "<u>Underwriter Group</u>") for any losses, claims, damages or liabilities (collectively, the "<u>Liabilities</u>") to which Lender, the Lender Group, the Issuer or the Underwriter Group may become subject insofar as the Liabilities arise out of, or are based upon, (A) any untrue statement or alleged untrue statement of any material fact contained in the information provided to Lender by Borrower and its agents, counsel and representatives, (B) the omission or alleged omission to state therein a material fact required to be stated in such information or necessary in order to make the statements in such information, in light of the circumstances under which they were made, not misleading, or (C) a breach of the representations and warranties made by Borrower in <u>Section 2.01(s)</u> of this Agreement (Full and Accurate Disclosure).  Borrower also agrees to reimburse Lender, the Lender Group, the Issuer and/or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Lender Group, the Issuer and/or the Underwriter Group in connection with investigating or defending the Liabilities.  Borrower's liability under this paragraph will be limited to Liabilities that arise out of, or are based upon, an untrue statement or omission made in reliance upon, and in conformity with, information furnished to Lender by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including financial statements of Borrower, operating statements and rent rolls with respect to the Property.  This indemnification provision will be in addition to any liability which Borrower may otherwise have.

(ii)    In connection with any Exchange Act Filing or other reports containing comparable information that is required to be made "available" to holders of the Securities under Regulation AB or applicable Legal Requirements, Borrower agrees to (i) indemnify Lender, the Lender Group, the Issuer and the Underwriter Group for Liabilities to which Lender, the Lender Group, the Issuer and/or the Underwriter Group may become subject insofar as the Liabilities arise out of, or are based upon, an alleged untrue statement or alleged omission or an untrue statement or omission made in reliance upon, and in conformity with, information furnished to Lender by or on behalf of Borrower in connection with the preparation of the Disclosure Document or in connection with the underwriting or closing of the Loan, including financial statements of Borrower, operating statements and rent rolls with respect to the Property, and (ii) reimburse Lender, the Lender Group, the Issuer and/or the Underwriter Group for any legal or other expenses reasonably incurred by Lender, the Lender Group, the Issuer and/or the Underwriter Group in connection with defending or investigating the Liabilities.

(iii)    Promptly after receipt by an indemnified party under this <u>Section 7.23(c)</u> of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this <u>Section 7.23(c)</u>, notify the indemnifying party in writing of the commencement thereof, but the omission to so notify the indemnifying party will not relieve the indemnifying party from any liability which the indemnifying party may have to any indemnified party hereunder except to the extent that failure to notify causes prejudice to the indemnifying party.  In

the event that any action is brought against any indemnified party, and it notifies the indemnifying party of the commencement thereof, the indemnifying party will be entitled, jointly with any other indemnifying party, to participate therein and, to the extent that it (or they) may elect by written notice delivered to the indemnified party promptly after receiving the aforesaid notice from such indemnified party, to assume the defense thereof with counsel satisfactory to such indemnified party.  After notice from the indemnifying party to such indemnified party under this <u>Section 7.23(c)</u>, such indemnified party shall pay for any legal or other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation; provided, however, if the defendants in any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there are any legal defenses available to it and/or other indemnified parties that are different from or additional to those available to the indemnifying party, the indemnified party or parties shall have the right to select separate counsel to assert such legal defenses and to otherwise participate in the defense of such action on behalf of such indemnified party at the cost of the indemnifying party.  The indemnifying party shall not be liable for the expenses of more than one separate counsel unless an indemnified party shall have reasonably concluded that there may be legal defenses available to it that are different from or additional to those available to the indemnifying party.  Without the prior written consent of Lender (which consent shall not be unreasonably withheld or delayed), no indemnifying party shall settle or compromise or consent to the entry of any judgment in any pending or threatened claim, action, suit or proceeding in respect of which indemnification may be sought hereunder (whether or not any indemnified party is an actual or potential party to such claim, action, suit or proceeding) unless the indemnifying party shall have given Lender reasonable prior written notice thereof and shall have obtained an unconditional release of each indemnified party hereunder from all liability arising out of such claim, action, suit or proceedings.

(iv)    In order to provide for just and equitable contribution in circumstances in which the indemnity agreement provided for in <u>Section 7.23(c)(i) or (ii)</u> is for any reason held to be unenforceable as to an indemnified party in respect of any Liabilities (or action in respect thereof) referred to therein which would otherwise be indemnifiable under <u>Section 7.23(c)(i) or (ii)</u>, the indemnifying party shall contribute to the amount paid or payable by the indemnified party as a result of such Liabilities (or action in respect thereof); provided, however, that no Person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any Person who was not guilty of such fraudulent misrepresentation.  In determining the amount of contribution to which the respective parties are entitled, the following factors shall be considered:  (A) the Issuer's and Borrower's relative knowledge and access to information concerning the matter with respect to which the claim was asserted; (B) the opportunity to correct and prevent any statement or omission; and (C) any other equitable considerations appropriate in the circumstances.  Lender and Borrower hereby agree that it would not be equitable if the amount of such contribution were determined by pro rata or per capita allocation.

(v)    The liabilities and obligations of both Borrower and Lender under this Section 7.23(c) shall survive the termination of this Agreement and the satisfaction and discharge of the Obligations.

7.24    Indemnity and Expenses. Borrower agrees to indemnify Lender and each of its directors, officers, employees, agents and affiliates from and against any and all claims, losses, damages, liabilities and reasonable expenses growing out of or resulting from any Loan Document or the transactions contemplated by any Loan Document, including enforcement of each Loan Document, except claims, losses or liabilities resulting from the gross negligence or willful misconduct of the Person to be indemnified.  During the occurrence of an Event of Default, Borrower shall pay any reasonable costs and expenses incurred by Lender to examine Borrower's accounting records with respect to the Property, as Lender shall reasonably determine to be necessary or appropriate in the protection of Lender's interest.

Within fifteen (15) days after a request by Lender Borrower will pay to Lender the amount of any and all costs and expenses, including the reasonable fees and out of pocket disbursements of its counsel and of any experts and agents, which Lender incurs in connection with (a) any amendment to any Loan Document, (b) the administration of each Loan Document or amendment thereto, (c) filing or recording fees incurred with respect to or in connection with any Loan Document, (d) the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, any of the Property, (e) the exercise or enforcement of any of the rights of Lender under any Loan Document, (f) the failure by Borrower to perform or observe any of the provisions of any Loan Documents, or (g) the participation by Lender in any legal proceedings or actions.  In addition, Borrower will pay to Lender the amount of any fees, costs, and expenses related to the repayment in full of all obligations under the Loan Documents including, without limitation a processing fee for the preparation of any payoff letters and filing, recording and legal fees incurred in connection with the termination or satisfaction of any and all filings or recordings.  All such costs and expenses not paid when requested by Lender will accrue interest at a rate per annum equal to the Default Interest Rate.

The obligations of Borrower under this Section shall survive the repayment of the Obligations.

7.25    Indemnification Covering Property. In addition to any other provision of this Agreement, Borrower shall protect, indemnify and save harmless Lender and its successors and assigns, and each of their agents, employees, officers and directors (each a "**Property Indemnified Party**"), from and against all liabilities, obligations, claims, damages, penalties, causes of action, costs and expense, including reasonable attorneys' fees and expenses, whether incurred within or outside the judicial process, imposed upon or incurred by or asserted against any Property Indemnified Party, by reason of (a) ownership of the Security Instrument, the Property or any part thereof or any interest therein or receipt of any Rents and Profits; (b) any accident, injury to or death of any person or loss of or damage to property occurring in, on or about the Property or any part thereof or on the adjoining sidewalks, curbs, parking areas, streets or ways; (c) any use, nonuse or condition in, on or about, or possession, alteration, repair, operation, maintenance or management of, the Property or any part thereof or on the adjoining sidewalks, curbs, parking areas, streets or ways; (d) any failure on the part of Borrower to perform or comply with any of the terms of this Agreement or the other Loan Documents; (e)

NY 00058782 v5

64

**EXHIBIT A**
**Page 74**

performance of any labor or services or the furnishing of any materials or other property in respect of the Property or any part thereof; (f) any claim by brokers, finders or similar Persons, except for claiming through Lender, claiming to be entitled to a commission in connection with any Lease or other transaction involving the Property or any part thereof; (g) any tax or assessment including, without limitation any tax or assessment attributable to the execution, delivery, filing, or recording of any Loan Document, Lease or memorandum thereof; (h) any Lien or claim arising on or against the Property or any part thereof under any Law or any liability asserted against Lender with respect thereto; and (i) the claims of any lessee or any Person acting through or under any lessee or otherwise arising under or as a consequence of any Lease. Notwithstanding the foregoing provisions of this Section to the contrary, Borrower shall have no obligation to indemnify a Property Indemnified Party pursuant to this Section for liabilities, obligations, claims, damages, penalties, causes of action, costs and expenses relative to the foregoing that result from such Property Indemnified Party's willful misconduct or gross negligence.  Any amounts payable to Lender by reason of the application of this Section shall constitute a part of the Obligations secured by the Security Instrument and other Loan Documents and shall become immediately due and payable and shall bear interest at the Default Interest Rate from the date loss or damage is sustained by the applicable Property Indemnified Party, until paid.

[SIGNATURES APPEAR ON THE FOLLOWING PAGE]

NY 00058782 v5

**EXHIBIT A**
**Page 74**

IN WITNESS WHEREOF, Borrower and Lender, intending to be legally bound hereby, have duly executed this Agreement as of the day and year first above written.

**BORROWER:**

**POWAY PROPERTY LP,** a Delaware limited partnership

By:    Capexco US GP Inc., its general partner

        By: _____
        Name: Trent Claughton
        Title: President

**LENDER:**

**UC FUNDING, LLC,** a Delaware limited liability company

By: _____
Name: _____
Title: _____

[signature page to Poway Outpost Loan Agreement]

IN WITNESS WHEREOF, Borrower and Lender, intending to be legally bound hereby, have duly executed this Agreement as of the day and year first above written.

**BORROWER:**

**POWAY PROPERTY LP**, a Delaware limited partnership

By:     Capexco US GP Inc., its general partner

        By: _____
        Name: _____
        Title: _____

**LENDER:**

**UC FUNDING, LLC**, a Delaware limited liability company

By: _____
Name: _James Osten_
Title: _Authorized Segnatory_

[signature page to Poway Outpost Loan Agreement]

## SCHEDULE I

### INSURANCE REQUIREMENTS

1.      Required Insurance Coverages.

      (a)      **Comprehensive All Risk Insurance**.   The Comprehensive All Risk Insurance policy shall include:

           (i)      coverage for loss in accordance with coverage found under a "special cause of loss form" or "all risk form" in an amount equal to one hundred percent (100%) of the Full Replacement Cost of the improvements on the Property and all furniture, furnishings, fixtures, and equipment owned by Borrower, and all stored materials (whether stored onsite or offsite).

           (ii)      an agreed amount endorsement with respect to the Property waiving all co-insurance provisions, or the policy shall be written on a no co-insurance form, and shall provide for no deductible in excess of Ten Thousand and No/100 Dollars ($10,000.00) for all such insurance coverage.

           (iii)      to the extent required by Lender: (A) law and ordinance coverage, (B) flood hazard insurance, (C) insurance against loss or damage by windstorm and earthquake insurance, and (D) terrorism coverage.

      (b)      **Commercial General Liability Insurance**.   The Commercial General Liability Insurance policy shall be on the so-called "occurrence" form including coverage for property damage, contractual damage and personal injury (including bodily injury and death) with a combined single limit of not less than $1,000,000 per occurrence and $2,000,000 in the aggregate.

      (c)      **Commercial Automobile Liability Insurance**.   The Commercial Automobile Liability Insurance policy shall be on the so-called "occurrence" form with a combined single limit of not less than $1,000,000.

      (d)      **Commercial Umbrella Liability Insurance**.   The Commercial Umbrella Liability Insurance policy shall be on the so called "occurrence" form with a combined single limit, per location, of not less than the limit specified below and shall be continued at not less than this limit until required to be changed by Lender in writing by reason of changed economic conditions making such protection inadequate.

|  | Excess or Umbrella Liability Limit |
|---|---|
| Loans $3.5MM and Under | $2,000,000 |
| Loans over $3.5MM - $10MM | $5,000,000 |
| Loans over $10MM - $25MM | $10,000,000 |
| Loans over $25MM - $50MM | $20,000,000 |

NY 00058783 v5

Lender may require higher limits of coverage for larger or more densely occupied properties, or as it otherwise deems appropriate in its sole discretion. If Borrower has a multi-location policy or loan, the aggregate amounts must be maintained on a per location basis.

(e) **Business Income Insurance**. The Business Income Insurance policy shall include:

(i)    coverage in an amount sufficient to prevent Borrower from becoming a co-insurer within the terms of the applicable policy, and sufficient to recover eighteen (18) months of business income (as determined by Lender).

(ii)    an Extended Period of Indemnity of one hundred eighty (180) days or more, as required by Lender.

(f) **Builder's All Risk Insurance**. The Builder's All Risk Insurance policy is required during any period of any construction, renovation or alteration of the improvements on the Property. The policy shall include:

(i)    coverage for demolition and increased cost of construction or renovation, in an amount approved by Lender.

(ii)    an Occupancy Endorsement and Worker's Compensation Insurance covering all persons engaged in the construction, renovation or alteration in an amount at least equal to the minimum required by statutory limits of the state in which the Property is located.

(g) **Workers' Compensation Insurance**. Any Workers' Compensation Insurance policy shall include:

(i)    Statutory Workers' Compensation.

(ii)    Employer's Liability coverage in an amount acceptable to Lender and consistent with the general liability limit.

(h) **Boiler and Machinery Insurance**. The Boiler and Machinery Insurance coverage shall be in an amount equal to one hundred percent (100%) of the Full Replacement Cost of all equipment installed in, on or at the improvements.

(i) **Additional Insurance**. Lender may require such other insurance as may from time to time be reasonably required by Lender against other insurable hazards; including, but not limited to, vandalism, sinkhole and mine subsidence.

2.    Additional Requirements.

(a)    Lender's interest must be clearly stated by endorsement in the insurance policies described in this Schedule I as follows:

**EXHIBIT A**
**Page 79**

(i)    All policies of insurance referenced in <u>Paragraph 1</u>, except for the insurance policy referenced in <u>Paragraph 1(g)</u>, shall name Borrower as the insured and Lender and its successors and/or assigns as the additional insured, as its interests may appear.

(ii)    The policies of insurance referenced in <u>Paragraphs 1(a) and (h)</u> above shall have attached thereto a standard mortgagee's loss payable endorsement for the benefit of Lender in form satisfactory to Lender.

(b)    All of the policies referred to in this <u>Schedule I</u>: (i) shall provide for at least thirty (30) days' written notice to Lender in the event of policy cancellation with respect to the Property and/or a material change pertaining to the Property, (ii) shall contain an endorsement or agreement by the insurer that any loss shall be payable to Lender in accordance with the terms of such policy notwithstanding any act or negligence of Borrower which might otherwise result in forfeiture of such insurance; (iii) shall waive all rights of subrogation against Lender; (iv) shall contain the following phrase on the face of the document: "This is evidence that the insurance as identified below has been issued, is in force and conveys all the rights and privileges afforded under the policy."; and (v) in the event that any Lease requires that any insurance policies affecting the Property contain a waiver of subrogation provision, shall, either by their terms or by endorsement, provide such a waiver.

(c)    All insurance companies must be authorized to do business in the state in which the Property is located and must be reasonably approved by Lender. All insurance companies must have (i) a general policy rating of A or better and a financial class of X or better by A.M. Best Company, Inc., (ii) a financial strength rating of "A" or better from Moody's, and (iii) a claims paying ability of "A" or better according to S&P. Borrower shall deliver evidence satisfactory to Lender of payment of premiums due under the insurance policies.

## SCHEDULE II

## CONDITIONS TO CONSTRUCTION DISBURSEMENTS

A.   **Renovation Reserve.**

    1.   <u>Conditions to Initial Disbursement from Renovation Reserve</u>.  The following shall be conditions to the initial Construction Disbursement from the Renovation Reserve:

        (a)   Lender shall have approved the General Contractor and any major Construction Contractors in its sole discretion.

        (b)   Borrower and/or the General Contractor shall have entered into Construction Contracts and sub-contracts covering not less than seventy five percent (75%) of the budgeted value of the Renovation and, in each case, having contract prices consistent with the Renovation Budget.

        (c)   Lender shall have received the following in form and content acceptable to Lender:

            (i)   certified copies of the General Contract.

            (ii)   fully executed copies of an architect's contract, an engineer's agreement, and any other design professionals' agreements necessary for the performance of the Renovation, if any.

            (iii)   (A) a list of all Construction Contractors who have been or will be supplying labor or materials for the Renovation, and (B) certified copies of all Construction Contracts then in effect.

            (iv)   the standard form of contract and/or subcontract to be used by Borrower and General Contractor.

            (v)   Assignments by Borrower of the General Contract, Construction Contracts, architect's contracts and all plans and specifications for the Renovation, consents by the General Contractor, Construction Contractors, and architect to such assignments, and undertakings by each of the General Contractor, Construction Contractors, and architect to continue performance on behalf of Lender under their respective contracts without additional cost in the event of an Event of Default under any of the Loan Documents.

            (vi)   the Renovation Budget.

            (vii)   two (2) complete sets of the final architectural and engineering plans and specifications for the Renovation, with evidence of all necessary approvals from all applicable Governmental Authorities shown thereon.

NY 00058782 v5

(viii)    copies of all Governmental Approvals required in connection with the Renovation including, without limitation, building permits and environmental approvals.

(d)    Lender shall have received a written report prepared at Borrower's expense by the Inspecting Engineer, which report shall be based upon an evaluation or investigation of specific factors and shall describe in detail the investigation and evaluations, as well as the findings.  The report shall include an evaluation of the plans and specifications for the Renovation and their compliance with all applicable Governmental Approvals and other applicable requirements, an evaluation of any mechanical, electrical and plumbing systems to be installed in the Property and the adequacy of design and operation of the systems for their intended uses, and any other matters required by Lender.  Borrower shall provide reasonable cooperation to the Inspecting Engineer in connection with its preparation of such report.

(e)    Borrower shall have furnished to Lender a sworn statement listing the amount and nature of the various costs to be paid from the proceeds of the Loan, and disclosing the various contracts entered into by Borrower for the furnishing of labor, materials, work or services related to the Renovation, which statement shall set forth as to each such contract the name and address of the person with whom said contract was made, the labor, materials, work, services or other items to be furnished pursuant to such contract, the amount of such contract, the amount paid to date, if any, and the balance due or to become due.

(f)    With respect to the General Contract and each Construction Contract, Borrower shall have furnished to Lender sworn contractor's statements, executed by the General Contractor or Construction Contractor, as applicable, reflecting the trade-by-trade, dollar-by-dollar, breakdown of the costs of construction, and setting forth the names of all subcontractors, materialmen and suppliers, and the portions of the work to be done or the material to be furnished by each such Person, the amounts of each contract with each such Person, the amounts, if any, theretofore paid to each or any of them and the sums due or to become due to each of them, which contractor's statements shall be prepared in form satisfactory to Lender, and shall fully comply with applicable mechanics' lien laws, and if any subcontractor or materialman has entered into further subcontracts or material contracts, such a sworn contractor's statement from said subcontractor or materialman shall be furnished.

(g)    All conditions to Construction Disbursements in Paragraph 2 below shall have been satisfied.

2.    Conditions to Initial and Subsequent Disbursements from the Renovation Reserve.  The following shall be conditions to the initial and subsequent Construction Disbursements from the Renovation Reserve
:

(a)    Lender shall have received the following, in form and content acceptable to Lender, at least ten (10) business days prior to the date that Borrower desires a Construction Disbursement for Renovation:

(i)    a Disbursement Request.

        (ii)     a currently dated Construction Cost Breakdown and Request for Partial Payment from the General Contractor (in the form of AIA Document No. G702 (including AIA Form G703 as an attachment thereto).

        (iii)    a sworn owner's statement, executed by Borrower.

        (iv)    sworn contractor's statements, executed by General Contractor and each Construction Contractor.

        (v)     waivers of lien from each Construction Contractor, subcontractor, and materialman.

        (vi)    invoices, receipts, cancelled checks or other evidence satisfactory to Lender verifying the cost of performing the Renovation to be reimbursed and verifying that such amounts were expended; provided that, if Borrower fails to submit any invoices, receipts, cancelled checks or other evidence within ninety (90) days after performance of the Renovation for which payment or reimbursement is being requested, then Lender will not be required to reimburse Borrower for the cost of performing such Renovation).

        (vii)   a certificate, at Borrower's cost, from the applicable Inspecting Engineer based upon an onsite inspection of the applicable Renovation made by the Inspecting Engineer not more than ten (10) days prior to the date of such Disbursement Request, in which the Inspecting Engineer shall (A) certify that (1) the portion of the applicable Renovation completed as of the date of such inspection has been substantially completed in accordance with the Renovation Budget, (2) the workmanship of the completed Renovation is good and the materials in place are of first quality, (3) the construction, to the date of the issuance of the certificate, complies with all applicable building codes, regulations, and ordinances, and (4) Borrower is entitled to receive the Construction Disbursement; and (B) state its estimate of (1) the percentage of the construction of the Renovations completed as of the date of such inspection on the basis of work in place and the Renovation Budget, (2) Construction Costs actually incurred for work in place as part of the Renovations as of the date of such inspection, (3) the actual sum necessary to complete the Renovations in accordance with the Renovation Budget, and (4) the amount of time from the date of such inspection which will be required to complete the Renovations in accordance with the Renovation Budget.

        (viii)  a $1,500.00 Lender processing fee (which processing fee shall be increased to $2,500.00 for Construction Disbursements of $500,000.00 or more) and/or any additional administrative or consulting fees required to process the applicable Construction Disbursement.

        (ix)    such additional certificates and documents, opinions, withholdings of objection and assurances as Lender shall deem necessary or appropriate.

        (b)     Lender shall have received a continuation of title showing that there are no new exceptions to the title of the Property.

(c)    Lender shall have received an executed Construction Contract and/or subcontract with respect to each trade for which Borrower is requesting a Construction Disbursement.

(d)    Borrower shall pay all costs and expenses incurred by the Inspecting Engineer and/or Lender in connection with any Construction Disbursement (including, without limitation, inspection and monitoring costs and expenses).

(e)    No Default or Event of Default shall have occurred and be continuing under any of the Loan Documents.

(f)    Lender shall have received evidence reasonably satisfactory to Lender that Borrower is diligently pursuing the completion of the Renovations in accordance with the terms of the Loan Documents, and Lender shall have reasonably determined that Substantial Completion of the Renovations is reasonably likely to occur on or before the Completion Date.

(g)    Any conditions to any prior Construction Disbursement that were waived by Lender shall have been satisfied.

(h)    With respect to the final Construction Disbursement from the Renovation Reserve, (i) all of the Renovations (including punchlist items) shall have been fully completed in a good and workmanlike manner and in accordance with the plans and specifications approved by Lender, (ii) the Property shall be free of any lien pertaining to the Renovations and all required receipts, releases of liens, affidavits, waivers, guarantees, warranties and bonds applicable to the lien-free completion of the Renovations, as well as any other documents required under this Agreement and/or pursuant to applicable legal requirements with respect to the lien-free completion of the Renovations, shall have been issued and delivered to Lender; (iii) Borrower shall have obtained and furnished to Lender, the originals or copies of all Governmental Approvals and all other certificates, licenses, consents and other approvals of the Governmental Authorities acting in and for the locality in which the Property is situated which are required for the operation, use and occupancy of the Property for its intended use (including, without limitation, a permanent certificate of occupancy); and (iv) General Contractor and each Construction Contractor shall have executed and delivered to Lender an affidavit and final waiver of lien with respect to the Renovations as a whole.

B.    **Construction Disbursements from the Replacement Reserve**.  The following shall be conditions to disbursements from the Replacement Reserve:

1.    Lender shall have received the following, in form and content acceptable to Lender, at least ten (10) business days prior to the date that Borrower desires a Construction Disbursement for Replacements:

(a)    a Disbursement Request.

(b)    a certification by Borrower to Lender that the applicable Replacements have been completed.

NY 00058782 v5

(c)    if requested by Lender, a certification, at Borrower's expense, from an Inspecting Engineer describing the completed work, verifying the completion of the work and the value of the completed work and, if applicable, certifying that the Property is, as a result of such work, in compliance with all applicable laws, ordinances, rules and regulations relating to the Replacements so performed.

(d)    if applicable, affidavits, lien waivers, title date-downs or other evidence reasonably satisfactory to Lender showing that all materialmen, laborers, subcontractors and any other parties who might or could claim statutory or common law liens and are furnishing or have furnished material or labor to the Property have been paid all amounts due for labor and materials furnished to the Property.

(e)    invoices, receipts, cancelled checks or other evidence satisfactory to Lender verifying the cost of performing the Replacements to be reimbursed and verifying that such amounts were expended.

(f)    to the extent applicable, a new (or amended) certificate of occupancy for the portion of the improvements covered by such Replacements, if required by law, or a certification by Borrower that no new (or amended) certificate of occupancy is required by law.

(g)    a $1,500.00 Lender processing fee (which processing fee shall be increased to $2,500.00 for Construction Disbursements of $500,000.00 or more) and/or any additional administrative or consulting fees required to process the applicable Construction Disbursement.

(h)    such additional certificates and documents, opinions, withholdings of objection and assurances as Lender shall deem necessary or appropriate.

2.    Lender shall have received a continuation of title showing that there are no new exceptions to the title of the Property.

3.    Borrower shall pay all costs and expenses incurred by the Inspecting Engineer and/or Lender in connection with any Construction Disbursement (including, without limitation, inspection and monitoring costs and expenses).

4.    No Default or Event of Default shall have occurred and be continuing under any of the Loan Documents.

## SCHEDULE III

## FINANCIAL DELIVERABLES

1.    **Monthly Deliverables**.  Within fifteen (15) days after the end of each calendar month, Borrower shall deliver to Lender:

(a)    monthly operating statements for the Property;

(b)    monthly balance sheets for Borrower;

(c)    monthly bank statements evidencing receipt of rents and other ancillary charges related to the Property; and

(d)    after leasing activities commence at the Property, certified current rent rolls for the Property.

2.    **Annual Deliverables**.  Within ninety (90) days after the end of each calendar year, Borrower shall deliver to Lender:

(a)    annual balance sheets and operating statements for the Property;

(b)    annual financial statements for Borrower reviewed by an independent certified public accountant; and

(c)    annual financial statements and unaudited tax returns for, each principal, manager or general partner in Borrower, and each indemnitor and guarantor under any indemnity or guaranty executed in connection with the Loan which shall include a balance sheet, profit and loss statement and schedule of real estate investments.

3.    **Tax Returns**.  Within thirty (30) days after the date of filing, Borrower shall deliver to Lender copies of all tax returns filed by Borrower and Guarantor.

4.    **Borrower Estoppel**.  Within ten (10) days after request by Lender, a statement, duly acknowledged and certified, setting forth (a) the original principal amount of the Loan, (b) the unpaid principal amount of the Loan, (c) the Applicable Interest Rate, (d) the date installments of interest and/or principal were last paid, (e) any offsets or defenses to payment of the Loan, if any, and (f) that the Note and other Loan Documents are valid, legal and binding obligations and have not been modified or, if modified, giving particulars of such modification;

5.    **Tenant Estoppel**.  Within thirty (30) days after request by Lender, Borrower shall deliver to Lender an estoppel certificate from any tenant any non-residential Lease (provided, however, that Borrower shall only be required to use commercially reasonable efforts to obtain any such estoppel certificate and that such certificate may be in the form required under the applicable Lease).  In the event any Tenant fails to deliver an estoppel certificate, Borrower shall provide to Lender, within the time period required herein, a Borrower's estoppel certificate providing such information as required by Lender's form.

NY 00058782 v5

6.    <u>**Additional Information**</u>.    Borrower shall deliver to Lender such other information with respect to the Property, Borrower, the principals, members or general partners in Borrower, and each indemnitor and guarantor under any indemnity or guaranty executed in connection with the Loan, which may be requested from time to time by Lender, within a reasonable time after the applicable requests.

## SCHEDULE IV

## SPE COVENANTS

Borrower hereby represents and warrants to, and covenants with Lender that, since its formation and at all times thereafter:

(a)     Borrower is organized solely for the purpose of acquiring, developing, owning, holding, selling, leasing, transferring, exchanging, managing, operating and maintaining the Property, entering into the Loan Documents with the Lender, refinancing the Property in connection with a permitted repayment of the Loan, and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing;

(b)     Borrower has not engaged and will not engage in any business unrelated to the acquisition, development, sale, ownership, leasing, transferring, exchanging, management, operation, mortgaging, financing, refinancing and maintenance of the Property;

(c)     Borrower does not have and will not have any assets other than the Property and such incidental personal property as may be necessary for the operation of the Property;

(d)     Borrower shall (i) have articles of organization, a certificate of formation, limited liability company agreement and/or an operating agreement, as applicable (if Borrower is a limited liability company), (ii) have a limited partnership agreement (if Borrower is a limited partnership), or (iii) have a certificate of incorporation, articles or bylaws (if Borrower is a corporation) that, in each case, provide that Borrower will not, without the affirmative vote of (A) all directors (if Borrower is a corporation), (B) all of its members if Borrower is a limited liability company, or (C) all of its general partners if Borrower is a partnership, take any Material Action;

(e)     Borrower has not and shall not, without the affirmative vote of (i) all directors (if Borrower is a corporation), or (ii) all of the Class A members if Borrower is a limited liability company, or (iii) all of its general partners if Borrower is a partnership, take any Material Action;

(f)     Borrower is solvent, has paid, and will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) only from its own assets as the same become due, and endeavors to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations;

(g)     Borrower has not failed and will not fail to correct any known misunderstanding regarding the separate identity of such entity;

(h)     Borrower has done or caused to be done and will do all things necessary to preserve its existence;

NY 00058782 v5

(i)     Borrower has maintained and will maintain its accounts, books and records separate from any other Person;

(j)     Borrower has filed and will file its own tax return separate from those of any other Person, except to the extent that Borrower is treated as a "disregarded entity" for tax purposes and is not required to file tax returns under applicable law, and has paid and to the extent there is sufficient cash flow from the operation of the Property to do so, shall pay any taxes required to be paid under applicable law solely from its own funds;

(k)     Borrower has maintained and will maintain its own resolutions and agreements;

(l)     Borrower (i) has not commingled and will not commingle its funds or assets with those of any other Person, (ii) will pay its obligations solely with its own assets, and (iii) has not participated and will not participate in any cash management system with any other Person other than Lender;

(m)     Borrower has held and will hold its assets in its own name;

(n)     Borrower has held itself out and identified itself and will hold itself out and identify itself, and has conducted and will conduct its business in its own name or in a name franchised or licensed to it by an entity other than an Affiliate of Borrower;

(o)     Borrower has not and shall not list its assets as assets on the financial statement of any other Person, provided, however, Borrower's assets may be included in a consolidated financial statement of its affiliate provided that (A) appropriate notation shall be made on such consolidated financial statement to indicate the separateness of Borrower from such affiliate and to indicate that Borrower's assets and credit are not available to satisfy the debts and other obligations of such affiliate or any other Person, and (B) such assets also shall be listed on Borrower's own separate balance sheet;

(p)     Borrower has a sufficient number of employees in light of its contemplated business operations, which may be none, and pays the salaries of its own employees, if any, solely from its own funds;

(q)     Borrower has observed and will observe all partnership, corporate, or limited liability company formalities, as applicable;

(r)     Borrower has no, and will have no, Indebtedness (including loans (whether or not such loans are evidenced by a written agreement) between Borrower and any Affiliates of Borrower) other than (i) the Loan, (ii) unsecured liabilities incurred in the ordinary course of business relating to the routine administration of Borrower and unsecured liabilities incurred in the ordinary course of business relating to the ownership and operation of the Property, which liabilities are owed to unrelated third parties, are not more than sixty (60) days past the date incurred and are paid when due (unless disputed in accordance with applicable law), are not evidenced by a note, and are in amounts that are normal and reasonable under the circumstances, but in any event shall not exceed two percent (2%) of the principal amount of the Loan;

NY 00058782 v5

(s) Borrower will not guarantee or become obligated for the debts of any other entity or person or hold out its credit as being available to satisfy the obligations of any other entity or Person, including not acquiring obligations or securities of its partners, members or shareholders;

(t) Borrower has not and will not acquire obligations of its partners, members or shareholders or any other Affiliate;

(u) Borrower has allocated and will allocate fairly and reasonably any overhead expenses that are shared with any Affiliate, including, but not limited to, paying for shared office space and services performed by any employee of an Affiliate;

(v) Borrower has not maintained or used, and will not maintain or use, invoices and checks bearing the name of any other Person, and will use its own stationery for written communications with all other Persons;

(w) Borrower has not pledged and will not pledge its assets for the benefit of any other Person;

(x) Borrower has maintained and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(y) Borrower has not made and will not make loans to any Person or hold evidence of indebtedness issued by any other person or entity (other than cash and investment-grade securities issued by an entity that is not an Affiliate of or subject to common ownership with such entity);

(z) Borrower has not identified and will not identify its partners, members or shareholders, or any Affiliate of any of them, as a division or part of it, and has not identified itself and shall not identify itself as a division of any other Person (except to the extent such treatment may be required under the federal income tax law and similar state law for disregarded entities);

(aa) Borrower has not entered into or been a party to, and will not enter into or be a party to, any contract, agreement or transaction with its partners, members, shareholders, guarantors or Affiliates, or any partner, member, shareholder, guarantor or Affiliate thereof except in the ordinary course of its business and on terms which are intrinsically fair, commercially reasonable and substantially similar to those of an arm's-length transaction with an unrelated third party;

(bb) Borrower does not and will not have any of its debts or obligations guaranteed by any Affiliate except for Guarantor in connection with the Loan Documents; and

(cc) Borrower has complied and will comply with all of the terms and provisions contained in its organizational documents. The statement of facts contained in its organizational documents are true and correct and will remain true and correct.

NY 00058782 v5

## SCHEDULE V

## DISBURSEMENT AND REPLENISHMENT OF INTEREST RESERVE

1.     <u>Disbursement from Interest Reserve</u>.  For so long as (a) no default has occurred hereunder or under any of the other Loan Documents beyond the expiration of any applicable notice and cure periods, (b) Borrower has complied with the replenishment of the Interest Reserve as set forth below, and (c) the revenues from the Property are insufficient to make payments of interest on the Loan which are due under the Note, on any Payment Date under the Note on which Lender shall have received Borrower's written request for application of funds in the Interest Reserve to the interest due under the Note (the "**Interest Reserve Request**") (together with evidence acceptable to Lender, in its discretion, that revenues are insufficient) Lender shall advance from the Interest Reserve to itself the amount of the monthly interest set forth in the Interest Reserve Request; provided, however, that Lender shall not have any obligation whatsoever to advance any amount from the Interest Reserve as aforesaid unless the Interest Reserve Request is received by Lender on or before the respective Payment Date. Nothing contained herein including, without limitation, the existence of the Interest Reserve, shall release Borrower of any obligation to make payments under the Note, this Agreement or the other Loan Documents strictly in accordance with the terms hereof or thereof and, in this regard, without limiting the generality of the foregoing, should the amounts contained in the Interest Reserve not be sufficient to pay in full the monthly interest installments, Borrower shall be responsible for paying such deficiency on the Payment Date of any such monthly interest installment.

2.     <u>Replenishment of Interest Reserve</u>.  Borrower agrees that if the amount held in the Interest Reserve is ever less than one (1) month of interest payments under the Note (the amount of which payment will be determined from time to time based on the interest payment made under the Note for the immediately preceding payment period), then Borrower shall replenish the Interest Reserve within ten (10) days after Lender's notice thereof so that the amount held in the Interest Reserve is thereby increased so as to equal three (3) months of interest payments under the Note.  In addition, if at any time following Lender's receipt of an Interest Reserve Request and Lender's disbursement from the Interest Reserve in accordance with such Interest Reserve Request, Lender determines (based on financial statements delivered to Lender or otherwise) that there were in fact adequate revenues from the Property for Borrower to make the required interest payments due under the Note, Borrower shall replenish the Interest Reserve within ten (10) days after Lender's notice thereof with an amount of funds equal to the amount that Lender disbursed from the Interest Reserve for which Borrower actually had revenues from the Property to make such interest payment under the Note.

NY 00058782 v5

## EXHIBIT A

## LEGAL DESCRIPTION

The land referred to is situated in the County of San Diego, City of Poway, State of California, and is described as follows:

PARCEL 1:
THE EASTERLY 249.50 FEET OF THE NORTHERLY 320.00 FEET OF THE WEST HALF OF THE NORTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 13, TOWNSHIP 14 SOUTH, RANGE 2 WEST, SAN BERNARDINO MERIDIAN, IN THE CITY OF POWAY, COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO UNITED STATES GOVERNMENT SURVEY.

PARCEL 2:
AN EASEMENT FOR INGRESS AND EGRESS FOR ROAD AND PUBLIC UTILITY PURPOSES OVER, UNDER, ALONG AND ACROSS THE SOUTHERLY 40.00 FEET OF THE NORTHERLY 360.00 FEET OF THE WEST HALF OF THE NORTHEAST QUARTER OF THE SOUTHWEST QUARTER OF SECTION 13, TOWNSHIP 14 SOUTH, RANGE 2 WEST, SAN BERNARDINO MERIDIAN, IN THE COUNTY OF SAN DIEGO, STATE OF CALIFORNIA, ACCORDING TO UNITED STATES GOVERNMENT SURVEY.

EXCEPTING THEREFROM THE EASTERLY 70.00 FEET.

APN: 317-473-20

NY 00058782 v5

A-1

**EXHIBIT A**
**Page 92**

## EXHIBIT B

## RENOVATION BUDGET

| Hard Cost Reserve | | | |
|---|---|---|---|
| Item # / Description of Work | Remaining Budget | PACE Reserve | UC Reserve |
| OCO #001 AirX Utility Surveyors | $3,932 | | $3,932 |
| OCO #002 Change West Wall to Shoring Raker Syst | $0 | | $0 |
| OCO #003 Dewatering Alarm | $350 | | $350 |
| OCO #004 Increased Tie Down Quantity | $2,402 | | $2,402 |
| OCO #005 Rain delays through 6/30/19 | $0 | | $0 |
| OCO #006 Repair/replace East fence panels | $124 | | $124 |
| OCO #007 Install Security Camera | $978 | | $978 |
| OCO #009 Revise completion date to 8/21/20 | $0 | | $0 |
| OCO #011 Dewatering costs exceeding budget | $5,924 | | $5,924 |
| OCO #013 Dewatering costs exceeding budget | $2,573 | | $2,573 |
| OCO #014 Generator costs exceeding budget | $1,589 | | $1,589 |
| OCO #012 Potholing underground utilities | $896 | | $896 |
| CC 3300 CIP Concrete Retention Adjustment | $0 | | $0 |
| CC 3300 CIP Concrete Retention Adjustment | ($327,600) | | ($327,600) |
| OCO #018 Reduced lagging production | $1,816 | | $1,816 |
| OCO #021 Add temporary tieback post grouting | $3,480 | | $3,480 |
| OCO #026 Composite Drain | $2,456 | | $2,456 |
| OCO #030 Materials to be Supplied by Owner | $1,959,782 | 424,088* | $1,535,694 |
| 1000.000 General Conditions | $50,887 | | $50,887 |
| 1023.000 PRE-CONSTRUCTION MANAGER | $5,000 | | $5,000 |
| 1260.000 General Requirements | $17,758 | | $17,758 |
| 1801.000 SURVEY/LAYOUT PERSONNEL | $9,324 | | $9,324 |
| 2025.000 SWPPP | $2,046 | | $2,046 |
| 2300.000 Earthwork | $0 | | $0 |
| 2400.000 Shoring, Boring, & Jacking | $272,750 | $0 | $272,750 |
| 2410.000 Demo | $8,990 | | $8,990 |
| 2500.000 Utility Services | $231,781 | | $231,781 |
| 2550.000 A.C. Paving | $6,136 | | $6,136 |
| 2555.000 Striping | $33,065 | | $33,065 |
| 2560.000 Site Concrete | $73,425 | $73,425 | $0 |
| 2600.000 Drainage & Containment | $68,401 | | $68,401 |
| 2900.000 Landscaping/Planting | $259,538 | | $259,538 |
| 3300.000 Cast-in-Place Concrete | $1,208,815 | $463,826 | $744,989 |
| 4200.000 Masonry Units | $98,880 | | $98,880 |
| 5250.000 Metal Fabrication | $201,423 | $201,423 | $0 |
| 6110.000 Rough Carpentry | $1,851,200 | | $1,851,200 |
| 6220.000 Finish Carpentry / Millwork | $266,458 | | $266,458 |
| 7011.000 Roofing | $261,188 | $150,594 | $110,594 |
| 7131.000 Waterproofing | $319,300 | | $319,300 |
| 7200.000 Insulation | $48,405 | $48,405 | $0 |
| 7600.000 Flashing & Sheet Metal | $102,360 | | $102,360 |
| 8110.000 Doors, Frames & Hardware | $163,075 | $163,075 | $0 |
| 8300.000 Specialty Doors | $70,000 | | $70,000 |

NY 00058782 v5

B-1

**EXHIBIT A**
**Page 92**

| | | | |
|---|---|---|---|
| 8400.000 Entrances & Storefronts | $281,600 | $281,600 | $0 |
| 8800.400 Glazing | $240,400 | $240,400 | $0 |
| 9200.000 Stucco | $715,190 | | $715,190 |
| 9290.000 Metal Stud & Drywall | $1,000,500 | $500,250 | $500,250 |
| 9300.000 Tile | $78,814 | | $78,814 |
| 9500.000 Acoustical Ceilings | $8,813 | | $8,813 |
| 9600.000 Flooring | $46,504 | | $46,504 |
| 9670.000 Epoxy Flooring | $0 | | $0 |
| 9900.000 Painting & Wallcovering | $307,372 | | $307,372 |
| 10141.000 Signage | $25,000 | | $25,000 |
| 10280.000 Bathroom Accessories | $41,800 | | $41,800 |
| 10520.000 Fire Protection Specialties | $9,500 | | $9,500 |
| 11130.000 Audio-Visual Equipmt | $12,000 | | $12,000 |
| 11261.000 Kitchen Equipment | $190,800 | | $190,800 |
| 12000.200 Furnishings | $18,200 | | $18,200 |
| 12210.000 Window Coverings | $79,500 | | $79,500 |
| 12360.000 Countertops | $0 | | $0 |
| 13700.000 Security Access & Surveillance | $75,000 | | $75,000 |
| 14000.000 Conveyor Equipment | $303,035 | | $303,035 |
| 15300.000 Fire Protection Piping | $407,500 | | $407,500 |
| 15400.000 Plumbing Fixtures & Equipmt | $894,377 | $50,201 | $844,176 |
| 15700.000 Heating & Air Cond. Equipmt | $510,750 | $510,750 | $0 |
| 16100.000 Electrical | $678,694 | $243,308 | $435,386 |
| 16300.000 Fire Alarm | $63,500 | | $63,500 |
| 16400.000 Low Voltage | $33,600 | | $33,600 |
| **Total Trade Costs** | **$13,311,353** | **$3,351,346** | **$9,960,008** |
| 1052.000 GC Contingency (0.9% of Trade Costs) | $117,653 | $117,653 | $0 |
| Additional Contingency (2.4% of Trade Costs) | $297,040 | $192,416 | $104,624 |
| 1054.000 FEE | $341,005 | $0 | $341,005 |
| **Total Hard Cost Budget** | **$14,067,051.29** | **$3,661,414.58** | **$10,405,636.71** |
| UC Released at Closing** | | | ($600,000) |
| UC Reserve at Closing** | | | $9,805,636.71 |

*Includes $31,088 for "Doors, Frames and Hardware", $108,000 for "Entrances and Storefront", $85,000 for "Glazing" and $200,000 for "HVAC Equipment"

**Amount Released at Closing and UC Reserve at Closing directly correlate to the Additional Borrower Equity Contribution amount that needs to be repaid by the Borrower

**EXHIBIT A**
**Page 93**

**EXHIBIT A**
**Page 94**

<h2 align="center">EXHIBIT C</h2>

<h2 align="center">SOFT COSTS BUDGET</h2>

| Soft Cost Reserve | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Item | Overall Budget | | | PACE Funding | | | UC Funding | | |
| | Total | Closing Draw | Reserve | Total | Closing Draw | Reserve | Total | Closing Draw | Reserve |
| Architecture | $25,000 | | $25,000 | | | | $25,000 | $0 | $25,000 |
| Civil* | $37,830 | | $37,830 | $53,509 | $0 | $53,509 | ($15,679) | $0 | ($15,679) |
| Structural | $10,542 | $4,520 | $6,022 | | | | $10,542 | $4,520 | $6,022 |
| Mechanical/Electrical | $25,000 | $7,750 | $17,250 | | | | $25,000 | $7,750 | $17,250 |
| Miscellaneous Consultant Allowance | $38,540 | $14,960 | $23,581 | | | | $38,540 | $14,960 | $23,581 |
| Pre Construction | $2,638 | | $2,638 | | | | $2,638 | | $2,638 |
| Marketing | $47,596 | | $47,596 | | | | $47,596 | $0 | $47,596 |
| Permitting | $55,333 | $55,333 | $0 | | | | $55,333 | $55,333 | $0 |
| Property taxes | $192 | | $192 | | | | $192 | $0 | $192 |
| Total Soft Cost Budget | $242,671 | $82,562 | $160,109 | $53,509 | $0 | $53,509 | $189,162 | $82,562 | $106,600 |

*At Closing, PACE overbudgeted the "Civil" line item by ~$16k, to be reconciled prior to the first draw

**EXHIBIT A**
**Page 94**

## EXHIBIT D

## PACE IMPROVEMENT SCHEDULE

| PACE Identified Costs | | | |
|---|---|---|---|
| Line Item | Approved Budget | Initial Funding | Remaining Reserve |
| Hard Costs | | | |
| Shoring, Boring & Jacking | $945,108 | $945,108 | $0 |
| Site Concrete | $73,425 | $0 | $73,425 |
| Cast In Place Concrete | $6,515,000 | $6,051,174 | $463,826 |
| Metal Fabrication | $227,120 | $25,697 | $201,423 |
| Roofing | $150,594 | $0 | $150,594 |
| Insulation | $48,405 | $0 | $48,405 |
| Doors, Frames & Hardware* | $194,163 | $0 | $194,163 |
| Entrances & Store Fronts* | $389,600 | $0 | $389,600 |
| Glazing* | $325,400 | $0 | $325,400 |
| Metal Stud & Drywall | $500,250 | $0 | $500,250 |
| Plumbing Fixtures & Equipment | $285,180 | $234,979 | $50,201 |
| HVAC Equipment* | $710,750 | $0 | $710,750 |
| Electrical | $415,097 | $171,789 | $243,308 |
| Contingency | $330,310 | $20,241 | $310,069 |
| GC Fee | $263,818 | $263,818 | $0 |
| Total Hard Costs | $11,374,220 | $7,712,805 | $3,661,415 |
| Soft Costs | | | |
| Other Consultant Cost Allowance | $16,900 | $16,900 | $0 |
| Impact Fees | $584,099 | $584,099 | $0 |
| Architecture | $292,049 | $292,049 | $0 |
| Civil | $68,599 | $15,090 | $53,509 |
| Structural | $48,026 | $48,026 | $0 |
| Mechanical/Electrical | $92,085 | $92,085 | $0 |
| Permitting | $61,655 | $61,655 | $0 |
| Total Soft Costs | $1,163,413 | $1,109,904 | $53,509 |
| Total Budget | $12,537,633 | $8,822,709 | $3,714,924 |

*A portion of these line items are included in the line item "OCO #30 - Materials to be Supplied by Owner"*

## EXHIBIT E

## PAYMENT DIRECTION LETTER

_____, 20\_\_\_\_

       Re:    Payment Direction Letter for _____ located in _____, _____ (the "**Property**")

Dear _____:

_____, a _____ and the owner of the Property (the "**Owner**") has mortgaged the Property to UC Funding, LLC, a Delaware limited liability company (together with its successors and assigns, the "**Lender**") and has agreed that all rents due for the Property will be paid directly to a bank selected by Lender. Therefore, from and after _____, 20\_\_, all rent to be paid by you under your lease agreement in effect at the Property (the "**Lease**") should be paid as follows:

(1)     If paying by check, money order or other instrument, please mail such items to the following address:

[CLEARING BANK]
[Address]

All checks or other instruments should be made out to the name of the "**[PROPERTY]**"; or

(2)     Transfer such amounts by the ACH System or wire transfer to the following account:

[CLEARING BANK]
ABA#
Attn:
Fax:
Account of:
Account #    _____

These payment instructions cannot be withdrawn or modified without the prior written consent of Lender or its agent (the "**Servicer**"), or pursuant to a joint written instruction from Borrower and Lender or Servicer. Until you receive written instructions from Lender or Servicer, continue to send all rent payments due under the Lease to the address of the clearing bank (the "**Clearing Bank**") indicated above. All rent payments must be delivered to such Clearing Bank no later than the day on which such amounts are due under the Lease.

NY 00058782 v5

D-2

If you have any questions concerning this letter, please contact _____ of _____ at _____. We appreciate your cooperation in this matter.


Sincerely,

OWNER:


_____,
a _____


By: _____
   Printed Name: _____
   Its: _____

# EXHIBIT 2

Poway Outpost
Loan Number:  62041

# PROMISSORY NOTE

$21,100,000.00                                                                                          October 22, 2020

    **THIS PROMISSORY NOTE** (this "**Note**") is made as of October 22, 2020 by **POWAY PROPERTY LP**, a Delaware limited partnership, authorized to transact business in the State of California ("**Borrower**") having an address at 13772 Paseo Valle Alto, Poway, California 92064, to and in favor of **UC FUNDING, LLC**, a Delaware limited liability company (together with its successors and assigns, "**Lender**") having an address c/o UC Credit Services LLC, 745 Boylston Street, Suite 502, Boston, Massachusetts 02116, Attention:  Loan Servicing.

    NOW, THEREFORE, FOR VALUE RECEIVED, Borrower promises to pay to the order of Lender, without any counterclaim, setoff or deduction whatsoever, on the Maturity Date, as hereinafter defined, at the office of Lender, or at such other place as Lender may designate to Borrower in writing from time to time, the principal sum of TWENTY-ONE MILLION ONE HUNDRED THOUSAND AND NO/100 DOLLARS ($21,100,000.00), together with interest on so much thereof as is from time to time outstanding and unpaid, from the date of the advance of the principal evidenced hereby, at the Applicable Interest Rate as hereinafter set forth, in lawful money of the United States of America, which shall at the time of payment be legal tender in payment of all debts and dues, public and private.

## ARTICLE 1
## TERMS AND CONDITIONS

    1.01    <u>Definitions</u>.  The following words and phrases shall have the meanings specified below.

    "**Applicable Interest Rate**" means the LIBOR Rate plus the Margin, which combined figure shall be rounded upwards to the nearest one-eighth percent (0.125%).  It is the interest rate from time to time accruing on the Loan.

    "**Applicable Pay Rate**" means (i) during the period commencing on the Closing Date and continuing through October 31, 2021, the Applicable Interest Rate minus five percent (5%), and (ii) during the period commencing on November 1, 2021 and continuing thereafter, the Applicable Interest Rate minus six percent (6%).  Notwithstanding the foregoing, during the continuance of any Deferred Fees Reserve Deposit Default, the Applicable Pay Rate shall mean (i) during the period commencing on the Closing Date and continuing through October 31, 2021, the Applicable Interest Rate minus ten percent (10%), and (ii) during the period commencing on November 1, 2021 and continuing thereafter, the Applicable Interest Rate minus eleven percent (11%).

    "**Closing Date**" means the date on which Lender first funds the Loan.

"**Comparable Index**" means a comparable published index rate selected by Lender in the event that (i) the Wall Street Journal ceases publication or ceases to publish the LIBOR Rate, (ii) for any other reason means do not reasonably exist for ascertaining the LIBOR Rate, or (iii) a contingency has occurred which materially adversely affects the London interbank market at which Lender prices loans.

"**Debt Service Amount**" is an amount equal to the annualized interest payments that would be due under this Note using the Applicable Interest Rate in effect at the time the Debt Service Coverage Ratio is being calculated.

"**Debt Service Coverage Ratio**" means the ratio of the Property's Net Operating Income to the Debt Service Amount.

"**Default Interest Rate**" means a rate per annum equal to twenty-four percent (24%), or if such increased rate of interest may not be collected under applicable law, then the maximum rate of interest, if any, which may be collected from Borrower under applicable law.

"**Event of Default**" has the meaning specified in Section 1.08.

"**Exit Fee**" has the meaning specified in Section 1.05.

"**Extension Term**" has the meaning specified in Section 1.06.

"**Interest**" has the meaning specified in Section 2.03.

"**Interest Rate Adjustment Date**" means the first (1st) day of the calendar month for which the Applicable Interest Rate is determined (i.e., the Interest Rate Adjustment Date is June 1 with respect to the interest accruing during said month of June and due on July 1).

"**Late Charge**" has the meaning specified in Section 1.08.

"**LIBOR Business Day**" means a day upon which United States dollar deposits may be dealt in on the London and the New York City interbank markets and commercial banks and foreign exchange markets are open in London and New York City.

"**LIBOR Rate**" means the greater of: (a) one and nine-tenths percent (1.90%); and (b) the average of London Interbank Offered Rates (in U.S. dollar deposits) for a term of one month determined solely by Lender as of each Interest Rate Adjustment Date. On each Interest Rate Adjustment Date, Lender will obtain the close-of-business LIBOR Rate published in The Wall Street Journal on the last LIBOR Business Day of the month immediately preceding the Interest Rate Adjustment Date. If The Wall Street Journal ceases publication or ceases to publish the LIBOR Rate, Lender shall select a comparable publication to determine the LIBOR Rate and provide notice thereof to Borrower. The LIBOR Rate may or may not be the lowest rate based upon the market for U.S. dollar deposits in the London interbank market at which Lender prices loans on the date on which the LIBOR Rate is determined by Lender as set forth above.

"**Loan**" means the loan in the original principal amount stated above, which is evidenced by this Note.

NY 00058777 v6

2

"**Loan Agreement**" means the Loan Agreement of even date herewith between Borrower and Lender, as it may be amended, restated or modified from time to time.

"**Loan Documents**" means this Note, the Security Instrument, the Loan Agreement and all other agreements, documents, instruments, guaranties or indemnifications evidencing and/or securing the Loan, together with any amendments, restatements, renewals or modifications of the same.

"**Margin**" means (i) during the period commencing on the Closing Date and continuing through October 31, 2021, eight and eighty-five one hundredths percent (8.85%), and (iii) during the period commencing on November 1, 2021 and continuing thereafter, nine and eighty-five one hundredths percent (9.85%). Notwithstanding the foregoing, during the continuance of any Deferred Fees Reserve Deposit Default, Margin shall mean (i) during the period commencing on the Closing Date and continuing through October 31, 2021, thirteen and eighty-five one hundredths percent (13.85%), and (iii) during the period commencing on November 1, 2021 and continuing thereafter, fourteen and eighty-five one hundredths percent (14.85%).

"**Maturity Date**" means January 1, 2022, subject to extension as set forth in Section 1.06.

"**Minimum Interest**" has the meaning specified in Section 1.05.

"**Net Operating Income**" means an annualized amount calculated by Lender considering the Property's gross income in place and for the three (3) month period prior to the calculation, the Property's expenses (which shall include, without limitation, any assessments attributable to the PACE Financing) in place and for the twelve (12) month period prior to the calculation (as such income and expenses may be adjusted by Lender for seasonal variations, for taxes, insurance, and other accruals, and based on customary underwriting standards for similar properties), taking into account deposits into the Replacement Reserve (in the amounts required under Section 2.05(c) of the Loan Agreement), and assuming a vacancy and collection loss factor equal to the greater of the Property's actual vacancy or five percent (5%).

"**Offer**" has the meaning specified in Section 1.09.

"**Payment Date**" has the meaning specified in Section 1.03(a).

"**Property**" has the meaning specified in the Security Instrument.

"**Refinance Loan**" has the meaning specified in Section 1.09.

"**Security Instrument**" means the Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing of even date herewith from Borrower for the benefit of Lender and encumbering the Property as security for the Loan, as it may be amended, restated, or modified from time to time.

1.02    Calculation of Interest Rate.

(a)    Interest due on the Loan shall be paid in arrears, calculated based on a 360-day year and paid for the actual number of days elapsed for any whole or partial month in which interest is being calculated. In computing the number of days during which interest accrues, the Closing Date shall be included regardless of the time of day the advance of Loan funds is made, and the day on which Loan funds are repaid shall be included.

(b)    (i)    Interest shall accrue on the outstanding principal amount of the Loan at a rate per annum equal to the Applicable Interest Rate. Adjustments to the Applicable Interest Rate in connection with changes in the LIBOR Rate shall be made on the Interest Rate Adjustment Date, except that the initial Applicable Interest Rate shall be determined by Lender prior to the Closing Date.

(ii)    Borrower shall pay interest accruing on the outstanding principal amount of the Loan at the Applicable Interest Rate from the Closing Date until the principal amount is paid in full. Such interest shall be payable as follows: (A) interest at the Applicable Pay Rate, shall be paid in arrears in monthly installments on each Payment Date with respect to the interest accrued hereunder during the immediately preceding calendar month through and including the Maturity Date, and (B) on the Maturity Date, the entire outstanding principal balance hereof, together with all accrued but unpaid interest thereon, shall be due and payable in full. All accrued but unpaid interest must be paid on the date the unpaid principal balance of this Note becomes due by acceleration or otherwise, if prior to the stated Maturity Date, and all accrued but unpaid interest must be paid upon prepayment of principal.

(c)    Lender's obligation to maintain interest based on the LIBOR Rate shall be suspended and the Applicable Interest Rate shall be based on the Comparable Index (plus the Margin) upon Lender's determination, in good faith, that adequate and reasonable means do not exist for ascertaining the LIBOR Rate or that a contingency has occurred which materially and adversely affects the London interbank market at which Lender prices loans (which determination by Lender shall be conclusive and binding on Borrower in the absence of manifest error). Computation of the Applicable Interest Rate based on the Comparable Index shall continue until Lender determines that the circumstances giving rise to Lender's substitution of the Comparable Index for the LIBOR Rate no longer exist. Lender shall promptly notify Borrower of each such determination.

(d)    If, at any time, Lender determines or agrees that it has miscalculated the Applicable Interest Rate (whether because of a miscalculation of the LIBOR Rate or otherwise), Lender shall notify Borrower of the necessary correction. If the corrected Applicable Interest Rate represents an increase in the applicable monthly payment, Borrower shall, within ten (10) days thereafter, pay to Lender the corrected amount. If the corrected Applicable Interest Rate represents an overpayment by Borrower to Lender and no Event of Default then exists, Lender shall refund the overpayment to Borrower or, at Lender's option, credit such amounts against Borrower's payment next due hereunder.

(e)    All payments made by Borrower hereunder shall be made free and clear of, and without reduction for, or on account of, any income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings hereafter imposed, levied, collected, withheld or assessed by any government or taxing authority (other than taxes on the overall net income or

NY 00058777 v6

4

overall gross receipts of Lender imposed as a result of a present or former connection between Lender and the jurisdiction of the government or taxing authority imposing same; provided, however, that this exclusion shall not apply to a connection arising solely from Lender's having executed, delivered, performed its obligations under, received a payment under, or enforced this Note or any other Loan Document).  If any such amounts are required to be withheld from amounts payable to Lender, the amounts payable to Lender under the Loan Documents shall be increased to the extent necessary to yield to Lender, after payment of such amounts, interest or any such other amounts payable at the rates or in the amounts specified herein.  If any such amounts are payable by Borrower, Borrower shall pay all such amounts by their due date and promptly send Lender a certified copy of an original official receipt showing payment thereof.  If Borrower fails to pay such amounts when due or to deliver the required receipt to Lender, Borrower shall indemnify Lender for any incremental taxes, interest or penalties that may become payable by Lender as a result of any such failure.

(f)    If Lender determines that the adoption of any law, regulation, or rule by any governmental authority (including, without limitation, any change regarding the imposition or increase in reserve requirements), whether or not having the force of law, does or will have the effect of reducing Lender's rate of return on the Loan (other than in connection with ordinary fluctuations in the LIBOR Rate), then, from time to time, within five (5) business days after written demand therefor by Lender, Borrower shall pay Lender such additional amount as will compensate Lender for its reduction.  In addition, if any law, regulation, or rule hereafter is enacted or modified by any governmental authority, whether or not having the force of law, and compliance therewith results in an increase in the cost to Lender (including, without limitation, a reduction in the income received by Lender) in making, funding or maintaining interest on the Loan at the rate herein provided, then, within five (5) business days after written demand therefor by Lender, Borrower shall pay Lender the additional amounts necessary to compensate Lender for such increased costs.

(g)    Notwithstanding anything to the contrary contained herein, if Borrower is prohibited by law from paying any amount due to Lender under Section 1.02(e) or (f), Lender may elect to declare the unpaid principal balance of the Loan, together with all unpaid interest accrued thereon and any other amounts due hereunder, due and payable within ninety (90) days of Lender's written notice to Borrower.  Lender's delay or failure in accelerating the Loan upon the discovery or occurrence of an event under Section 1.02(e) or (f) shall not be deemed a waiver or estoppel against the exercise of such right.

1.03    Payments.

(a)    Subject to the provisions of Section 1.02(b)(ii) above, (i) Borrower shall pay all interest accruing at the Applicable Interest Rate on the unpaid principal amount of this Note from the Closing Date until the principal amount of this Note has been paid in full, and (ii) such interest shall be payable in arrears in monthly installments, beginning on November 1, 2020, and continuing on the first (1st) day of each and every month thereafter (each, a "**Payment Date**") with respect to the interest accrued hereunder during the immediately preceding calendar month through and including the Maturity Date, at which time the entire outstanding principal balance hereof, together with all accrued but unpaid interest thereon, shall be due and payable in full.  If Borrower defaults in its obligation to repay the Loan in full on or before the Maturity

Date then, in addition to any other rights or remedies available to Lender under the Loan Documents, any repayment of the Loan after the Maturity Date shall include an amount equal to the unearned interest which would accrue for the period from the date of repayment through the first (1st) day of the month following the month in which repayment is made.

(b)    Payments in federal funds immediately available in the place designated for payment received by Lender prior to 2:00 p.m. local time at said place of payment shall be credited prior to close of business, while other payments may, at the option of Lender, not be credited until immediately available to Lender in federal funds in the place designated for payment prior to 2:00 p.m. local time at said place of payment on a day on which Lender is open for business.

(c)    All payments shall be applied (i) first, to all Late Charges, interest at the Default Interest Rate, the Exit Fee, the Minimum Interest, or other premiums and other sums payable hereunder or under the other Loan Documents; (ii) second, to all interest (other than interest at the Default Interest Rate) that shall be due and payable with respect to the Loan pursuant to the terms hereof as of the date the payment is received; (iii) third, to any other accrued and unpaid interest; and (iv) fourth, to the outstanding principal amount of the Loan until the Loan has been repaid in full.

1.04    Prepayment.

(a)    Borrower may prepay the Loan in whole only in accordance with the following provisions:

(i)    Lender shall have received from Borrower thirty (30) days' prior written notice specifying the date proposed for prepayment;

(ii)    Borrower shall pay to Lender all interest due through and including the relevant Payment Date on which the prepayment is being made, together with any and all other amounts due and owing pursuant to the terms of this Note and the other Loan Documents including, without limitation, the Exit Fee, any Minimum Interest, and any Late Charges;

(iii)    No Event of Default shall have occurred and be continuing which would not be cured by the repayment of the Loan in full; and

(iv)    If prepayment is not made on a Payment Date, Borrower pays with such prepayment (in addition to all other amounts due under this Section 1.04) an amount equal to the unearned interest which would accrue for the period from the date of prepayment through the forthcoming Payment Date.

(b)    Partial prepayments of this Note shall not be permitted, except for (i) partial prepayments resulting from Lender applying insurance or condemnation proceeds to reduce the outstanding principal balance of this Note as provided in the Loan Agreement and (ii) the partial prepayment resulting from Lender applying Borrower's Additional Equity Contribution to reduce the outstanding principal balance of this Note as provided in the Loan Agreement. No notice of prepayment shall be required under the circumstances specified in the preceding sentence. No principal amount repaid may be re-borrowed. Any such partial

NY 00058777 v6

6

prepayments shall be applied on the next succeeding Payment Date following Lender's determination to apply insurance or condemnation proceeds to the partial prepayment of the amounts outstanding under this Note in the following order: (w) first, to all Late Charges, interest at the Default Interest Rate, the Exit Fee, the Minimum Interest, or other premiums and other sums payable hereunder or under the other Loan Documents; (x) second, to all interest (other than interest at the Default Interest Rate) that shall be due and payable with respect to the Loan pursuant to the terms hereof as of the date the payment is received; (y) third, to any other accrued and unpaid interest; and (z) fourth, to the outstanding principal amount of the Loan until the Loan has been repaid in full.

    1.05    <u>Exit Fee and Minimum Interest</u>.  Any payment of principal hereunder (whether on the Maturity Date or the date the unpaid principal balance otherwise becomes due, by acceleration or otherwise, or upon prepayment) shall be accompanied by the payment of an amount equal to (a) one and one-half percent (1.50%) of the amount being repaid (the "**Exit Fee**"), plus (b) the positive difference, if any, between (i) the amount of interest that would have accrued at the Applicable Interest Rate on the amount being repaid from the Closing Date through October 31, 2021, and (ii) the aggregate interest actually paid by Borrower on the amount being repaid from the Closing Date through the date of repayment (the "**Minimum Interest**").

    Borrower acknowledges that the Exit Fee and the Minimum Interest have been earned by Lender at the time of making the Loan.  Failure to pay the Exit Fee and the Minimum Interest shall constitute an Event of Default hereunder.

    1.06    <u>Extension of Maturity Date</u>.    Borrower, subject to Lender's consent in its reasonable discretion, may elect to extend the Maturity Date for up to two (2) additional consecutive terms of three (3) months each (each, an "**Extension Term**") upon satisfaction of the following terms and conditions with respect to each Extension Term:

    (a)    At least thirty (30) days prior to the then scheduled Maturity Date, Borrower delivers to Lender a written request to extend the Maturity Date for the applicable Extension Term;

    (b)    Borrower shall pay all of Lender's reasonable expenses, if any, incurred in connection with the extension of the Maturity Date;

    (c)    No Event of Default has occurred and is continuing on the date of the request for extension or on the Maturity Date;

    (d)    Borrower shall pay to Lender an extension fee with respect to each Extension Term in an amount equal to one-half of one percent (0.50%) of the original principal amount of this Note, which payment must be made with the applicable notice delivered to Lender pursuant to <u>Section 1.06(a)</u> above;

    (e)    Borrower shall replenish the Interest Reserve (as defined in <u>Section 2.05</u> of the Loan Agreement) so as to equal three months of interest payments under the Note;

NY 00058777 v6

(f)     Borrower shall deposit into the Impound Reserve (i) an amount sufficient (when added to the monthly deposits described in Section 2.04 of the Loan Agreement) to pay the next due installment of real estate taxes and assessments on the Property at least two (2) months prior to the delinquency date thereof (if paid in one installment), (ii) an amount sufficient to pay in full the next assessment due with respect to the PACE Financing (as defined in the Loan Agreement), and (iii) an amount sufficient to pay the next due insurance premiums with respect to the Property at least two (2) months prior to the due date thereof (if paid in one installment);

(g)     Substantial Completion of the Construction shall have occurred; and

(h)     The Property shall have a Debt Service Coverage Ratio of not less than 1.10:1.00 on the date of the request for extension and on the original Maturity Date.

Notwithstanding anything to the contrary set forth above, any failure by Borrower to repay the Loan on or prior to the then scheduled Maturity Date without extending the Maturity Date shall be deemed to be an attempt to extend the Maturity Date without satisfying the requirements of this Section 1.06. Accordingly, upon such failure, the extension fee that would otherwise apply under Section 1.06(d) shall be immediately due and payable irrespective of whether the other conditions to extension contained in this Section 1.06 are satisfied and irrespective of whether Lender agrees to grant any such extension.

1.07   Security.  The indebtedness evidenced by this Note and the Loan Agreement and the obligations created hereby are secured by the Security Instrument and the other Loan Documents.  All of the terms and provisions of the other Loan Documents are incorporated herein by reference.  Some of the other Loan Documents are to be filed for record on or about the date hereof in the appropriate public records.

1.08   Events of Default.  It is hereby expressly agreed that (a) if (i) any monthly installment of interest due under this Note is not paid within five (5) days after the date when due, (ii) any principal payable under this Note is not paid on the date on which such payment is due including, without limitation, the Maturity Date, or (iii) any other amount payable under the Loan Documents is not paid within five (5) days after written notice that such payment was due, or (b) should any other Event of Default, as defined in the Loan Agreement, occur, then an "**Event of Default**" shall exist hereunder and the indebtedness evidenced hereby, including all sums advanced or accrued hereunder or under any other Loan Document, and all unpaid interest accrued thereon, shall at the option of Lender, and without notice to Borrower, at once become due and payable and may be collected forthwith, whether or not there has been a prior demand for payment and regardless of the stipulated date of maturity.  In the event that any payment is not received by Lender upon the Maturity Date or, with respect to any other payment, within five (5) days after the date on which such payment is due (or such other date as may be required under applicable law), then in addition to any default interest payments due hereunder, Borrower shall pay to Lender a late charge ("**Late Charge**") in an amount equal to four percent (4.0%) of the amount of such overdue payment.  At any time that an Event of Default exists, regardless of whether or not there has been an acceleration of the indebtedness evidenced hereby, and at all times after maturity of the indebtedness evidenced hereby (whether by acceleration or

NY 00058777 v6

8

otherwise), interest shall accrue on the outstanding principal balance of this Note at the Default Interest Rate, and such default interest shall be immediately due and payable. Borrower acknowledges that it would be extremely difficult or impracticable to determine Lender's actual damages resulting from any late payment or default, and such Late Charges and default interest are reasonable estimates of those damages and do not constitute a penalty. The remedies of Lender in this Note or in the other Loan Documents, or at law or in equity, shall be cumulative and concurrent, and may be pursued singly, successively or together in Lender's discretion. Time is of the essence with respect to this Note. In the event that this Note, or any part hereof, is collected by or through an attorney-at-law, Borrower agrees to pay all costs of collection including, but not limited to, reasonable attorneys' fees.

    1.09   <u>Refinance Loan</u>.

        (a)    Borrower acknowledges that as an inducement to make the Loan, Lender shall have the exclusive right (but not the obligation) to provide directly to Borrower refinancing with respect to the Property in order to refinance the Loan (the "**Refinance Loan**") on customary terms and conditions then offered by institutional lenders with respect to similar properties.

        (b)    In the event Borrower is seeking to refinance the Loan, at least three (3) months prior to the Maturity Date (or, if Borrower intends to prepay the Loan pursuant to <u>Section 1.04</u> hereof, at least three (3) months prior to the date of such prepayment), Borrower shall submit an application for such Refinance Loan to Lender. Borrower shall provide such information as is reasonably requested by Lender in connection therewith and shall cooperate in good faith with Lender.

        (c)    Before accepting any commitment or other offer to provide financing (an "**Offer**"), Borrower shall submit the Offer to Lender and Lender will have ten (10) business days after submission of such Offer to match the terms thereof. If Lender matches such terms, Borrower will enter into a financing arrangement with Lender upon the terms matched by Lender. If Lender does not match such terms within such ten (10) business day period, Borrower may enter into the financing arrangement with the other institutional lender pursuant to the terms of the Offer. Notwithstanding the foregoing provisions, if, after Borrower has accepted any such Offer from an institutional lender other than Lender, any of the material terms thereof are modified so as to increase the yield to such lender, reduce the amount of the loan or reduce the term thereof, then Lender will be given a further opportunity to match such new terms and Borrower will present such new terms to Lender, which will then have ten (10) business days after receipt thereof to match the new terms. If Lender agrees within such ten (10) business day period to match such new terms, Borrower will consummate the financing with Lender. If Lender does not match such new terms within such ten (10) business day period, Borrower may enter into such financing arrangement upon such new terms with the other institutional lender. For the purposes of this Section, the terms "match" or "matching" means agreeing to match the principal amount, overall yield to the lender, and term of the loan.

        (d)    If Lender provides (or arranges with a third-party lender to provide) Borrower with a financing commitment letter for the Refinance Loan or matches a commitment or offer from another institutional lender pursuant to <u>Section 1.09(c)</u>, Borrower shall be obligated to accept such financing commitment from Lender for the Refinance Loan.

NY 00058777 v6

## ARTICLE 2
## GENERAL CONDITIONS

2.01    <u>No Waiver; Amendment</u>.  No failure to accelerate the debt evidenced hereby by reason of an Event of Default hereunder, acceptance of a partial or past due payment, or indulgences granted from time to time shall be construed (a) as a novation of this Note or as a reinstatement of the indebtedness evidenced hereby or as a waiver of such right of acceleration or of the right of Lender thereafter to insist upon strict compliance with the terms of this Note, or (b) to prevent the exercise of such right of acceleration or any other right granted hereunder or by any applicable laws; and Borrower hereby expressly waives the benefit of any statute or rule of law or equity now provided, or which may hereafter be provided, which would produce a result contrary to or in conflict with the foregoing.  No extension of the time for the payment of this Note or any installment due hereunder, made by agreement with any person now or hereafter liable for the payment of this Note shall operate to release, discharge, modify, change or affect the original liability of Borrower under this Note, either in whole or in part unless Lender agrees otherwise in writing.  This Note may not be changed orally, but only by an agreement in writing signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

2.02    <u>Waivers</u>.    Presentment for payment, demand, protest and notice of demand, protest and nonpayment and all other notices are hereby waived by Borrower.  Borrower hereby further waives and renounces, to the fullest extent permitted by law, all rights to the benefits of any statute of limitations and any moratorium, reinstatement, marshaling, forbearance, valuation, stay, extension, redemption, appraisement, exemption and homestead  now or hereafter provided by the Constitution and laws of the United States of America and of each state thereof, both as to itself and in and to all of its property, real and personal, against the enforcement and collection of the obligations evidenced by this Note or the other Loan Documents.

2.03    <u>Limit of Validity</u>.  The provisions of this Note and of all agreements between Borrower and Lender, whether now existing or hereafter arising and whether written or oral, are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of demand or acceleration of the maturity of this Note or otherwise, shall the amount paid, or agreed to be paid, to Lender for the use, forbearance or retention of the money loaned under this Note ("**Interest**") exceed the maximum amount permissible under applicable law.  If, from any circumstance whatsoever, performance or fulfillment of any provision hereof or of any agreement between Borrower and Lender shall, at the time performance or fulfillment of such provision shall be due, exceed the limit for Interest prescribed by law or otherwise transcend the limit of validity prescribed by applicable law, then ipso facto the obligation to be performed or fulfilled shall be reduced to such limit and if, from any circumstance whatsoever, Lender shall ever receive anything of value deemed Interest by applicable law in excess of the maximum lawful amount, an amount equal to any excessive Interest shall be applied to the reduction of the principal balance owing under this Note in the inverse order of its maturity (whether or not then due) or at the option of Lender be paid over to Borrower, and not to the payment of Interest.  All Interest (including any amounts or payments deemed to be Interest), contracted for, charged, taken, reserved,  paid or agreed to be paid to Lender shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of this Note, including

NY 00058777 v6

10

any extensions or renewals hereof, until payment in full of the principal balance of this Note so that the Interest thereof for such full period will not exceed the maximum amount permitted by applicable law.   This Section 2.03 will control all agreements between Borrower and Lender.

      2.04    <u>Use of Funds</u>.   Borrower hereby warrants, represents and covenants that no funds disbursed hereunder shall be used for personal, family or household purposes.

      2.05    <u>Unconditional Payment</u>.   Borrower is and shall be obligated to pay principal, interest and any and all other amounts which become payable hereunder or under the other Loan Documents absolutely and unconditionally and without any abatement, postponement, diminution or deduction and without any reduction for counterclaim or setoff.   In the event that at any time any payment received by Lender hereunder shall be deemed by a court of competent jurisdiction to have been a voidable preference or fraudulent conveyance under any bankruptcy, insolvency or other debtor relief law, then the obligation to make such payment shall survive any cancellation or satisfaction of this Note or return thereof to Borrower and shall not be discharged or satisfied with any prior payment thereof or cancellation of this Note, but shall remain a valid and binding obligation enforceable in accordance with the terms and provisions hereof, and such payment shall be immediately due and payable upon demand.

      2.06    <u>Further Assurances</u>.   Borrower shall execute and acknowledge (or cause to be executed and acknowledged) and deliver to Lender all reasonable documents, and take all reasonable actions, reasonably required by Lender from time to time to confirm the rights created under this Note and the other Loan Documents, to protect and further the validity, priority and enforceability of this Note and the other Loan Documents, to subject to the Loan Documents any property of Borrower intended by the terms of any one or more of the Loan Documents to be encumbered by the Loan Documents, or otherwise carry out the purposes of the Loan Documents and the transactions contemplated thereunder; <u>provided</u>, <u>however</u>, that no such further actions, assurances and confirmations shall increase, modify or change Borrower's obligations under this Note or under the other Loan Documents.

      2.07    <u>Litigation Provisions</u>.

          (a)    **BORROWER CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED OR HAVING JURISDICTION IN THE COUNTY IN WHICH THE PROPERTY IS LOCATED, IN WHICH ANY LEGAL PROCEEDING MAY BE COMMENCED OR PENDING RELATING IN ANY MANNER TO THIS NOTE, THE LOAN, OR ANY OF THE OTHER LOAN DOCUMENTS.**

          (b)    **BORROWER AGREES THAT PROCESS IN ANY LEGAL PROCEEDING RELATING TO THIS NOTE, THE LOAN OR ANY OF THE OTHER LOAN DOCUMENTS MAY BE SERVED ON BORROWER AT ANY LOCATION.**

          (c)    **BORROWER AGREES THAT ANY LEGAL PROCEEDING RELATING TO THIS NOTE, THE LOAN, OR ANY OF THE OTHER LOAN DOCUMENTS MAY BE BROUGHT AGAINST BORROWER IN ANY STATE OR FEDERAL COURT LOCATED OR HAVING JURISDICTION IN THE COUNTY IN**

NY 00058777 v6

**EXHIBIT A**
**Page 110**

WHICH THE PROPERTY IS LOCATED.  BORROWER WAIVES ANY OBJECTION TO VENUE IN ANY SUCH COURT AND WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE THE VENUE FROM ANY SUCH COURT.

(d)      BORROWER AGREES THAT IT WILL NOT COMMENCE ANY LEGAL PROCEEDING AGAINST LENDER RELATING IN ANY MANNER TO THIS NOTE, THE LOAN OR ANY OF THE OTHER LOAN DOCUMENTS IN ANY COURT OTHER THAN A STATE OR FEDERAL COURT LOCATED IN BOSTON, MASSACHUSETTS, OR IF A LEGAL PROCEEDING IS COMMENCED BY LENDER AGAINST BORROWER IN A COURT IN ANOTHER LOCATION, BY WAY OF A COUNTERCLAIM IN SUCH LEGAL PROCEEDING.

(e)      BORROWER HEREBY WAIVES TRIAL BY JURY IN ANY LEGAL PROCEEDING RELATING TO THIS NOTE, THE LOAN OR ANY OF THE OTHER LOAN DOCUMENTS.

2.08   <u>Governing Law; Miscellaneous</u>.   THIS NOTE SHALL BE INTERPRETED, CONSTRUED AND ENFORCED ACCORDING TO THE LAWS OF THE STATE IN WHICH THE PROPERTY IS LOCATED.  The terms and provisions hereof shall be binding upon and inure to the benefit of Borrower and Lender and their respective heirs, executors, legal representatives, successors, successors-in-title and assigns, whether by voluntary action of the parties or by operation of law.   As used herein, the terms "Borrower" and "Lender" shall be deemed to include their respective  successors, successors-in-title and assigns, whether by voluntary action of the parties or by operation of law.   Subject to the limitations set forth in Section 7.18 of the Loan Agreement, if Borrower consists of more than one person or entity, each shall be jointly and severally liable to perform the obligations of Borrower under this Note. All personal pronouns used herein, whether used in the masculine, feminine or neuter gender, shall include all other genders; the singular shall include the plural and vice versa.  Titles of articles and sections are for convenience only and in no way define, limit, amplify or describe the scope or intent of any provisions hereof.  Capitalized terms used in this Note and not otherwise defined herein shall have the meaning ascribed to them in the Loan Agreement, or in the other Loan Documents.  Time is of the essence with respect to all provisions of this Note, the Loan Agreement, the Security Instrument, and the other Loan Documents.  This Note and the other Loan Documents contain the entire agreements between the parties hereto relating to the subject matter hereof and thereof and all prior agreements relative hereto and thereto which are not contained herein or therein are terminated.   All notices, demands, requests or other communications to be sent by one party to the other hereunder or required by law shall be given and become effective as provided in the Loan Agreement. If any provision under this Note or the application thereof to any entity, person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Note and the application of the provisions hereof to other entities, persons or circumstances shall not be affected thereby and shall be enforced to the fullest extent permitted by law.

[Signature Page Follows]

NY 00058777 v6

**EXHIBIT A**
**Page 110**

**EXHIBIT A**
**Page 111**

IN WITNESS WHEREOF, Borrower, intending to be legally bound hereby, has duly executed this Note as of the day and year first written above.

<u>**BORROWER**</u>:

**POWAY PROPERTY LP**, a Delaware limited partnership

By:     Capexco US GP Inc., its general partner

By:
Name:   Trent, Claughton
Title:   President

<u>Address</u>:

14555 Symons Valley Road NW
Calgary, AB T3R 1E7
Canada
Attn: Mr. Denny Chow

[signature page to Poway Outpost Promissory Note]

**EXHIBIT A**
**Page 111**

# EXHIBIT 3

RECORDING REQUESTED BY
STEWART TITLE GUARANTY COMPANY

2000480869

This instrument was prepared with the assistance of an attorney licensed in the State of California, and after recording should be returned to:

Federman Steifman LLP
220 East 42nd Street, 29th Floor
New York, New York 10017
Attention: John Nastasi, Esq.

DOC# 2020-0649142

Oct 22, 2020  04:14 PM
OFFICIAL RECORDS
Ernest J. Dronenburg, Jr.,
SAN DIEGO COUNTY RECORDER
FEES: $365.00  (SB2 Atkins: $225.00)
PCOR: N/A
PAGES: 28

ORIGINAL

SPACE ABOVE THIS LINE FOR RECORDER'S USE.

**POWAY PROPERTY LP**, as Borrower

to

**STEWART TITLE GUARANTY COMPANY**, as Trustee

for the benefit of

**UC FUNDING, LLC**, as Lender

**DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING**

**THIS DOCUMENT IS ALSO A FIXTURE FILING IN ACCORDANCE WITH SECTION 9502(b) OF THE CALIFORNIA COMMERCIAL CODE**

UNRECORDED LEASE

| | |
|---|---|
| Dated: | As of October 22, 2020 |
| Location: | 13247 Poway Road<br>Poway, California |
| County: | San Diego |

Poway Outpost
Loan Number: 62041

NY 00058811 v1

**EXHIBIT A**
**Page 114**

RECORDING REQUESTED BY
STEWART TITLE GUARANTY COMPANY

2000080869

| |
|---|
| This instrument was prepared with the assistance of an attorney licensed in the State of California, and after recording should be returned to: |
| |
| Federman Steifman LLP |
| 220 East 42nd Street, 29th Floor |
| New York, New York 10017 |
| Attention: John Nastasi, Esq. |

SPACE ABOVE THIS LINE FOR RECORDER'S USE.

**POWAY PROPERTY LP**, as Borrower

to

**STEWART TITLE GUARANTY COMPANY**, as Trustee

for the benefit of

**UC FUNDING, LLC**, as Lender

**DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS,
SECURITY AGREEMENT AND FIXTURE FILING**

**THIS DOCUMENT IS ALSO A FIXTURE FILING
IN ACCORDANCE WITH SECTION 9502(b)
OF THE CALIFORNIA COMMERCIAL CODE**

*UNRECORDED LEASE*

| | |
|---|---|
| Dated: | As of October 22, 2020 |
| Location: | 13247 Poway Road |
| | Poway, California |
| County: | San Diego |

Poway Outpost
Loan Number: 62041

NY 00058811 v1

**EXHIBIT A**
**Page 114**

<u>DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING</u>

THIS **DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS, SECURITY AGREEMENT AND FIXTURE FILING** (this "<u>**Security Instrument**</u>") is made as of October 22, 2020, from **POWAY PROPERTY LP**, a Delaware limited partnership authorized to transact business in the State of California, having an address of 13772 Paseo Valle Alto, Poway, California 92064("<u>**Borrower**</u>"), as grantor, to **STEWART TITLE GUARANTY COMPANY**, a Texas corporation having an address of 7676 Hazard Center Drive, Suite 1400, San Diego, California 92108 ("<u>**Trustee**</u>"), as trustee, for the benefit of **UC FUNDING, LLC**, a Delaware limited liability company having an address c/o UC Credit Services LLC, 745 Boylston Street, Suite 502, Boston, Massachusetts 02116, Attention: Loan Servicing (together with its successors and assigns, "<u>**Lender**</u>"), as beneficiary.

BORROWER, FOR AND IN CONSIDERATION OF THE SUM OF TEN AND NO/100 DOLLARS ($10.00), AND OTHER VALUABLE CONSIDERATION, INCLUDING THE INDEBTEDNESS HEREIN RECITED, THE RECEIPT AND SUFFICIENCY OF WHICH ARE HEREBY ACKNOWLEDGED, HEREBY IRREVOCABLY AND UNCONDITIONALLY GRANTS, BARGAINS, SELLS, MORTGAGES, CONVEYS, TRANSFERS, PLEDGES, SETS OVER, ASSIGNS, AND CONFIRMS, AND GRANTS A SECURITY INTEREST, TO AND IN FAVOR OF TRUSTEE, ITS SUCCESSORS AND ASSIGNS, IN TRUST WITH POWER OF SALE AND RIGHT OF ENTRY, all of Borrower's estate, right, title and interest in, to and under any and all of the following described property, whether now owned or hereafter acquired (collectively, the "<u>**Property**</u>"):

(A)     All that certain real property situated in the City of Poway, County of San Diego, more particularly described on <u>Exhibit A</u> attached hereto and incorporated herein by this reference (the "<u>**Real Estate**</u>"), together with all of the easements, rights, privileges, franchises, tenements, hereditaments and appurtenances now or hereafter thereunto belonging or in any way appertaining thereto, and all of the estate, right, title, interest, claim and demand whatsoever of Borrower therein or thereto, either at law or in equity, in possession or in expectancy, now owned or hereafter acquired;

(B)     All structures, buildings and improvements of every kind and description now or at any time hereafter located or placed on the Real Estate (the "<u>**Improvements**</u>");

(C)     All easements, rights-of-way, strips and gores of land, vaults, streets, ways, alleys, passages, sewer rights, air rights and development rights and other emblements now or hereafter located on the Real Estate or under or above the same or any part or parcel thereof, all rights to oil, gas, minerals, coal and other substances of any kind or character, and all estates, rights, titles, interests, privileges, liberties, tenements, hereditaments and appurtenances, reversions and remainders whatsoever, in any way belonging, relating or appertaining to the Property or any part thereof, or which hereafter shall in any way belong, relate or be appurtenant thereto, whether now owned or hereafter acquired by Borrower;

NY 00058811 v1

2

(D)     All furniture, furnishings, fixtures, goods, equipment, inventory or personal property owned by Borrower and now or hereafter located on, attached to or used in or about the Improvements; including, but not limited to, all machines, engines, boilers, dynamos, elevators, stokers, tanks, cabinets, awnings, screens, shades, blinds, carpets, draperies, lawn mowers, and all appliances, plumbing, heating, air conditioning, lighting, ventilating, refrigerating, disposal and incinerating equipment, and all fixtures and appurtenances thereto, and such other goods and chattels and personal property owned by Borrower as are now or hereafter used or furnished in operating the Improvements, or the activities conducted therein, and all building materials and equipment hereafter situated on or about the Real Estate or the Improvements, and all warranties and guaranties relating thereto, and all additions thereto and substitutions and replacements therefor (exclusive of any of the foregoing owned or leased by tenants of space in the Improvements);

(E)     All water, water courses, ditches, wells, reservoirs and drains and all water, ditch, well, reservoir and drainage rights and powers which are appurtenant to, located on, under or above or used in connection with the Real Estate or the Improvements, or any part thereof, together (i) with all utilities, utility lines, utility commitments, utility capacity, capital recovery charges, impact fees and other fees paid in connection with the same, (ii) reimbursements or other rights pertaining to utility or utility services provided to the Real Estate and/or the Improvements, and (iii) the present or future use or availability of waste water capacity or other utility facilities to the extent same pertain to or benefit the Real Estate and/or the Improvements; including, without limitation, all reservations of or commitments or letters covering any such use in the future, whether now existing or hereafter created or acquired;

(F)     All minerals, crops, timber, trees, shrubs, flowers and landscaping features now or hereafter located on, under or above the Real Estate;

(G)     All cash funds, deposit accounts and other rights and evidence of rights to cash, now or hereafter created or held by Lender pursuant to this Security Instrument, the Loan Agreement or any other of the Loan Documents, as hereinafter defined; including, without limitation, all funds now or hereafter on deposit in the Reserves held by Lender pursuant to the terms of the Loan Agreement;

(H)     All leases, licenses, rental agreements and occupancy agreements of whatever form now or hereafter affecting all or any part of the Real Estate and/or the Improvements and any and all guaranties, extensions, renewals, replacements and modifications thereof (collectively, the "**Leases**");

(I)     All rents, royalties, issues, profits, revenue, income and other benefits of the Real Estate, the Improvements, or the fixtures or equipment now or hereafter arising from the use or enjoyment of all or any portion thereof or from any present or future Leases, and all cash or securities deposited to secure performance by the Tenants of their obligations under any of the Leases, whether said cash or securities are to be held until the expiration of the terms of said Leases or applied to one or more of the installments of rent coming due prior to the expiration of said terms (collectively, the "**Rents**");

NY 00058811 v1

3

(J)    All contracts and agreements now or hereafter entered into covering any part of the Real Estate or the Improvements (collectively, the "**Contracts**") and all revenue, income and other benefits thereof; including, without limitation, management agreements, service contracts, maintenance contracts, equipment leases, personal property leases and any contracts or documents relating to construction on any part of the Property (including plans, specifications, studies, drawings, surveys, tests, operating and other reports, bonds and governmental approvals) or to the management or operation of any part of the Real Estate or the Improvements;

(K)    All present and future monetary deposits given to any public or private utility with respect to utility services furnished to any part of the Real Estate or the Improvements;

(L)    All present and future funds, accounts, instruments, accounts receivable, documents, causes of action, claims, general intangibles (including, without limitation, trademarks, trade names, servicemarks and symbols now or hereafter used in connection with any part of the Real Estate or the Improvements, all names by which the Real Estate or the Improvements may be operated or known, all rights to carry on business under such names, and all rights, interest and privileges which Borrower has or may have as developer or declarant under any covenants, restrictions or declarations now or hereafter relating to the Real Estate or the Improvements) and all notes or chattel paper now or hereafter arising from or by virtue of any transactions related to the Real Estate or the Improvements (collectively, the "**General Intangibles**");

(M)    All water taps, sewer taps, certificates of occupancy, permits, special permits, uses, licenses, franchises, certificates, consents, approvals and other rights and privileges now or hereafter obtained in connection with the Real Estate or the Improvements and all present and future warranties and guaranties relating to the Improvements or to any equipment, fixtures, furniture, furnishings, personal property or components of any of the foregoing now or hereafter located or installed on the Real Estate or the Improvements;

(N)    All building materials, supplies and equipment now or hereafter placed on the Real Estate or in the Improvements and all architectural renderings, models, drawings, plans, specifications, studies and data now or hereafter relating to the Real Estate or the Improvements;

(O)    All right, title and interest of Borrower in any insurance policies or binders now or hereafter relating to the Property, including any unearned premiums thereon;

(P)    All proceeds, products, substitutions and accessions (including claims and demands therefor) of the conversion, voluntary or involuntary, of any of the foregoing into cash or liquidated claims; including, without limitation, proceeds of insurance and condemnation awards and all refunds, rebates or credits in connection with a reduction or overpayment of taxes;

(Q)    All interest rate cap agreements, swaps or other interest hedging agreements now or hereafter executed with respect to the Loan, as hereinafter defined, or to guard against interest rate exposure in connection with the Loan; and

(R)    All other or greater rights and interests of every nature in the Real Estate or the Improvements and in the possession or use thereof and income therefrom, whether now owned or hereafter acquired by Borrower.

NY 00058811 v1

4

SAID PROPERTY IS CONVEYED IN TRUST FOR THE PURPOSE OF SECURING:

(1)     A loan from Lender to Borrower in the original principal amount of TWENTY-FIVE MILLION AND NO/100 DOLLARS ($25,000,000.00) (the "**Loan**"), which is evidenced by (a) a Loan Agreement of even date herewith between Borrower and Lender (the "**Loan Agreement**"), and (b) a Promissory Note of even date herewith executed by Borrower and payable to the order of Lender in the original principal amount of the Loan (the "**Note**") with a maturity date of January 1, 2022, as may be extended pursuant to the Note;

(2)     The truth, accuracy and completeness of all representations and warranties, and the performance of all covenants and obligations of Borrower set forth in the Loan Agreement;

(3)     The full and prompt payment and performance of all of the provisions, agreements, covenants and obligations herein contained and contained in any other agreements, documents or instruments now or hereafter evidencing, securing or otherwise relating to the indebtedness evidenced by the Note (the Note, the Loan Agreement, this Security Instrument, and such other agreements, documents and instruments, together with any and all renewals, modifications, amendments, restatements, consolidations, substitutions, replacements, and extensions and modifications thereof, are hereinafter collectively referred to as the "**Loan Documents**") and the payment of all other sums therein covenanted to be paid; including, without limitation, all interest, fees, and any applicable yield maintenance premiums or prepayment fees;

(4)     Any and all future or additional advances (whether or not obligatory) made by Lender to protect or preserve the Property, or the lien or security interest created hereby on the Property, or for taxes, assessments or insurance premiums as hereinafter provided or for performance of any of Borrower's obligations hereunder or under the other Loan Documents or for any other purpose provided herein or in the other Loan Documents (whether or not the original Borrower remains the owner of the Property at the time of such advances), together with interest thereon at the Default Interest Rate (as defined in the Note); and

(5)     Any and all other indebtedness now owing or which may hereafter be owing by Borrower to Lender, however and whenever incurred or evidenced, whether express or implied, direct or indirect, absolute or contingent, or due or to become due, and all renewals, modifications, amendments, restatements, consolidations, substitutions, replacements and extensions thereof.

(All of the sums referred to in Paragraphs (1) through (5) above are herein sometimes referred to as the "**Indebtedness**").

Capitalized terms used in this Security Instrument and not specifically defined herein shall have the meanings provided in the Note and/or the Loan Agreement.

PROVIDED, HOWEVER, that if the principal and interest and all other sums due or to become due under the Note (including Minimum Interest and the Exit Fee); including, without limitation, any prepayment fees required pursuant to the terms of the Note, shall have been paid at the time and in the manner stipulated therein and all other sums payable hereunder and all other Indebtedness shall have been paid and all other covenants contained in the Loan

NY 00058811 v1

Documents shall have been performed, then, in such case, this Security Instrument shall be satisfied and the estate, right, title and interest of Trustee and Lender in the Property shall cease, and upon payment to Lender of all costs and expenses incurred for the preparation of the release hereinafter referenced and all recording costs if allowed by law, Lender shall direct Trustee to release this Security Instrument and the lien hereof by proper instrument in accordance with Section 4.02 hereof and shall deliver the Note to Trustee. Borrower shall pay Trustee's reasonable costs incurred in releasing the Security Instrument.

## ARTICLE 1
## BORROWER COVENANTS

1.01    <u>Warranty of Title</u>.  Borrower has good, marketable and indefeasible fee simple title to the Property, subject only to those matters expressly set forth on Schedule B of the title insurance policy obtained by Lender insuring the lien of this Security Instrument (the "**Permitted Exceptions**"), and has full power and lawful authority to grant, bargain, sell, convey, assign, transfer and encumber its interest in the Property in the manner and form hereby done or intended.  None of the Permitted Exceptions materially interfere with the security intended to be provided by this Security Instrument, the proposed use of the Property or the ability of the Property to generate income sufficient to service the Loan.  Borrower will preserve its interest in and title to the Property and will forever warrant and defend the same to Lender against any and all claims whatsoever and will forever warrant and defend the validity and priority of the lien and security interest created herein against the claims of all persons and parties whomsoever, subject to the Permitted Exceptions.  The foregoing warranty of title shall survive the foreclosure, exercise of any power of sale or other enforcement of this Security Instrument and shall inure to the benefit of and be enforceable by Lender in the event Lender acquires title to the Property pursuant to any foreclosure, exercise of any power of sale or otherwise.

1.02    <u>Defense of Title</u>.  If, while this Security Instrument is in force, the title to the Property or the interest of Lender therein shall be the subject, directly or indirectly, of any action at law or in equity, or be attached directly or indirectly, or endangered, clouded or adversely affected in any manner, Borrower, at Borrower's expense, shall take all necessary and proper steps for the defense of said title or interest, including the employment of counsel reasonably approved by Lender, the prosecution or defense of litigation, and the compromise or discharge of claims made against said title or interest.

1.03    <u>Performance of Obligations</u>.  Borrower shall pay when due the principal of and the interest on the Indebtedness, including all charges, fees and other sums required to be paid by Borrower as provided in the Loan Documents, and shall observe, perform and discharge all obligations, and conditions, and comply with all prohibitions, covenants and agreements to be observed, performed or discharged by Borrower set forth in the Loan Documents in accordance with their terms.  In the event that Lender determines that Borrower is not adequately performing any of its obligations under this Security Instrument or under any of the other Loan Documents, Lender may, without limiting or waiving any other rights or remedies of Lender hereunder, take such steps with respect thereto as Lender shall deem necessary or proper, and any and all costs and expenses reasonably incurred by Lender in connection therewith, together with interest thereon at the Default Interest Rate, from the date incurred by Lender until actually paid by

NY 00058811 v1

6

Borrower, shall be immediately paid by Borrower on demand and shall be secured by this Security Instrument and by all of the other Loan Documents securing all or any part of the Indebtedness.

     1.04    <u>Insurance</u>.

          (a)    Borrower shall, at Borrower's expense, maintain in force and effect on the Property at all times while this Security Instrument continues in effect all insurance with respect to Borrower and the Property as is required in Section 2.02 of the Loan Agreement.

          (b)    In the event Borrower fails to provide, maintain, keep in force or deliver and furnish to Lender the policies of insurance required by the Loan Agreement or evidence of their renewal as required therein, Lender may, but shall not be obligated to, procure such insurance, in accordance with the terms of Section 2.02 of the Loan Agreement. Any amounts so advanced by Lender, together with interest thereon, shall be secured by this Security Instrument and by all of the other Loan Documents securing all or any part of the Indebtedness.

     1.05    <u>Payment of Taxes, Mechanics Liens and Other Lienable Charges</u>. Borrower shall pay all taxes, assessments, mechanic's liens and other charges assessed or imposed upon the Property as and when required by Sections 2.03, 2.08 and 2.11 of the Loan Agreement. If, in accordance with the terms of the Loan Agreement, Lender advances any sums by reason of Borrower's failure to pay or discharge any lienable charge, such sums, together with interest thereon, shall be secured by this Security Instrument and by all of the other Loan Documents securing all or any part of the Indebtedness.

     1.06    <u>Casualty and Condemnation</u>. Borrower shall comply with all obligations set forth in Section 2.07 of the Loan Agreement in the event the Property is damaged by a casualty or becomes subject to any condemnation or other taking. All proceeds or awards recovered by, or payable to, Borrower by reason of such event shall be paid and administered in accordance with the terms of the Loan Agreement.

     1.07    <u>Leases</u>. Borrower shall not enter into any Leases or take any action with respect to the same unless such action is in accordance with the terms of Section 2.09 of the Loan Agreement.

     1.08    <u>Alienation and Further Encumbrances</u>. Borrower shall not cause or permit any transfer of the Property or any transfer or pledge of ownership interests in Borrower or any individual or entity holding interests in Borrower, except in accordance with the terms of Section 2.10 of the Loan Agreement.

     1.09    <u>Payment of Costs; Advances to Protect Property</u>.

          (a)    Borrower shall pay all reasonable costs and expenses of every character incurred in connection with the closing of the Loan or otherwise attributable or chargeable to Borrower as the owner of the Property; including, without limitation, appraisal fees, recording fees, documentary, stamp, mortgage or intangible taxes, brokerage fees and commissions, title policy premiums and title search fees, uniform commercial code/tax lien/litigation search fees, escrow fees and reasonable attorneys' fees.

NY 00058811 v1

7